UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
HAMMOND DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| v. | ) | Cause No. 2:19-cr-159 PPS/JEM |
| | ) | |
| SAMANTHA ELHASSANI | ) | |

**GOVERNMENT'S SENTENCING MEMORANDUM**

Defendant Samantha Elhassani dragged her seven-year-old son halfway across the world to smuggle funds that she knew was going to help ISIS, a violent terrorist organization responsible for killing and enslaving thousands of innocent people. She was a key member of a conspiracy that resulted in her two minor children living in war-torn Syria for nearly two years while her husband and brother-in-law fought under the ISIS flag. She lied to family and friends to get there, and continues to tell a version of facts that does not add up.

Elhassani is scheduled to be sentenced by this Court on August 27, 2020, after pleading guilty to one count of Financing Terrorism, in violation of 18 U.S.C. § 2339C(c)(2)(A). For the reasons discussed in this memorandum, the government recommends Elhassani receive a Guideline ten year sentence for her crimes.

**Presentence Investigation Report**

The government has no objections to the final PSR. Its response to the draft PSR pointed out Elhassani's inconsistent statements regarding her family and personal history. Those points relate to her history and characteristics under 18

1

U.S.C. § 3553(a), but do not require any changes to the PSR.

The bulk of Defendant's objections to the PSR concern Probation's summary of the offense conduct, which are not really fact disputes but instead arguments about how the undisputed facts should be perceived. Since those "objections" have no impact on the Sentencing Guidelines, they need not be formally resolved by the Court. *See United States v. Vitrano*, 495 F.3d 387, 391 (7th Cir. 2007) (explaining "Rule 32 imposes no affirmative duty on the district court" to address arguments about whether facts should be considered at sentencing).

The government has addressed Defendant's "objections" in great detail as reflected in the PSR Addendum [DE 19, pp. 13-41],[1] but one particular objection merits separate discussion. Elhassani's objection to Paragraph 9 of the PSR raises a concern about her acceptance of responsibility. As illustrated in the chart below, the PSR mirrors facts that Elhassani admitted in the Plea Agreement and during her change of plea colloquy; but her objection to the PSR flatly contradicts those sworn statements:

---

[1] The parties' objections and responses to the PSR contain numerous references to discovery materials. The government will make all of the documents cited in its objections and responses to the PSR available at the sentencing hearing should the Court wish to review them. Some of those documents are attached to this memorandum including Elhassani's handwritten diary, which she penned while living in a Kurdish-controlled camp sometime after she fled ISIS territory in November 2017 and had been interviewed by FBI agents. Elhassani titled this diary "The Truth." *See* Exhibit 1. While the diary is not entirely "truthful" (much of it is contradicted by her guilty plea), it reveals how Elhassani planned to sell her story to the public—and possibly a jury—before she was charged.

2

| PSR | Plea Agreement | Objection to PSR |
|---|---|---|
| "In late November … Moussa informed the defendant that he and his brother Abdelhadi wanted to travel to Syria to join ISIS and live in the Caliphate." DE 18, PSR ¶ 9 | "In November 2014, I was informed by my husband, … that he and his brother … wanted to travel to Syria to live in the Caliphate and join ISIS," DE 2, ¶ 8 | "[I]n late November 2014 … Moussa did not tell [Elhassani] that he wanted to 'travel to Syria to join ISIS.'"<br><br>"Moussa did not tell Samantha that he wanted to join ISIS." DE 19, p. 25 |

Further, in the Plea Agreement, Elhassani admitted that "Between November 2014 and April 2015, I helped Individuals A and B join ISIS, by making three trips abroad to Hong Kong," and "I performed these acts knowingly and willingly and with the knowledge that ISIS was a foreign organization involved in terrorist activities." DE 2, Plea Agreement ¶8.

Soon after swearing to these facts, Elhassani wavered on her criminal culpability during conversations with journalist Joshua Baker. Among other things, Elhassani told Baker she was not sure the money she smuggled to Hong Kong would be used to support ISIS until after they departed Hong Kong for Turkey. *See* Exhibits 2-1 & 2-2, video clips (Dec. 4, 2019).[2] Now, Elhassani claims that she innocently believed Moussa just wanted to move to a Muslim country, and that she "would come to understand that one could live in the Caliphate in Syria without being part of or fighting for ISIS." DE 19, p. 25.

---

[2] The government has submitted to chambers a disk containing clips of audio and video interviews given by Elhassani to journalists while in custody, as referenced in this memorandum. The full unedited recordings have been tendered to defense counsel and will be made available at the sentencing hearing.

3

But the fact that Elhassani smuggled and concealed funds that she knew *at the time she performed these acts* would be used to benefit a foreign terrorist organization is essential to the factual basis of her guilty plea. *See* DE 2 ¶ 8(c) ("At the time I transported the funds and gold . . . I knew . . . that [Moussa and Abdelhadi] intended to use those resources to support ISIS."). Elhassani's retreat from her plea admissions should deprive her of acceptance of responsibility credit, and at a minimum be viewed as an aggravating factor at sentencing.

With respect to the Guidelines, Defendant objects to two of the sentencing enhancements recommended by Probation: (a) the two-level enhancement in U.S.S.G. § 2M5.3(b)(1) for providing "funds or other material support or resources with the intent, knowledge, or reason to believe they are to be used to commit or assist in the commission of a violent act"; and (b) the two-level enhancement that Defendant "used or attempted to use a person of less than eighteen years of age to commit the offense or assist in avoiding detection of, or apprehension for, the offense." U.S.S.G. § 3B1.4. The government's response to these objections is fully explained in the addendum to the PSR. DE 19, pp. 43-46. Whether or not the Court adopts these enhancements, Elhassani's Guidelines range is ten years.

4

## Sentencing Recommendation

The government recommends that Defendant be sentenced to ten years in prison, consistent with the Sentencing Guidelines and the following factors under 18 U.S.C. § 3553(a).

**1. Nature and Circumstances of the Offense**

   A. <u>Elhassani was critical to helping Moussa and Abdelhadi join ISIS.</u>

However she might minimize her role in supporting ISIS, the facts show Elhassani was an essential member of the conspiracy to help Moussa and Abdelhadi join and fight for ISIS. To put her actions in historical context, Elhassani began supporting her husband's plans to join ISIS in late November 2014. By then, ISIS had been designated by the United States as a foreign terrorist organization and had become a household name, in large part due to the beheadings of journalist James Foley and other Westerners by ISIS member "Jihadi John" that went viral on the internet in the summer of 2014. Elhassani explained to journalist Shane Bauer that she knew about these beheadings when Moussa introduced the idea of joining ISIS. Exhibit 3, audio clip (Aug. 8, 2019).

So she knew exactly what she was getting into when, on Thanksgiving weekend 2014, Moussa said he wanted to join ISIS. That same weekend, he booked a trip for Elhassani to travel to Morocco, ostensibly to visit his family. However, the trip included a stopover in Istanbul, Turkey, which is 2,000 miles outside the flight path from Chicago to Morocco and was a central point for Westerners traveling to ISIS territory. . *See, e.g.,* Tim Arango and Eric Schmitt, *A Path to ISIS, Through a*

5

*Pourous Turkish Border*, NY Times (March 9, 2015), *available at* https://www.nytimes.com/2015/03/10/world/europe/despite-crackdown-path-to-join-isis-often-winds-through-porous-turkish-border.html. Soon after Moussa booked the trip, Elhassani communicated with an individual in Istanbul and sought his help to leave the airport and visit a bank during her layover.

At that time, Moussa and Abdelhadi were living in the United States illegally and therefore could not freely travel in and out of the country. Elhassani, on the other hand, was a U.S. citizen with a valid passport who could easily travel across international borders. Elhassani planned to take her seven-year-old son and two-year-old daughter, referred here as Minor Child 1 and Minor Child 2. However, she needed written permission from J.S.[3]—Minor Child 1's father—to take her son abroad. So, within weeks of deciding to help Moussa join ISIS, Elhassani met J.S. in Chicago and persuaded J.S. to grant this permission by lying that she needed the passport for a family trip to Paris, France.

While they were in Morocco—and soon after the infamous Charlie Hebdo terrorist attack in Paris—J.S. sent Defendant an exasperated and worried message that he could not reach her and commented she was in a "country that was just attacked by terrorist [sic] last week." Exhibit 4. Elhassani joked in response, "Haha that was me :) lol"; however, she did not disclose that she was actually in Morocco and never went to Paris. *Id.*

---

[3] Minor Child 1's father plans to testify at the sentencing hearing. He has requested that his full name not be used because it would reveal the identity of his son.

On February 17, 2015, just weeks after returning from Morocco, Elhassani took Minor Child 1 with her to Hong Kong. Elhassani and her husband had already begun drawing down the savings in their bank accounts and she took cash and gold bought with those savings to Hong Kong. She found a storage facility and left the money there. Unlike Turkey, Hong Kong was not a common staging point for Westerners to travel through en route to joining ISIS and thus less likely to arouse suspicion.

On March 16, 2015, a few weeks after they returned from their first Hong Kong trip, Elhassani took Minor Child 1 on a one-day, round-trip visit to Hong Kong to deposit more of the couple's savings. With the money safely abroad in an inconspicuous location, Abeldhadi and Moussa would be able to leave the United States without carrying large sums of money and precious metals.

By this point, Elhassani was selling her firearms and was aware that her vehicles and other personal belongings were being sold online. However, the Elhassani family travel plans were done in secret. In the months leading up their final departure, Elhassani told coworkers, including close friend Cassie Daniels, that she and her family were taking an extended vacation to Morocco. On March 19, 2015, she lied to FBI agents with whom she previously worked as a confidential human source[4] that she was traveling to Morocco for three months for knee surgery to be performed by her father-in-law (who was actually an engineer) and had not yet made

---

[4] The March 19, 2015 meeting was Elhassani's first meeting with the FBI since she began helping Moussa join ISIS in November 2014.

7

travel plans. In fact, her final trip to Hong Kong was booked almost two weeks before her meeting with the FBI.

Elhassani departed for Hong Kong with her entire family on March 22, 2015. While there, Elhassani's Rocketmail, eBay and Paypal accounts show she helped Moussa acquire tactical gear, including rifle scopes and image-stabilized binoculars. Though Elhassani contends a selected review of the IP addresses demonstrate she could not have used those accounts to purchase these items and communicate with sellers, she has recently bragged to journalist Joshua Baker that she knew how to manipulate IP addresses, claiming that she learned this while working with the Federal Government. *See* Exhibit 5, video clip (July 25, 2020). Putting aside whether Elhassani personally purchased these items or communicated with sellers, it is clear that she picked these items up knowing that they were for the benefit of ISIS.

Elhassani and her family left Hong Kong for Turkey on April 7, 2015. Days before, she scrambled to find a hair salon in Hong Kong to change her appearance "on short notice." Exhibit 6. When Elhassani arrived in Turkey, she continued to deceive her family and friends about her travel. Despite telling others that she was planning to be in Morocco for three months for knee surgery, she told friend Cassie Daniels via Facebook messenger that she was on her way to Morocco "for two weeks" to straighten out Moussa's immigration paperwork "and then will be back." Exhibit 7. A few days later, Elhassani told Abdelhadi's wife Linda Abdallah that she was in Oklahoma "helping clean up after the storms." *Id*. While still in Turkey, Elhassani later told

8

Daniels, "We are relaxing and having a good time. We got a hotel so we aren't smothered by [Elhassani's in-laws] all the time. Plus, Moussa is here so we can kinda venture out a bit." *Id*. Then, as the Court knows, Elhassani took her two minor children across the border to Syria.

Regardless of what happened after that point, Elhassani is responsible for advancing a conspiracy that resulted in her two minor children living in war-torn Syria, her husband becoming a sniper for ISIS, and her brother-in-law likewise joining the terrorist organization. Elhassani was not a passive bystander in Moussa's and Abdelhadi's plans to join ISIS. She was a key contributor, who went to extreme measures to ensure the success of their mission. She knew what she was doing and why she was doing it and should be punished accordingly for her role.

    B.    <u>Elhassani planned and intended to move to Syria.</u>

The above facts disprove Elhassani's repeated claims that she did not intend to move to the ISIS Caliphate. Early on, Elhassani told the media and others that she and her family were vacationing in Turkey near the Syrian border and that her husband Moussa tricked her at the last minute by arranging for a driver to take them into ISIS territory. *See* Nick Walsh & Salma Abdelaziz, *Beaten, Tortured, Sexually Abused: An American ISIS Widow Looks for a Way Home*, CNN (Apr. 10, 2018) https://www.cnn.com/2018/04/19/middleeast/syria-us-isis-bride-intl/index.html; Shane Bauer, *Behind the Lines: An American in the Islamic State*, Mother Jones (July/Aug. 2019), https://www.motherjones.com/politics/2019/06/behind-the-lines-

9

syria-part-two. When she was first brought back to the United States to face charges, she told FBI agents that she and her husband were traveling to Morocco to buy a beach home where they would spend six months each year. Exhibit 8, video clip (July 24, 2018). More recently, Elhassani has claimed that she believed her husband had changed his mind about Syria and that they were moving to Morocco to live with his parents. *See* DE 19, p. 25.

None of these stories make logical sense based on the facts of this case. They do not take into account that Elhassani and Moussa were draining their bank accounts while she was smuggling tens of thousands of dollars in gold and precious metals from the United States to Hong Kong to be used for the benefit of ISIS. Financial records show they bought roughly $97,000 in gold and precious metals from November 2014 through the time they crossed into Syria. Elhassani was also busy selling her guns, cars, and personal items. Elhassani cannot credibly claim that she was liquidating all of her savings and assets for a vacation or knee surgery in Morocco. And there is no plausible reason for anyone vacationing or moving to Morocco to convert their spending money to gold and spend thousands of dollars in flights to transport that gold to a storage unit in Hong Kong. Finally, before she stepped foot in Turkey, Moussa copied her on an email to his sister Zahra relating to the sale of their house. Exhibit 10. Her stories that she was vacationing or getting surgery in Morocco do not explain why her sister-in-law was selling her home.

Moreover, while she was in Morocco in January 2015 purportedly looking at

10

beach houses, Elhassani frequently communicated with Moussa and other friends via email and Facebook Messenger and sent numerous family and tourism pictures documenting their visit. The search warrant returns for her accounts contained no discussion or pictures of any of the neighborhoods or homes they purportedly visited. After she returned from Morocco, there was no discussion between Moussa, Elhassani and Moussa's parents about moving or even traveling to Morocco in April 2015. Elhassani and Moussa frequently communicated with Moussa's parents; the lack of any discussion about moving or even traveling to Morocco in April 2015 indicates there were no such plans.

Elhassani also pulled Minor Child 1 from school months before her purported plans to move to Morocco. There is no evidence that Elhassani spent any time or resources homeschooling Minor Child 1. Instead, she took him to shooting ranges, bragged about his shooting ability and talked about drafting a will. In isolation, these events might not reflect nefarious intent. But given the timing, context and circumstances—including the fact Elhassani was actively transporting and concealing funds for her husband's plans to join a foreign terrorist organization—it becomes clear Elhassani was preparing for a move to a war zone, not with her in-laws.

Finally, if Elhassani believed she was moving to Morocco, why lie to everyone about it? There is nothing illegal or suspicious about moving to Morocco. There was no reason to tell some people she was taking a short vacation, and others she was

11

getting knee surgery. There was no reason to lie to the FBI and say she had traveled to Hong Kong to start a henna business if she believed her trips were part of a legitimate move to Morocco. If she believed she was going to Morocco, there was no reason for her to scramble to change her physical appearance "on short notice" before leaving for Turkey. Elhassani's counter-surveillance activities all point to the commonsense conclusion that Elhassani knew she was moving to the ISIS Caliphate, and that she intended and planned for her family to move there.

C.     Elhassani has nobody to blame but herself for her criminal actions.

We may never know Elhassani's true motivations for helping her husband and brother-in-law join ISIS. There is no evidence that Elhassani supported ISIS's violent or terrorist agenda or that she wanted to harm the United States.[5] Only Elhassani knows whether she did what she did because of her devotion to her husband, a warped sense of adventure, or because she actually believed in ISIS's false propaganda about its so-called Caliphate.

Whatever her motivations, they were not innocent or naive. As explained above, Elhassani knew ISIS was a violent terrorist organization that killed innocent people when she willingly agreed to help her husband and brother-in-law join and

---

[5] The government does not concede that the lack of evidence documenting Elhassani's ideology or views on ISIS prior to moving to Syria means she did not harbor those views. There is similarly little or no documentation of Moussa's support of ISIS's ideology or the Caliphate before they moved to Syria. Yet there is no dispute that Moussa wanted to join and eventually became a fighter for ISIS. The only member of the conspiracy who openly discussed his support for ISIS before traveling to Syria was Abdelhadi.

fight for ISIS. She will undoubtedly point the finger at her deceased husband and missing brother-in-law as much as possible. But passing blame has its limits. Elhassani's involvement in this story was not an isolated moment of poor judgment. She actively advanced this conspiracy over a span of several months and had many opportunities to withdraw from the plans, report her husband to law enforcement, or put her foot down and just stop. She had numerous places to turn: friends, coworkers, family and even FBI agents with whom she had developed a working relationship as a source. Instead, at every opportunity she chose to forge ahead.

The consequences of those decisions will have a lasting impact on innocent people, most significantly her children. It is one thing to follow your husband to a war zone for misguided reasons. It is another to voluntarily uproot your family and subject your young children to years of severe trauma living among terrorists.

**2.    Defendant's History and Characteristics**

In its response to the draft PSR, the government identified notable inconsistencies between what Elhassani told Probation and other people about her background and upbringing. The government is not in a position to know the truth about Elhassani's background, mental health and relationship issues. And Elhassani is entitled to tell her personal story. But the Court is also entitled to know the different stories Elhassani has told.[6] With respect to events in Syria, Elhassani and

---

[6] In her December 16, 2019 interview with Probation, Elhassani reported she was sexually abused as a child. The timing of this statement is surprising because she emphatically denied suffering any such abuse months earlier in communications with a journalist. Exhibit 9. When messaging a friend, Elhassani mocked her sister Lori

13

her children undoubtedly suffered grave personal consequences as a result of her decision to move to a war zone. But whatever happened there, Elhassani's long history of self-serving lies and manipulation make it impossible to completely trust her account without independent verification.

Elhassani has been described by friends and family as strong-willed, independent, impulsive, deceptive and manipulative. Put differently, she is no wallflower or pushover. Before she moved to Syria, she helped manage her brother-in-law's shipping business and was knowledgeable about international shipping customs and regulations. She used her expertise to provide confidential information to the FBI and to smuggle funds to Hong Kong. After her husband died, Elhassani managed to escape and navigate war-torn Syria with her four children and three Yazidi slaves. Based on these facts, nobody can dispute that Elhassani was a highly competent person and capable of making her own decisions.

Elhassani's decisions as a parent are critical to any evaluation of her character. It is clear from her diary and investigative interviews that Elhassani was deeply devoted to her husband before they moved to Syria. Her children paid the price. The government encourages the Court to re-watch the two homemade videos where Minor Child 1 is taught to assemble and disassemble a military rifle, and later how to use a suicide belt to kill American soldiers. *See United States v. Elhassani*, 2:18-cr-33, DE

---

for suggesting that she had been abused as a child. *Id*. If Elhassani suffered child abuse, that is tragic. But it does not justify her criminal actions in this case, or her decision to subject her own children to harm. And it makes her role in acquiring a Yazidi slave, knowing what that slave would be subjected to, more appalling.

56. Elhassani has admitted to helping film these chilling videos and not explaining to her son the impropriety of what he was directed to say. The video appears to have been an attempt to shock family members back home so that they would send help or money. Whatever the reason, it is horrifying that she would participate in subjecting her innocent and impressionable son to that experience.

With respect to the Yazidis she bought or helped her husband buy, Elhassani wants the Court to believe that she was a mother figure and hero to them. Elhassani justified the decision to purchase three human beings by claiming they were better off with her and her husband as their owners than another ISIS family. *See* Walsh & Abdelaziz, *Beaten, Tortured, Sexually Abused: An American ISIS Widow Looks for a Way Home*, CNN (Apr. 20, 2018), https://www.cnn.com/2018/04/19/middleeast/syria-us-isis-bride-intl/index.html; DE 19, p. 38. Yet Elhassani made the decision to purchase the first Yazidi slave knowing that Moussa wanted slaves to have sex with so that he could have more children and improve his standing within ISIS. However she tries to sugarcoat her relationship with her Yazidi slaves, Elhassani's decision to voluntarily participate in the ISIS-condoned practice of slave purchase and ownership—knowing what they would be subjected to—speaks volumes about her judgment and character.

3. **Specific and General Deterrence**

It is an understatement to say that much has changed since Elhassani made the decision to move to Syria and help her husband and brother-in-law join ISIS. The

15

ISIS Caliphate does not exist as it once did, and its future prospects are unknown. There is no evidence that Elhassani is a threat to rejoin ISIS or any groups that share its ideology. Yet Elhassani's objections to the PSR and statements to journalists since pleading guilty raise serious concerns about her willingness or ability to accept responsibility for her crimes.

Elhassani appears determined to sell a fabricated story about this case. She wants the benefit of the plea agreement but also wants people to believe that she was an unwitting pawn of her husband and did not really know what was going on. Her story is unbelievable because it is false. Elhassani did not liquidate her life savings, smuggle gold and cash to Hong Kong, and sell her home and personal belongings because she thought she was going on a second vacation to Morocco. She did not pull Minor Child 1 from school, lie to his father about her travels, drag him on two trips to Hong Kong, take him to a firing range and refer to him as a "sniper" because she thought she was going to Morocco to get knee surgery. She did not tell friends, family and federal agents that she would return soon because she thought she was buying a beach home or moving permanently to Morocco. And she did not agree to delay her purported travel plans to Morocco and then go on vacation near the Turkey-Syria border because she thought she talked her husband out of joining ISIS.

If Elhassani cannot accept undeniable truths about this case, she poses a continuing danger to herself, her children and society. A light prison sentence will send the wrong message to the public that someone can support and help others

16

engage in terrorism without severe consequences. Because of her actions, behavior and words, a ten year prison sentence is just and justified.

                                  Respectfully Submitted,

                                  THOMAS L. KIRSCH II
                                  UNITED STATES ATTORNEY

By:    /s/ *Abizer Zanzi*

                                  Abizer Zanzi
                                  Jennifer Chang-Adiga
                                  Nathaniel Whalen
                                  Assistant United States Attorneys
                                  United States Attorney's Office
                                  Northern District of Indiana
                                  5400 Federal Plaza, Suite 1500
                                  Hammond, IN 46320
                                  Telephone: (219) 937-5500