**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF INDIANA
HAMMOND DIVISION**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 2:19 CR 159 |
| | ) | Judge Philip P. Simon |
| SAMANTHA ELHASSANI, | ) | |
| | ) | |
| Defendant. | ) | |

**DEFENDANT'S OBJECTIONS AND CLARIFICATIONS TO THE
PRESENTENCE INVESTIGATION REPORT AND SENTENCING MEMORANDUM**

**THE RERUM NOVARUM CENTER
FOR CIVIL & HUMAN RIGHTS OF CHICAGO**
515 W. Arlington Place
Chicago, IL 60614
Tel: (312) 981-0123
tdurkin@durkinroberts.com

**LAW OFFICE OF JOSHUA G. HERMAN**
53 W. Jackson, Blvd., Suite 457
Chicago, IL 60604
Tel: (312) 909-0434
jherman@joshhermanlaw.com

## TABLE OF CONTENTS

I.    Introduction...................................................................................................... 1

II.   Procedural Background..................................................................................... 2

III.  Objections and Clarifications to the PSR and
      Position on the Advisory Guideline Level ....................................................... 3

  A.  Objections and Clarifications to the PSR....................................................... 3

    1.  PART A.  THE OFFENSE, The Offense Conduct pp. 4-9, ¶¶9-41............... 3

    2.  PART A.  THE OFFENSE, Offense Level Computation,
        Application of U.S.S.G. §2M5.3(b)(1), PSR, p. 11, ¶58 ............... 5

    3.  PART A.  THE OFFENSE Offense Level Computation,
        Application of U.S.S.G. §3B1.4, PSR, p. 11, ¶60 ........................ 8

  B.  Position on the Advisory Guideline Level and Commentary
      on Terrorism Enhancement from U.S.S.G. §3A1.4..................................... 10

IV.   Argument ....................................................................................................... 12

  A.  Legal Standards........................................................................................... 12

  B.  Nature and Circumstances of the Offense—§3553(a)(1) ............................. 14

  C.  History and Characteristics of Defendant—§3553(a)(1)............................. 15

    1.  Samantha's Childhood and Upbringing......................................... 16

    2.  At Seventeen-Years-Old, Samantha Married an Older, Abusive Man....... 17

    3.  Samantha Suffered Physical, Sexual, and Emotional Abuse from
        Moussa, Who Dominated Her and Treater Her as His Property.............. 18

    4.  Samantha Worked as an FBI Confidential Human Source to
        Report on the El Hassani Family Business,
        Including on National Security Matters....................................... 22

    5.  Samantha's Horrific Experience in Syria and Her Harrowing
        Escape from ISIS, Only to be Held in Kurdish Camps and
        Then Returned to the United States in Custody and
        Was Separated from Her Children............................................... 24

    6.  Samantha's Detention Has Resulted in Ongoing Separation from
        Her Children and Infection by COVID-19. ................................. 32

    7.  Samantha Benefits from Ongoing Support From Her Parents
        Who Now Have Custody of Her Children and Hope to
        Reunify the Family in the Future. ............................................. 34

    8.  Samantha Suffers from Serious Mental Health Problems
        That Require Intensive and Persistent Treatment. ..................... 36

  C.  A Sentence Well Below the Advisory Guidelines
      Addresses the Factors Set Forth in § 3553(a)(2). .................................. 39

    1.  Seriousness of the Offense......................................................... 39

2. General Deterrence. ..................................................................................... 41

3. Specific Deterrence. .................................................................................... 43

4. A Lengthy Prison Sentence Would Not Provide Needed Mental Health Care, but Would Create Additional Health Risks for COVID-19. ............................. 44

    i. Samantha's Mental Health Needs Are Better Met Through Persistent Treatment That is Not Available in Prison.............................. 44

    ii. Samantha Has Already Survived COVID-19, and a Lengthy Prison Sentence Would Unnecessarily Put Her at Risk for  Re-infection and Further Health Consequences. ....................................................... 46

        1. The COVID-19 Pandemic........................................................... 47

        2. COVID-19 is Especially Dangerous in Jails and Prisons. ................... 49

        3. Samantha Has Risk Factors that Present Real Dangers to Her Health if Exposed Again to COVID-19 in Prison. ........................ 52

5. A Sentence in the 30-37 Month Range, and No More Than 48 Months, Combined with Strict Conditions of Supervised Release, Would Reflect the Seriousness of the Offense, Promote Respect for the Law, and Provide Just Punishment. ....................................................................... 55

V. Conclusion ....................................................................................................... 57

## **TABLE OF AUTHORITIES**

**Cases**

*Doe v. Barr*, No. 20-cv-02263 (RMI), 2020 WL 1984266 (N.D. Cal. Apr. 27, 2020)................ 53

*Griffin v. Wisconsin*, 483 U.S. 868, 874 (1987).......................................................... 56

*Koon v. United States*, 518 U.S. 14 (1996)................................................................ 14

*Nelson v. United States*, 555 U.S. 350 (2009) ........................................................... 13

*Pepper v. United States*, 131 S. Ct. 1229 (2011) .................................................. 12, 13

*United States v. Alhaggagi*, 372 F. Supp. 3d 1005 (N.D. Cal. 2019) ....................... 11

*United States v. Arreola-Bretado*, Case No. 3:19-cr-3410,
    Dkt. No. 50 (S.D. Cal. May 15, 2020)............................................................... 54

*United States v. Baker*, 445 F.3d 987 (7th Cir. 2006)................................................ 56

*United States v. Bannister*, 786 F. Supp. 2d 617 (E.D.N.Y. 2011)........................... 41

*United States v. Booker*, 543 U.S. 220 (2005)........................................................... 12

*United States v. Brazinskas*, 458 F.3d 666 (7th Cir. 2006)....................................... 10

*United States v. Brown*, Case No. 2:18-cr-360, Dkt. No. 35 (N.D. Ala. May 22, 2020).............. 54

*United States v. Ceasar*, 388 F. Supp. 3d 194 (E.D.N.Y. 2019).............................. 11

*United States v. Courtney*, 76 F. Supp. 3d 1267 (D.N.M. 2014).............................. 41

*United States v. Cull*, 446 F. Supp. 2d 961 (E.D. Wisc. 2006)................................ 56

*United States v. Dhirane*, 896 F.3d 295 (4th Cir. 2018)............................................. 7

*United States v. Doe*, 323 F. Supp. 3d 368 (E.D.N.Y. 2018) ..................................... 11

*United States v. Edwards*, 595 F.3d 1004 (9th Cir. 2010).......................................... 42

*United States v. Hill*, 645 F.3d 900 (7th Cir. 2011)................................................... 12

*United States v. Hodges*, 315 F.3d 794 (7th Cir. 2003) ............................................. 10

*United States v. Huntley*, No. 13-cr-119-ABJ, ECF No. 263 (D.D.C. May 5, 2020).................... 54

*United States v. Jimenez*, 300 F.3d 1166 (9th Cir. 2002) ........................................... 9

*United States v. Jumaev*, 2018 U.S. Dist. LEXIS 119916, 2018 WL 3490886
    (D. Colo., July 18, 2018)..................................................................................... 10

*United States v. Knights*, 534 U.S. 112 (2001)........................................................... 55

*United States v. Kriglstein*, 1:16-cr-00663-JCH-1, ECF No. 60 (D.N.M. Apr. 27, 2020) .......... 54

*United States v. Lawrence*, 2017 U.S. Dist. LEXIS 86834, 2017 WL 2462530
    (E.D.N.Y. May 23, 2017) .................................................................................. 42

*United States v. Lopez*, 634 F.3d 948 (7th Cir. 2011)................................................ 13

*United States v. Molina*, 469 F.3d 408 (5th Cir. 2006)................................................ 9

*United States v. Musgraves*, 883 F.3d 709 (7th Cir. 2018)............................................ 13

*United States v. Nayyar*, 2013 U.S. Dist. LEXIS 79002
(Case No. 09 CR 1037) (S.D.N.Y. June 4, 2013) ...................................................... 8

*United States v. Pankow*, 884 F.3d 785 (7th Cir. 2018) ............................................... 13

*United States v. Perez*, 571 F. App'x 495 (7th Cir. 2014)............................................ 13

*United States v. Qualls*, 373 F. Supp. 2d 873 (E.D. Wis. 2005).................................. 56

*United States v. Ramirez*, No. 17-10328-WGY, 2020 U.S. Dist. LEXIS 83363
(D. Mass. May 12, 2020) ........................................................................................ 50

*United States v. Ramsey*, 237 F.3d 853 (7th Cir. 2001) ............................................... 10

*United States v. Rivera*, 248 F.3d 677 (7th Cir. 2001)................................................... 9

*United States v. Robinson*, 654 F.3d 558 (5th Cir. 2011) .............................................. 9

*United States v. Rountree*, 2020 WL 2610923 (N.D.N.Y. May 18, 2020)..................... 50

*United States v. Santoya*, 493 F. Supp. 2d 1075 (E.D. Wis. 2007).............................. 14

*United States v. Stewart*, 590 F.3d 93 (2d Cir. 2009) .................................................. 12

*United States v. Vivit,* 214 F.3d 908 (7th Cir. 2000).................................................... 10

*United States v. Wachowiak*, 496 F.3d 744 (7th Cir. 2007).......................................... 13

*United States v. Woodard*, 2017 U.S. Dist. LEXIS 192738 (E.D.N.Y. Nov. 3, 2017)................ 42

*United States v. Young*, 2020 WL 2514673 (D. Mass. May 15, 2020)......................... 50

**Statutes**

18 U.S.C. §2 .................................................................................................................. 3

18 U.S.C. §2339B .................................................................................................... 3, 6

18 U.S.C. §2339C .................................................................................................... 3, 6

18 U.S.C. §3553(a) ................................................................................................ *passim*

18 U.S.C. §3582(c)(1)(A) .............................................................................................. 47

18 U.S.C. §3661 ............................................................................................................ 3

28 U.S.C. §994(j) ........................................................................................................ 57

**Other Authorities**

U.S.S.G. §1B1.3(a)(1)(A) ............................................................................................. 4

U.S.S.G. §1B1.3(a)(1)(B) ............................................................................................. 4

U.S.S.G. §2M5.3(b)(1) ......................................................................................... *passim*

U.S.S.G. §2X3.1 ........................................................................................................... 6

U.S.S.G. §3A1.4(a) ............................................................................ 1, 2, 5, 10

U.S.S.G. §3B1.4 .................................................................................... 2, 8, 12

U.S.S.G. §5B1.3 ............................................................................................ 56

**Rules**

Rule 32(c) of the Federal Rules of Criminal Procedure ............................... 1

**Other Sources**

Allison Whitten, *Can You Get COVID-19 Twice?  Scientists Say It's Too
    Early to Tell*, Discover, July 31, 2020 ......................................................... 54

*Amnesty International Briefing*, December 19, 2013 ................................. 26

Angelo Carfì, et al., *Persistent Symptoms in Patients After Acute COVID-19*,
    JAMA Network, July 9, 2020 ........................................................................ 53

B. Saloner, Ph.D., et al., *Covid-19 Cases and Deaths in Federal & State Prisons*,
    JAMA Network, July 8, 2020 ........................................................................ 51

CBS News, *Boy says he lived with U.S. family under ISIS rule*, Jan. 22, 2018 ............ 29

CDC, *Groups at Higher Risk for Severe Illness* .......................................... 49

CDC, *How to Protect Yourself & Others* ...................................................... 49

CDC, Interim Clinical Guidance for Management of Patients with
    Confirmed Coronavirus Disease (COVID-19) ............................................ 48

CDC, *Interim Guidance on Management of Coronavirus
    Disease 2019 (COVID-19) in Correctional and Detention Facilities* ..................... 50

CDC, *People with Certain Medical Conditions*, July 30, 2020 ...................... 49

Charlotte Huff, *Delirium, PTSD, brain fog:  The aftermath of surviving COVID-19*,
    American Psychological Association, July 1, 2020 ....................................... 53

Colin Dwyer, *"No Evidence" Yet That Recovered COVID-19 Patients are Immune,
    WHO Says*, NPR, Apr. 25, 2020 .................................................................... 54

Emily Landon, MD, *COVID-19:  What we know so far about the 2019 novel coronavirus*,
    UChicago Medicine, May 8, 2020 .................................................................. 48

Hodwitz, Omi, "The Terrorism Recidivism Study (TRS): Examining Recidivism
    Rates for Post-9/11 Offenders," Perspectives on Terrorism 13 (April) ................... 11

James Gallagher, *Coronavirus Immunity:  Can you catch it twice?*,
    BBC News, July 17, 2020 .............................................................................. 54

James P. McLoughlin Jr., Deconstructing United States Sentencing Guidelines
    Section 3A1.4: Sentencing Failure in Cases of Financial Support for
    Foreign Terrorist Organizations, 28 Law & Ineq. 51 (2010) ................................ 11

Jennifer Couzin-Frankel, *From 'brain fog' to heart damage, COVID-19's
  lingering problems  alarm scientists*, Science, July 31, 2020.................................................. 52

Joseph Shapiro, *As COVID-19 Spreads In Prisons, Lockdowns Spark Fear of
  More Solitary Confinement,* (June 15, 2020), NPR .................................................... 52

Kaiser Health news, *CDC Data Confirms Reports That Underlying Conditions
  Play a Large Role in Hospitalizations, Fatalities*, Apr. 1, 2020 ............................................. 49

Karina Zaiets and Ramon Padilla, *Coronavirus, diabetes, obesity and other
  underlying conditions: Which patients are most at risk?*, USA Today, Apr. 15, 2020 ........... 49

Kelly Servic, *For survivors of severe COVID-19, beating the virus is just the beginning,*
  Science, Apr. 8, 2020.......................................................................................................... 53

Kelsey Borresen, *5 Behaviors That Seem 'Normal' But Could Be Signs of Emotional Abuse*,
  January 15, 2019 ................................................................................................................. 21

Laura Hawkes, *Covid-19 in Prisons and Jails in the United States*,
  JAMA Network, Apr. 28, 2020 .......................................................................................... 50

Liliana Segura, *As Coronavirus Spreads In Federal Prisons,
  Cases In Halfway Houses Are Being Undercounted,* The Intercept, May 28, 2020............... 52

Lisa Aronson Fontes, PhD, *From Romance to Isolation:
  Understanding Grooming*, Feb. 11, 2019 ........................................................................... 21

*Medecins Sans Frontieres*, Driven out by war, displaced in desperate conditions...................... 32

Melissa E. Dichter, *Women's Experiences of Abuse as a Risk Factor for Incarceration:
  A Research Update*, National Online Resource Center on
  Violence Against Women, July 2015 .................................................................................. 43

*National Domestic Violence Hotline* "Abuse Defined".................................................................. 22

Nicole Lyn Pesce, *55% of coronavirus patients still have
  neurological problems three months later:  study*, MarketWatch, Aug. 9, 2020 ................... 53

Proclamation on Declaring a national Emergency Concerning the Novel
  Coronavirus Disease (COVID-19) Outbreak, The White House (Mar. 13, 2020) ................... 47

Robert T. Muller, PhD, *Trauma Survivors at Risk for
  Future Abusive Relationships*, Jan. 8, 2016........................................................................... 17

Rukmini Callimachi, *The ISIS Files*, N.Y. Times, Apr. 4, 2018 ................................................... 7

Salma Abdelaziz and Arwa Damon, *Kidnapped boy raised by American
  ISIS woman in Raqqa* , Jan. 23, 2018 ................................................................................. 29

Samer Ahmed, Is History Repeating Itself? Sentencing Young American
  Muslims in the War on Terror, 126 Yale L.J. 1520, 1549-1550 (2017).................................. 11

Shadi Hamid, *What America Never Understood About ISIS*, The Atlantic, Oct. 31, 2019 ........... 7

Shane Bauer, *Behind the Lines*, Mother Jones, Part Two, July/August 2019.................. 20, 26, 27

Symposium, Convicted Terrorists: Sentencing Considerations and
  Their Policy Implications, 8 J. Nat'l Security L. & Pol'y 347, 361 (2016).............................. 11

Tanya Lewis, *How Coronavirus Spreads through the Air:*
  *What We Know So Far*, Scientific American, May 12, 2020 .................................................. 48

Tonya Simpson and Luke Barr, *As coronavirus spreads through nation's jails and prisons,*
  *lawmakers demand more transparency on toll*, ABCNews, Aug. 6, 2020.............................. 51

U.S. Dept. of Health & Human Services, National Institutes of Health,
  Study suggests new coronavirus may remain on surfaces for days.......................................... 48

Valerie Wright, Ph.D., *Deterrence in Criminal Justice:*
  *Evaluating Certainty vs. Severity of Punishment*, p. 1, The Sentencing Project, Nov. 2010 ... 41

Wikipedia, Genocide of Yazidis by ISIL.................................................................................... 28

World Health Organization, Scientific Brief, *"Immunity Passports" in the*
  *Context of Covid-19*, April 24, 2020...................................................................................... 54

*Yazidi family liberated during a SDF special operation*,
  Nov. 18, 2017, Hawar News Agency ...................................................................................... 31

Defendant, **SAMANTHA ELHASSANI**, by and through her attorneys, **THOMAS ANTHONY DURKIN** and **JOSHUA G. HERMAN** pursuant to the Due Process, Effective Assistance of Counsel, and Cruel and Unusual Punishment clauses of the Constitution of the United States, Rule 32(c) of the Federal Rules of Criminal Procedure, and 18 U.S.C. § 3553(a), respectfully submits the following: Objections and Clarifications to the Presentence Investigation Report ("PSR") and Sentencing Memorandum.

## I.    INTRODUCTION

From the very outset of this case there has been a drastic dispute over the nature of this prosecution, including its propriety or wrongheadedness—at least from the defense standpoint insofar as it is seen through the eyes of the National Security Division of the Department of Justice, which tends to treat every case somehow related to terrorism through the lens of the equally wrongheaded one-size-fits all "Terrorism Enhancement," U.S.S.G. §3A1.4(a).    Thus, notwithstanding being a survivor of severe domestic abuse here and abroad, war, torture and unimaginable suffering, first-time offender Samantha Elhassani now faces the maximum sentence permissible under her sole count of conviction—a conviction, mind you, that is *not for material support for terrorism or for being a member or supporter of a terrorist group*, but, instead, for concealing a Hong Kong financial transaction involving terrorism that was done at the direction of her violently abusive husband, Moussa Elhassani.[1]  That is, Samantha was a wife under the thumb of her violently abusive and radical husband and equally, if not more, radical jihadi brother-in-law.

---

[1] The evidence is overwhelmingly clear that her husband Moussa physically and psychologically abused and controlled her, treated her as his property, and threatened to kill her if she left him, as witnesses vividly recall.  (*See* A. Lightner 8.11.20 Interview; A. Benke 7.24.20 Interview; AJ Moring 7.23.20 Interview, attached hereto as Exhibit B).

Nevertheless, the government, like Probation, may very well argue that the maximum 120-month sentence is justifiable under the absurd calculation of the guidelines. However, without the infamously draconian Terrorism Enhancement, those guidelines should be no worse than 30-37 months.[2] Thus, for this reason alone, as well as all the other reasons set forth herein, counsel strongly suggest that a sentence in that range, or in any event, not more than 48 months, is sufficient but not greater than necessary to meet the sentencing goals dictated by 18 U.S.C. §3553(a). Such a sentence would allow Samantha to receive desperately-needed mental health treatment for her severe Post-Traumatic Stress Disorder (PTSD) and depression without undue delay; and, equally as important, would not unnecessarily postpone her reunification with her family and children.

## II.   PROCEDURAL BACKGROUND

The PSR summarizes the key points of the procedural background. (PSR, p. 3, 1-6). The indictment in this case was returned on March 21, 2018 while Samantha was still with her children in a Kurdish refugee camp, and charged her with making a false statement to the FBI three years earlier and before following her husband to Syria on March 19, 2015, in violation of 18 U.S.C. § 1001. (18 CR 33, Dkt. #1). Upon the return of the indictment, the government moved to seal the case until Defendant's arrest and return to the United States. (18 CR 33, Dkt. #2). In late July 2018, the government executed the arrest warrant and flew Samantha and her four children back to the United States on a military cargo transport plan. Upon landing at the Gary airport, Samantha was immediately detained and separated from her children, whom she has not seen since.

---

[2] Based on an offense level of 17, and Criminal History Category I, the sentencing range would be 24-30 months without the misguided and misplaced "terrorism enhancement" from U.S.S.G. §3A1.4(a), and absent two separate two-level offense level increases included in the PSR, which are based on a specific offense characteristic (U.S.S.G. §2M5.3(b)(1)) and role adjustment (U.S.S.G. §3B1.4). *See* PSR, p. 11, ¶¶ 58, 60. While counsel believe that neither §2M5.3(b)(1) nor §3B1.4 should apply, even if one did, the guideline range would be 30-37 months, based on an offense level of 19 and Criminal History Category I.

On August 22, 2018, a superseding indictment was returned by the grand jury.  (18 CR 33, Dkt. #23).   The superseding indictment charged Defendant with Conspiracy to Provide Material Support to ISIS, from Fall 2014 through Summer 2015, in violation of 18 U.S.C. §2339B(a)(1) (Count One) and Aiding and Abetting two individuals in Providing Material Support to ISIS, from March 23, 2015 through April 7, 2015, in violation of 18 U.S.C. §2 and 18 U.S.C. §2339B.  On November 25, 2019, pursuant to a plea agreement, Samantha pled guilty to a one-count criminal Information, which charged the lesser offense of financing of terrorism, in violation of 18 U.S.C. §2339C and 18 U.S.C. §2.  (19 CR 159, Dkt. #2).

### III.    OBJECTIONS AND CLARIFICATIONS TO THE PSR AND POSITION ON THE ADVISORY GUIDELINE LEVEL

#### A.    Objections and Clarifications to the PSR.

##### 1.  PART A.  THE OFFENSE
##### The Offense Conduct pp. 4-9, ¶¶9-41

The Information to which Samantha pled guilty specifically charges her with the lesser offense of financing of terrorism *between February 2015 and March 2015*, in violation of 18 U.S.C. §2339C(c)(2)(A).  The "Offense Conduct" portion of the PSR, which is pulled from the government's Offense Statement submitted to Probation, spans thirty-five (35) paragraphs long and details incidents and events that far exceed the actual offense to which Samantha pled guilty, including conduct by others that occurred many years after the offense.  The Court no doubt has broad discretion to consider reliable evidence to impose an individualized sentence pursuant to 18 U.S.C. §3553(a).  *See* 18 U.S.C. §3661 ("No limitation shall be placed on the information concerning the background, character, and conduct of a person convicted of an offense which a court of the United States may receive and consider for the purpose of imposing an appropriate sentence.").  However, counsel must still object to how the PSR—at the government's urging—

3

greatly expands the scope of the offense of conviction.   The vast majority of incidents included in

the "Offense Conduct" section is far too attenuated even to be included as relevant conduct, and

should not be included as "offense conduct."

The government may attempt to portray the entire "Offense Conduct" section as relevant

conduct under U.S.S.G. §1B1.3(a)(1)(A).  However, even relevant conduct is limited to "acts and

commissions" "that occurred during the commission of the offense of conviction."  *Id*.  The

government's expansion of what it deems to be offense conduct, adopted in full by Probation, is

all the more questionable in light of the prosecution's previous pre-trial insistence on the drawing

of a Maginot line between events pre- and post-Syria, with the former being material and the

latter—when the defense wished to raise it—being  irrelevant.  But now, the offense conduct is so

broadly framed that virtually anything that the lunatics Moussa and Abdelhadi did becomes

Samantha's offense conduct.  This lends considerable credence to counsel's repeated concern that

the government's prosecution of Samantha is in many ways, like it or not, a proxy prosecution

against her dead husband and his brother.   Samantha has pled guilty and clearly accepted

responsibility for her role in concealing financial transactions that helped her husband and his

brother make their way to Syria with her and her two children in tow.   But the events that

unexpectedly unfolded amidst the chaos of war in Syria, and which Samantha could in no way

foresee, should not be considered relevant conduct, much less offense conduct.[3]  Just by way of

example, when Samantha found out about the third video that Moussa made of M.S. after it was

---

[3] And there are serious questions whether or not it is proper to use the foreseeability standard for relevant conduct, which applies to "jointly undertaken criminal activity."  *See* U.S.S.G. §1B1.3(a)(1)(B).  It is quite clear that Moussa and Abdelhadi had conspired to join ISIS together, including by submitting "applications" that were subsequently recovered by the government.  Their agreement did not include Samantha in every aspect, and she most certainly cannot be held criminally responsible for all of their acts.  This is not to say, in any fashion, that Samantha does not deeply regret the disastrous consequences of her emotionally-induced decision to follow after the two jihadi brothers.

completed, she argued against it with Moussa, who then beat her ruthlessly while she was still recovering from a painful caesarian section procedure. Yet, the PSR still includes that video as part of her offense conduct.

In short, while Samantha admits that she concealed financial transactions while knowing in part that the resources from those transactions would be used by Moussa and Abdelhadi to provide their own material support to ISIS, there must be some end point to the "offense conduct." Additionally, what Samantha may or may have not told various press outlets, years after the charged conduct should not be treated as "offense conduct." Accordingly, counsel would move to strike from the "offense conduct" section any paragraphs that do not directly relate to the offense of conviction, which would include, at a minimum, paragraphs 29-41.[4] To be clear, counsel do not even remotely suggest that the Court cannot consider any information that it finds to be reliable in the context of the §3553(a) analysis, as discussed below. Nevertheless, there is a significant difference to what should constitute criminal liability, as opposed to bad judgement and bad parenting.

### 2. PART A.  THE OFFENSE
### Offense Level Computation,
### Application of U.S.S.G. §2M5.3(b)(1), PSR, p. 11, ¶58

The PSR concludes that a two-level enhancement from U.S.S.G. §2M5.3(b)(1) should apply. (PSR, p. 11, ¶58). This enhancement was not part of the plea agreement. As noted below, due to the "terrorism enhancement" from U.S.S.G. §3A1.4, combined with the statutory maximum sentence of ten years, the guidelines are 120 months, with or without any additional offense level enhancements. However, counsel must still object under the unique circumstances of this case to

---

[4] Counsel are also concerned with the contents of the "Offense Conduct" section of the PSR for practical purposes. BOP officials will review the PSR to make security designation decisions. *See* BOP Program Statement, P5100.08.

the application of U.S.S.G. §2M5.3(b)(1).  The details of this objection are set forth in counsel's objections to the Draft PSR.  (Dkt. #13, pp. 19-20).

Section 2M5.3(b)(1) states as follows:

If the offense involved the provision of (A) dangerous weapons; (B) firearms; (C) explosives; (D) funds with the intent, knowledge, or reason to believe such funds would be used to purchase any of the items described in subdivisions (A) through (C); or (E) funds or other material support or resources with the intent, knowledge, or reason to believe they are to be used to commit or assist in the commission of a violent act, increase by 2 levels.

U.S.S.G. §2M5.3(b)(1).[5]  Because the charged offense does not involve the provision of dangerous weapons, firearms, or explosives, subsections (A)-(C) do not apply.  Further, subsection (D) should not apply because reliable evidence does not show that any funds that Samantha helped transfer overseas were provided to purchase dangerous weapons, firearms, or explosives.  Thus, the application of the enhancement turns on subsection (E), and whether the offense involved the provision funds or other material support and resources with the intent, knowledge, or reason to believe they are to be used to commit or assist in the commission of a violent act.  That provision should not apply for several reasons.

First, Samantha made no statements indicating that she knew any of the funds that she helped transfer would be used to commit a violent act.  There is no evidence to suggest even remotely that Samantha personally condoned any act of violence or sought to further the terroristic acts of ISIS.

Second, Samantha's general knowledge that Moussa and Abdelhadi had expressed an interest in joining ISIS or the caliphate is insufficient on its own to show that she knew, intended,

---

[5] Section 2M5.3 only applies because the otherwise controlling guideline, U.S.S.G. §2X3.1, instructs to apply the guideline for the "underlying offense."  Here, the "underlying offense" for the violation of 18 U.S.C. §2339C(c)(2)(A) is 18 U.S.C. §2339B.  *See* U.S.S.G. §2X3.1, Application Note 1.

6

or reasonably believed that the funds she helped transfer to Hong Kong in early 2015 were to be used to commit acts of violence. There is a significant difference between what Samantha knew, intended, and believed and what Moussa and Abdelhadi intended.

Third, general knowledge of ISIS's violent proclivities does not mean that the particular funds involved in this case were intentionally provided by Samantha to further such violence. If that was the case, then this specific enhancement would be redundant (and thus be double counted), as providing material support to terrorist organizations would arguably inherently involve supporting a group that, at least in substantial part, uses violence to advance political goals. In including U.S.S.G. §2M5.3(b)(1), the Sentencing Commission must have intended it to require conduct beyond simply providing funds or support to a terrorist organization. Such extra conduct is not present with respect to Samantha. Indeed, it was also possible to live in ISIS-controlled territory without being a member of ISIS, and that cities like Raqqa were functioning cities with administrative functions.[6] Funds that Samantha helped transfer were used to purchase places to live, food, vehicles, and other staples that had nothing to do with the commission of violent acts. And in the end, the remaining funds that she took from Abdelhadi were used to help pay for her escape, along with her children and the Yazidis. Put simply, the facts of this case are fundamentally different from the common scenario of money or weapons being provided directly to the foreign terrorist organization. *See United States v. Dhirane*, 896 F.3d 295, 305 (4th Cir. 2018) (finding enhancement under §2M5.3(b)(1)(E) proper "[b]ecause the defendants' financial support was directed at and designed to support al-Shabaab's military operations in fighting a war

---

[6] Rukmini Callimachi, *The ISIS Files*, N.Y. Times, Apr. 4, 2018 (available at: https://nyti.ms/3a3oW1S) (last visited Aug. 13, 2020) ("ISIS built a state of administrative efficiency that collected taxes and picked up the garbage. It ran a marriage office that oversaw medical examinations to ensure that couples could have children."); Shadi Hamid, *What America Never Understood About ISIS*, The Atlantic, Oct. 31, 2019 (available at: https://bit.ly/3c7pki1) (last visited Aug. 13, 2020).

of terrorism in Somalia and Kenya."). *United States v. Nayyar*, 2013 U.S. Dist. LEXIS 79002, at *15 (Case No. 09 CR 1037) (S.D.N.Y. June 4, 2013) ("Since the Defendant conspired to sell firearms and ammunition to Hizballah knowing that they would be used in furtherance of violence, the offense level is increased two levels pursuant to §2M5.3(b)(1).").

### 3.  PART A.  THE OFFENSE
#### Offense Level Computation,
#### Application of U.S.S.G. §3B1.4, PSR, p. 11, ¶60

The PSR also includes a two-level role in the offense adjustment based on U.S.S.G. §3B1.4, which is entitled "Using a Minor to Commit a Crime."  (PSR p. 11, ¶60).  This adjustment was rightly so not included in the plea agreement.  As with the two-point enhancement discussed above, the application of this adjustment does not technically increase Samantha's guidelines, due to the 120-month statutory cap.  However, counsel must still object to its inclusion, as it radically distorts the facts.  (*See also* Dkt. #13, pp. 21-22).

The §3B1.4 adjustment applies when a defendant "used or attempted to use a person less than eighteen years of age to commit the offense or assist in avoiding detection of, or apprehension for, the offense."  *Id*.  Probation (and now the government) argue that the adjustment applies because Samantha brought her son, M.S., on two trips to Hong Kong in February and March 2015. At the time, M.S. was seven years old.  Probation concludes that the adjustment applies because, "according to the FBI the defendant pulled her son [M.S.] out of school and used him as a decoy by bringing him on multiple trips to Hong Kong to pre-position funds."  (PSR, p. 10, ¶46).

The mere presence of M.S. on these trips is insufficient to prove, even by a preponderance of the evidence, that he was used as a decoy.  First, there are no admissions or statements by Samantha or anyone else to prove that was the purpose of M.S. joining her on the trips to Hong Kong, which were from February 17-26, 2015, and then from March 16-18.  Second, the inference

8

drawn by Probation that taking M.S. out of school to take an international trip was designed to deflect attention is baseless.   One might think that having a school-age child out of school would instead attract attention and trigger additional scrutiny at airports.   Third, the government has argued that Samantha knew that taking M.S. would help her avoid attention because she worked in a shipping company owned by the El Hassani family.   That too makes little sense.   The company was a shipping and receiving operation where packages were delivered and shipped by commercial carrier.   It in no way equipped Samantha with some specialized knowledge about how to trick customs officials by having a minor in her company.   The facts are simply too unreliable to apply the adjustment.   The reality is that Samantha was afraid to leave M.S. alone with Moussa because she did not like how he treated him, as she confided to friends at the time.   (A. Benke 7.24.20 Interview).

In addition to these factual problems, the caselaw cannot justify the role adjustment.   The mere presence of a minor is not enough to justify the adjustment.   *United States v. Molina*, 469 F.3d 408, 415 (5th Cir. 2006) (mere presence of minor during commission of crime is insufficient to justify the adjustment).   *United States v. Jimenez*, 300 F.3d 1166, 1170 (9th Cir. 2002) ("Absent other evidence, the 'mere presence of a minor' is insufficient to support the application of § 3B1.4.").   Moreover, M.S. was not used in a specific way to advance the offense, as in *United States v. Robinson*, 654 F.3d 558, 563 (5th Cir. 2011), where the defendant directed the minor to purchase a phone that was then used to make threats.   Likewise, the minor took directed action in the commission of the offense in *United States v. Rivera*, 248 F.3d 677, 682 (7th Cir. 2001), when the defendant used him for "unloading the marijuana from the van, weighing quantities of

9

marijuana in the residence, and retrieving money to pay the co-conspirators."[7]  Application of the adjustment is thus supported by neither the facts nor law.

### B.      Position on the Advisory Guideline Level and Commentary on Terrorism Enhancement from U.S.S.G. §3A1.4.

Counsel agree, consistent with the PSR, that the adjusted guideline range is 120 months. (PSR, p. 20, ¶136).[8]  The plea agreement stipulates to the application of the draconian "terrorism enhancement" from U.S.S.G. § 3A1.4(a), as that provision technically applies to the charged offense.  (19 CR 159, Dkt. #2, p. 7(b)(ii); PSR, p. 3, ¶3; p. 11, ¶59); (Dkt. #13, p. 19).  Even so, counsel must still object to the severity of that enhancement, which takes a "wrecking ball" to the federal sentencing guidelines.  *United States v. Jumaev*, 2018 U.S. Dist. LEXIS 119916, *13, 2018 WL 3490886 (D. Colo., July 18, 2018).  Pursuant to that extreme enhancement, twelve offense level points are added as a "victim related adjustment."   Additionally, Samantha, who has no criminal history—one of the most crucial sentencing factors in any other sentencing—is pole-vaulted to the highest possible level of Criminal History VI when her criminal history would otherwise be zero, which would result in a criminal history category of I.  (PSR, p. 12, ¶71).

Placing Samantha in Criminal History VI is particularly absurd and a gross overstatement of the seriousness of this offense.  As noted in the PSR, Samantha has *no* prior criminal history whatsoever—not even an arrest.  PSR, p. 12, ¶¶ 68-69.  She is a first-time offender, yet is still

---

[7] Other cases further illustrate that a minor's mere presence is insufficient to warrant application of the enhancement.  *United States v. Brazinskas*, 458 F.3d 666, 668-69 (7th Cir. 2006) (adjustment proper when minor participated in the bank robbery, helped with getaway, counted money, and when other defendants felt her presence as a female would avoid police detection); *United States v. Hodges*, 315 F.3d 794, 802 (7th Cir. 2003) (adjustment proper when defendant used minor to deliver firearms); *United States v. Ramsey*, 237 F.3d 853, 859 (7th Cir. 2001) (using minors to deal drugs); *United States v. Vivit,* 214 F.3d 908 (7th Cir. 2000) (directing minors to falsify records so defendant could file false insurance claims on behalf of the minors).

[8] Absent the two-level enhancement and two-level role adjustment objected to above, the adjusted offense guideline is 29, which at level VI results in a guideline range of 151-188 months.

placed in the highest criminal history category. Legal scholars who have studied the §3A1.4 enhancement have discredited the underlying assumption that terrorism defendants pose a high risk to recidivate, and thus should be treated in as Criminal History VI defendants. *See* James P. McLoughlin Jr., Deconstructing United States Sentencing Guidelines Section 3A1.4: Sentencing Failure in Cases of Financial Support for Foreign Terrorist Organizations, 28 Law & Ineq. 51 (2010) ("when U.S.S.G. section 3A1.4 was adopted, the number of the anti-terrorism cases was tiny, so there could be no analysis of a statistically reliable group of defendants upon which to build a reliable Guideline").[9] Courts have also questioned the assumptions about recidivism. *See United States v. Doe*, 323 F. Supp. 3d 368, 390-91 (E.D.N.Y. 2018) (Weinstein, J.) (noting lack of data on terrorist recidivism rates and the "likelihood for recidivism is highly individualized and should be assessed on a case-by-case basis"); *United States v. Alhaggagi*, 372 F. Supp. 3d 1005, 1014-15 (N.D. Cal. 2019) (district court rejected terrorism enhancement for several reasons, including that it was inappropriate based on a generalized risk of recidivism for terrorism offenses).

Moreover, and for perspective, absent the terrorism enhancement, Samantha's adjusted offense level would start at 20, and her criminal history level would be I. The PSR identifies an additional two-level enhancement (U.S.S.G. §2M5.3(b)(1)) and a two-level role adjustment

---

[9] *See also* Samer Ahmed, Is History Repeating Itself? Sentencing Young American Muslims in the War on Terror, 126 Yale L.J. 1520, 1549-1550 (2017) ("when the Terrorism Enhancement was promulgated, no statistically sound evidence was used to substantiate that all terrorism defendants were so different as to necessitate such a large increase in the Guidelines range. Similarly, courts of appeals upholding the idea that terrorism defendants 'are unique among criminals in the likelihood of recidivism, the difficulty of rehabilitation, and the need for incapacitation' have also not cited any evidence to support that opinion."); Symposium, Convicted Terrorists: Sentencing Considerations and Their Policy Implications, 8 J. Nat'l Security L. & Pol'y 347, 361 (2016) (noting absence of empirical studies for recidivism in terrorism cases). A recent actual study concluded that "Only 1.6% of terrorist offenders released between 2001 and 2018 recidivated, and none of the crimes which they committed post-release were clearly politically motivated." *United States v. Ceasar*, 388 F. Supp. 3d 194, 214 (E.D.N.Y. 2019) (citing Hodwitz, Omi, "The Terrorism Recidivism Study (TRS): Examining Recidivism Rates for Post-9/11 Offenders," *Perspectives on Terrorism* 13 (April): 54-64, available at: https://bit.ly/34H0m5A).

(U.S.S.G. §3B1.4), neither of which counsel believe should apply.  After reducing her offense level for acceptance of responsibility, at level 17 Samantha's adjusted guideline range would be 24-30 months.  And even if the additional enhancements applied, increasing her adjusted offense level to 21, the guideline range would still only be 37-46 months.  Thus, while Samantha has agreed to the maximum advisory guideline range of 180 months pursuant to the plea agreement, counsel submit that these concerns are worthy factors considering, vis-à-vis 18 U.S.C. § 3553(a), both in terms of the artificially overstated offense level but also the overstated criminal history, which should not handcuff the Court's broad discretion.  *See*, *e.g.*, *United States v. Stewart*, 590 F.3d 93, 154 (2d Cir. 2009) (Calabresi, J.) (considering the terrorism enhancement and observing, "When a Guidelines recommendation has such dramatic consequences and yet covers a multitude of sins, unusually broad sentencing discretion in the district court is essential.  Indeed, it must be so to comply with the Supreme Court's remedial holding in *United States v. Booker*, 543 U.S. 220, 244 (2005).").

## IV.   ARGUMENT

### A.  Legal Standards

The Federal Sentencing Guidelines serve as a "starting point" and "initial benchmark" in the determination of a just and appropriate sentence.  *See Gall v. United States*, 552 U.S. 38, 49-51 (2007); *Pepper v. United States*, 131 S. Ct. 1229, 1241 (2011); *Kimbrough v. United States*, 552 U.S. 85, 108 (2007) (quoting *Gall*, 552 U.S. at 49); *United States v. Hill*, 645 F.3d 900, 905 (7th Cir. 2011).  *Gall* directs sentencing judges to "consider all of the 3553(a) factors" to arrive at a just sentence that is "sufficient but not greater than necessary" to achieve the purposes of sentencing. 18 U.S.C. § 3553(a).

Thus, under *Gall*, district courts must "consider all of the 3553(a) factors" to arrive at a just sentence that is "sufficient but not greater than necessary" to achieve the purposes of sentencing.  18 U.S.C. § 3553(a).  A district court cannot simply presume the guideline range to be reasonable.  *United States v. Perez*, 571 F. App'x 495, 497 (7th Cir. 2014) (citing *Nelson v. United States*, 555 U.S. 350, 352 (2009) ("A district court cannot presume that a sentence within the guidelines range would be reasonable.").  As the Seventh Circuit has emphasized, "the Guidelines are, after all, guidelines [that] must be considered seriously and applied carefully…. In the end, however, the defendant's sentence is the responsibility of the district judge, after careful consideration of all the relevant factors under 18 U.S.C. § 3553(a)."  *United States v. Lopez*, 634 F.3d 948, 953-954 (7th Cir. 2011) (internal citations omitted); *United States v. Musgraves*, 883 F.3d 709, 715 (7th Cir. 2018) (the "Guidelines are an advisory starting point for a judge, but after correctly calculating a guideline range, the judge has discretion to select an appropriate sentence for the individual defendant and the surrounding circumstances.").

Adequate consideration of the § 3553(a) sentencing factors helps ensure that the sentencing decision is individualized, as it must be.  Indeed, "[w]hen determining a sentence, the court 'must make an individualized assessment based on the facts presented.'" *United States v. Pankow*, 884 F.3d 785, 793 (7th Cir. 2018) (quoting *Gall*, 552 U.S. at 50)); *see United States v. Wachowiak*, 496 F.3d 744, 748 (7th Cir. 2007) (internal citations omitted) ("the § 3553(a) factors are broad, vague, and open-ended ... and review for reasonableness is deferential … so the sentencing judge has considerable discretion to individualize the sentence to the offense and offender as long as the judge's reasoning is consistent with § 3553(a).").  The Supreme Court has emphasized that the punishment imposed "should fit the offender and not merely the crime." *Pepper*, 131 S.Ct. at 1240

(citations omitted) (emphasis added).  *See also Gall*, 522 U.S. at 52, *quoting Koon v. United States*, 518 U.S. 14. 81, 113 (1996).

The "sufficient but not greater than necessary" standard—also known as the "parsimony" clause—is the "overarching provision" of § 3553(a).  *Kimbrough*, 552 U.S. at 101.  By its terms, that provision instructs the Court to consider a sentence that is the least severe, *i.e.*, not greater than necessary.  *See United States v. Santoya*, 493 F. Supp. 2d 1075, 1077 (E.D. Wis. 2007) ("This is the so-called 'parsimony provision,' which requires district courts to impose the minimum punishment needed to satisfy the purposes of sentencing—just punishment, deterrence, protection of the public and rehabilitation of the defendant.").

## B.  <u>Nature and Circumstances of the Offense—§ 3553(a)(1)</u>

In determining the sentence to be imposed, the Court must consider the "nature and circumstances of the offense." 18 U.S.C. § 3553(a)(1).  In reviewing the PSR, someone unfamiliar with the case could sincerely ask, what exactly is the offense?  Samantha pled guilty to a discrete set of acts that specifically took place between February 2015 and March 2015.  Yet the "offense conduct" section of the PSR includes acts that occurred years later, including those in the middle of a war zone by her jihadi husband.  Counsel's objections to this expansive view of relevant conduct are set forth above.  And regarding the remaining allegations in the "offense conduct" section, counsel's disagreements and objections are detailed in their February 25, 2016 objections to the draft PSR.  (Dkt. #13, pp. 2-3).  Rather than restate those objections and clarifications in detail, counsel would request to adopt them fully herein.  However, and perhaps more importantly, dwelling on these factual disputes seriously risks losing the proverbial forest through the trees, and drowning out the many substantive sentencing issues that must be addressed under §3553(a).  As such, further responses regarding allegations currently classified as "offense conduct," such as

Moussa's control of the online accounts and his purchases of "tactical gear," as well as all of the events that occurred in Syria, including the incendiary false narrative regarding the Yazidis, will be addressed in either a reply to the government's sentencing memorandum or at the sentencing hearing should the prosecution continue to press this absurd position.

Suffice it to say for now, Samantha continues to admit the conduct set forth in the plea agreement. She is deeply remorseful for her conduct and the toll it has taken on her children and family. (PSR, p. 18, ¶119); (A. Smith Letter, "Samantha has learned a valuable lesson that she will never be naïve to, or trust easily again. Samantha went through every horror you could imagine for a woman, and now she just wants to be with the family who loves her and can best begin her healing process that will take the rest of her life to recover."). (E. Wiegand Letter, "Samantha harbors guilt for causing all family members so much pain and anguish. This type of catastrophy [sic] has never touched our family before and it has taken a toll on many people."). In the same breath, there should be no doubt that Samantha would never have engaged in the offense conduct but for the substantial influence and control of her husband Moussa (who in turn was influenced by Abdelhadi). Not only had she never been arrested, but she was also working as an FBI CHS prior to the offense conduct. Indeed, to fully appreciate the nature of the circumstances of the offense, one must appreciate Samantha's history and characteristics, most particularly her abusive and tormented relationship with the violent and unstable Moussa.

## C. <u>History and Characteristics of Defendant—§3553(a)(1)</u>

In determining the sentence to be imposed, the Court must also consider the "history and characteristics of the defendant." 18 U.S.C. § 3553(a)(1). The PSR commendably and thoroughly covers many details of Samantha's difficult and often tragic history and characteristics. (PSR, p. 13-19, ¶¶75-131). In particular, the PSR's description of Samantha's mental and emotional health,

which summarizes the findings of Dr. Stephen Xenakis, and portrays the deeply traumatic events that have left serious mental and emotional scars that desperately require long-term professional psychiatric and therapeutic treatment that, to date, she has never received. Not only that, which counsel submit is a relevant sentencing factor, the government strenuously resisted counsel's request to modify the conditions of detention to permit treatment for which she was in desperate need. *See* Defendant's Emergency Motion for Pre-Trial Release on Conditions (Dkt. #49) and Government's response (Dkt. #53).

### 1. **Samantha's Childhood and Upbringing.**

Samantha grew up in Oklahoma with loving and supportive, albeit very conservative, parents who described her as always "display[ing] care and concern for others" as a child. (R. and L. Sally Letter, p. 1). She grew up with a large extended family, as evidenced by the number of character letters submitted by relatives. Others describe how she was raised in a "Christian" home that valued work. (M. Wolf Letter). Her parents were also strict, traditional, and "old school." (PSR, p. 13, ¶78). For instance, when she was in sixth grade, her parents pulled her from school and began home-schooling her after they discovered that she had a crush on a boy. (*Id.*).[10] As a result of this and other formative experiences, Samantha felt isolated and suffered from low self-esteem and loss of confidence. (*Id.*). On the outside, though, Samantha continued to appear fun-loving, upbeat, and happy. (B. Currier Letter, p. 1; E. Wiegand Letter; J. Postlewate Letter; J. Abbott Letter).

---

[10] Of note, the PSR lists just one aggravating factor in support of a variance: "The defendant did not graduate from high school and did not earn her GED." (PSR, p. 22, ¶153). Samantha should not be docked in this manner given the circumstances of her educational history. Moreover, one only needs to sit with her for several minutes to see that she is an intelligent individual who would have no problem passing that rudimentary examination.

Unfortunately, and through no fault of her parents, Samantha was a victim of childhood sexual abuse early in her life.  (PSR, p. 13, ¶79).  When she was around twelve and thirteen-years-old, a non-immediate family member sexually abused her.  (*Id*.).  And at sixteen-years-old, a neighbor groomed Samantha, but this experience did not result in any sexual abuse or assault.  (PSR, p. 14, ¶80).  These remain sensitive topics that Samantha has shared with few, and has never addressed through counseling or therapy.  Samantha's upbringing was thus one of conflicts.  She had supportive and perhaps strict parents who tried to establish boundaries for her.  Yet she also suffered abuse that she internalized.  It is perhaps no surprise that she would rebel at an early age and, sadly, that she would do so by becoming involved in repeated abusive relationships—a hardly uncommon pattern for victims of childhood sexual abuse.  As her parents bluntly state, and to put it rather mildly, Samantha "had problems with choices in men."  (R. and L. Sally Letter, p. 3).

### 2. At Seventeen-Years-Old, Samantha Married an Older, Abusive Man.

When she was seventeen-years-old, Samantha was working as a receptionist, but spent time online and ended up meeting a 21-year-old man named A. Humphrey in an online chatroom.  (R. and L. Sally Letter, p. 3).  After meeting in person, Samantha ran away with him to Indiana.  (*Id*.).  Her parents found her within 24 hours and brought her back home.  But the boyfriend followed and took Samantha back.  They would soon marry, and Samantha's parent's fears came true, as the man was physically abusive and beat Samantha so severely that she required hospitalization.  (R. and L. Sally Letter, p. 3); (PSR, p. 14, ¶90).  This failed and toxic marriage would sadly presage many of the aspects of her abusive relationship with Moussa ten years later.[11]

---

[11] According to professional literature, individuals who are victims of abuse in childhood and in their formative years are at more risk, not less, for being victims of abusive relationships in adulthood.  *See* Robert T. Muller, PhD, *Trauma Survivors at Risk for Future Abusive Relationships*, Jan. 8, 2016 (available at: http://bit.ly/32XdYsx) (last visited Aug. 15, 2020) ("When children witness or experience abuse, it can have a detrimental effect on their well being as an adult...").  Thus, Samantha's childhood abuse as well as

### 3. Samantha Suffered Physical, Sexual, and Emotional Abuse from Moussa, Who Dominated Her and Treater Her as His Property.

After a break-up of another bad and abusive relationship in Texas, Samantha moved to Indiana for a new start.[12] Her sister Lori was already in Indiana and offered Samantha a place to live. (PSR, p. 15, ¶96). Lori was married to one of the El Hassani brothers, and introduced Samantha to Moussa. Samantha began working at the El Hassani family's warehouse with Lori, and began socializing with the family and would soon develop a relationship with Moussa. At that fatal point, everything changed for the worse. Samantha's parents describe how her "problems really began" when she met Moussa. (R. and L. Sally Letter, p. 2). They recall how communication with their daughter stopped after she met Moussa. (*Id.* "There was a wedge driven between Sam and her family that got very deep, to the point of zero communication."). Her parents lost touch with her for several years when she was in Syria and even before for all intents and purposes.[13] Samantha told her parents that she believed she could control Moussa, but this obviously proved wrong. (R. and L. Sally Letter, p. 2). Instead, it was Moussa who was "controlling and abusive." (PSR, p. 15, ¶96). Other people who were close to Samantha at the time describe, often graphically, the abuse she suffered and reported from Moussa.[14]

---

[11] her first abusive marriage when she was only seventeen-years-old made her vulnerable to abusive relationships later in life, such as with Moussa.

[12] Angela Benke, who worked at the El Hassani family's warehouse with Samantha remembered that when Samantha moved to Indiana, she said that she had been "beaten from her previously relationship." (A. Benke 7.24.20 Interview). Needless to say, no one told Samantha the proverbial adage that the only problem with geographic cures is that she had to take herself along.

[13] Isolating a victim from communicating with their family is in itself a widely documented tactic of abusers. (National Domestic Violence Hotline Power and Control Wheel, https://www.thehotline.org/is-this-abuse/abuse-defined/) (last visited Aug. 15, 2020).

[14] Much more could be said about Moussa, but for the purposes of this sentencing memorandum, the focus should be on Samantha and her abuse at the hands of Moussa. With that said, it is noteworthy that Moussa had a significant problem with drugs, including hard-core drugs, which caused erratic behavior. (AJ Moring, 7.23.20 Interview). AJ Moring recalled one incident when Moussa barricaded himself inside the warehouse while he was high on drugs because he thought that people "were out to get him." (*Id.*). He had

AJ Moring personally saw Moussa "hit and shove Samantha." (AJ Moring 7.23.20 Interview). He remembered seeing how when Samantha did not quit smoking like Moussa commanded her to, Moussa smashed each cigarette from a pack on Samantha's head, one at a time. (*Id.*). Samantha also confided in Moring that "Moussa was beating her." (*Id.*). Samantha also told Moring that when she did not want to have sex with Moussa, "he would not take no for an answer and pretty much would rape her." (*Id.*). *See also* A. Benke 7.24.20 Interview ("Angela stated, Samantha told her that Moussa forced her to have sex with him and that it was brutal and not passionate.").

Angela Benke recalled how Samantha would tell her that Moussa hit her and that she also did not like the way that Moussa treated Matthew. (A. Benke 7.24.20 Interview). Andria Lightner, another friend and coworker at the warehouse, did not personally witness any beatings, but remembered how "Samantha would come in with lots of makeup on to hide bruises." (A. Lightner, 8.11.20 Interview). Samantha would explain to Lightner that Moussa was in a "bad mood." (*Id.*). Lightner also describes how Samantha's mood would change when Moussa was around and that she would "kind of cower." (*Id.*). *See also* A. Benke 7.24.20 Interview (describing how Samantha

---

wild mood swings, even when he was sober, and would often go on bizarre spending sprees. All indications suggest the presence of a mental illness, perhaps bipolar disorder. Counsel would proffer that their investigation and meeting with the El Hassani family in Morocco confirmed that mental illness is present in at least one of Moussa's living brothers. Additionally, Moussa would often solicit sex workers, including when he was married to Samantha. He rarely would go to the Mosque. In sum, his behavior, conduct, and demeanor exhibited everything *but* radicalized behavior that would have caused Samantha concern, or even suggest that he should be taken seriously when he started talking about ISIS in November 2014 (which started when he was high on marijuana with his brother, not coincidentally). Perhaps this also explains why the FBI—who was using Samantha to surveil the El Hassani warehouse during the same time—missed the fact that the two El Hassani brothers were plotting a trip to Syria to join ISIS. This, of course, presumes that the FBI did not know exactly what the two brothers were up to and decided to let them go for their own investigative purposes—whatever that may have been. It is hard to fathom, with all the surveillance abilities at the FBI's disposal and after having an informant (Samantha) in the midst of the family's dubious overseas business for two years, how the FBI could have simply lost track of two terrorists hiding in plain sight. Perhaps the Court knows the answer to this question from its review of the classified evidence, but undersigned counsel cannot fathom any other answer.

was fun and outgoing when away from Moussa but "would say nothing" when she was around him).

In addition to physical and sexual abuse, Moussa would emotionally control Samantha in virtually every other way, as others recall. (C. Daniels Letter, p. 2). Moring remembered how Moussa told him directly that "Samantha was *his property and he could do whatever he wanted to her*." (AJ Moring 7.23.20 Interview). Andria Lightner, who worked at the El Hassani warehouse with Samantha, recalled how during this time "Samantha said Moussa got mad at her and took her car keys and made Samantha and [M.S.], her son, walk home which was several miles away. It was snowing outside and cold." (A. Lightner, 8.11.20 Interview). In a prior interview, Moring also recalled how Moussa would take away Samantha's "keys and credit cards so she couldn't leave."[15] Lightner recalled how Samantha also told her that when they got home Moussa had changed the locks on the doors. (*Id*.). As a result, Samantha and M.S. had to sleep outside in the cold.

Moussa bought Samantha nice things like expensive cars, but as one friend observes, it still "didn't seem like she had much freedom." (C. Daniels Letter, p. 3). Lightner bluntly recalls: "Samantha would have to do whatever Moussa told her to do …. if Samantha wanted to do anything, she would have to get Moussa's permission." (A. Lightner, 8.11.20 Interview). Samantha also changed her physical appearance to suit Moussa's desires. She bleached her hair blonde. She had plastic surgery. She lost weight because, as she told AJ Moring, Moussa said "she was fat and had to lose weight." (AJ Moring 7.23.20 Interview). It is, of course, not uncommon for abusers to buy their victims gifts and treat them nicely for spells. Literature

---

[15] Shane Bauer, *Behind the Lines*, Mother Jones, Part Two, July/August 2019 ("*Behind the Lines*") (available at: https://bit.ly/32VVybL) (last visited Aug. 15, 2020).

describes this type of affection as part of the pattern of abuse and control, and ultimately as a "type of grooming, a predatory tactic that is meant to build a deep emotional connection.[16]

It should also come as no surprise that Samantha's heavy reliance on alcohol to relieve stress (PSR, p. 18, ¶120) and addiction to Vicodin (PSR p. 18, ¶122) during her marriage with Moussa were forms of self-medication to dull the pain of his abuse. The alcohol and painkillers no doubt clouded her judgment as well.

Thus, regardless of the pleasant outward appearance or "good face" that Samantha put forward, which is typical in abusive relationships, she was trapped with Moussa. Benke recalled asking Samantha why she did not move away if she was afraid of Moussa, and that Samantha said that she could not because she was "in love with him." (Benke 7.24.20 Interview). But the real answer was that Samantha was scared of him, and trapped in a domestic abuse cycle. Benke's statements are chilling:

> Angela stated, Samantha came in one day and she was crying and Angela asked if it was Moussa and Samantha said yes. Samantha told Angela that Moussa told her if she was to ever leave he would kill her. Samantha told Angela, I am scared to death.
> Angela said she told Samantha there are people that can help her and Samantha said he will kill us.

(A. Benke 7.24.20 Interview). Samantha also told Moring that she was afraid Moussa would kill her if she left, but added graphic details that explained why her fear was real. A recent interview of Moring reflects as follows:

> AJ told Samantha to quit taking all the abuse and leave Moussa. Samantha told him it was okay. AJ said, Samantha decided to tell Moussa she was leaving him.

---

[16] Lisa Aronson Fontes, PhD, *From Romance to Isolation: Understanding Grooming*, Feb. 11, 2019 (available at: https://bit.ly/331Hwp6) (last visited Aug. 15, 2020). *See also* Kelsey Borresen, *5 Behaviors That Seem 'Normal' But Could Be Signs of Emotional Abuse*, January 15, 2019. (available at http://bit.ly/2IsPVZ0) (last visited Aug. 15, 2020) (""[A]n emotional abuser will take it to another level by showering you with extravagant gestures that are in no way commensurate with the length or seriousness of the relationship.").

Samantha told AJ that Moussa grabbed a pair of scissors held her down and in front of [M.S.], her 5 year old son, put the scissors to her throat.

(AJ Moring 7.23.20 Interview).   The significance of Moussa committing this violent domestic abuse in front of M.S. cannot be understated.   In a warped way, it added to Samantha's need to stay with Moussa in order to protect M.S.[17]   She wanted out but could not leave, emotionally or without fear for herself and her children's lives.   One does not need expert examinations or testimony to recognize how the abuse, control, and Samantha's inability to leave fit the familiar pattern of a battered woman in an abusive relationship.   This abuse and control—and particularly Moussa's threats to harm Samantha if she tried to leave him—frame the very decisions and conduct for which she now stands convicted.   Moussa's abuse would continue and escalate even more severely in Syria, including to the point of beating Samantha when she was pregnant with his daughter, which the Yazidis B.H. and S.K. both recalled seeing.   (S.K., FD-302, p. 5; B.H., FD-302, p. 6).[18]   In Syria, Moussa finally achieved his goal of isolating Samantha, so that she could not leave until he was dead, as discussed in more detail below.

### 4.   Samantha Worked as an FBI Confidential Human Source to Report on the El Hassani Family Business, Including on National Security Matters.

Adding to the incredible complexity of this case, and of Samantha herself, is that from 2012 through 2015, she served as an FBI CHS.   Not only did she regularly report to FBI handlers and receive payment for her services, but she was tasked with collecting and information the El

---

[17] Domestic violence in front of children or using safety of children against the victim is also a widely documented tactic of abusers.   In fact, Moussa's behavior  accounts for virtually every category on the National Domestic Violence Hotline's guide intended to help identify abusive relationships, including reproductive abuse, physical and sexual violence, using children, using isolation, economic abuse, threats, and "making [the victim] do illegal things." (*National Domestic Violence Hotline* "Abuse Defined", (available at: https://bit.ly/346rfll) (last visited Aug. 16, 2020).

[18] Copies of the FD-302 reports from B.H. and S.K. are submitted as under seal Exhibit C.

Hassani family warehouse.  As the Court will recall from a prior discussion of the FBI reports reflecting Samantha's cooperation, which are now part of the discovery, Samantha's tasks as a CHS included logging details of items and their destinations, such as noting serial numbers of smart phones that were being shipped to locations in the Middle East.  Judging by some of the items that Samantha typically saw being shipped through the warehouse, one can understand why Samantha was not surprised to have Moussa ask her to pick up binoculars, cameras, and even rifle scopes (which she did not know she was picking up until the package was opened).

FBI reports reflect how the Bureau determined Samantha to be in a position to "obtain information on any/all account holders at the shipping company" and to have access to "items being shipped."  This access was determined to be "vital in providing real time intelligence" to the FBI and perhaps other intelligence agencies.  (00013462).  (*See* Exhibit D, Under Seal).  Not surprisingly, one FBI report specifically described Samantha's services as reporting on national security issues.  Specifically, the FBI Agent's comments included the following:  "CHS's reporting on items being shipped from CHS's employer has provided valuable insight to the FBI, [Redacted]. CHS's report [Redacted] provides the FBI with important information about potential national security threats."   Additionally, the CHS's employer has been utilized by a variety of individuals/groups of interest to the FBI [Redacted].  [Redacted].  The CHS was briefed that they should not only focus on [Redacted], but should focus on any types of suspicious shipments of a criminal or national security nature."  (00013497).  (*See* Exhibit D, Under Seal).

Counsel submit that Samantha's multi-year cooperation with the FBI is a critical aspect to understanding her complicated history and characteristics.  But it is just as important to contextualize this prosecution.  The Court will surely recall that Samantha was initially charged not with material support, but with lying to the FBI in violation of 18 U.S.C. §1001.  That charge

was related to statements and omissions that Samantha made during the course of her cooperation, and specifically about her travel plans in March 2015.  It is not difficult to see how these charges provided convenient cover for the FBI.[19]  The FBI not only let a working CHS travel to Syria, but also had her terrorist husband and brother-in-law, whose family company was under national security surveillance, leave the country and fight for  ISIS right under its nose.  One might also ask why it is the government does not see fit to request credit for this cooperation or, at least, supply the Court with details concerning this cooperation as a matter in mitigation. The simple fact of the matter is that this case should well embarrass the government, and it is within reason for counsel to suggest a motivation to turn this case into a proxy "national security" prosecution. Again, counsel do not raise this as an excuse for Samantha's conduct for which she continues to accept responsibility.  However, it does provide context to the entire prosecution.

> **5.  Samantha's Horrific Experience in Syria and Her Harrowing Escape from ISIS, Only to be Held in Kurdish Camps and Then Returned to the United States in Custody and Was Separated from Her Children.**

Sometime in April 2015, Samantha and her two children crossed the border from Turkey into Syria along with Moussa and Abdelhadi.  Considerable debate could be had over whether Samantha did this willingly or under duress, but that would have required the trial that both parties did not think was in anyone's interest.[20]  Samantha and her children were separated from Moussa

---

[19] Indeed, after a June 20, 2015 report that noted "CHS had limited reporting due to personal overseas travel both before and after the 3/19/2015 debriefing. … No handling issues noted," in a July 3, 2015, close to four months after the last debriefing, the agents concluded that Samantha may have left the country without notifying the handlers.  Copies of these FBI reports are attached in Exhibit D.

[20] As the Court well knew from the many pre-trial conferences, and the *ex parte* CIPA §4 hearing, undersigned counsel wanted very much to try this case out of concern that the only way the Court could get the full flavor of this case from the defense perspective was through an exposition of all the facts at trial. Nevertheless, Samantha herself urged counsel to resolve the case after the government proposed the plea to the §2339C count.  In plain point of fact, while counsel still had reservations about proceeding on a plea for sentencing purposes, Samantha was simply too emotionally exhausted to proceed to trial and did not

and Abdelhadi and taken to a "women's house."  Samantha, who spoke no Arabic and was not Muslim, was suddenly forced into a foreign, frightening, and often deadly existence that would last for over four years of some form of captivity, which has continued to this day.  This nightmare experience haunts her; seeing bottles of water lined up on the floor or hearing jail doors slam trigger flash backs of Syria.  (PSR, p. 17, ¶116).

Samantha wanted to leave Syria almost as soon as she arrived in 2015 but would stay in Raqqa for over two years—for the same reasons she ended up there in the first place, the children. During that time, she gave birth to two more children, meaning she was also pregnant for much of that period.  Remarkably, at least insofar as the government seems capable of acknowledging,[21] *she was imprisoned, tortured, and raped by ISIS guards after being taken to an ISIS prison.* Moussa's drug usage increased, and so did his violence toward her.  Samantha also survived violence and the constant threat of death from not only ISIS, but from coalition forces that besieged and bombed Raqqa, and eventually forced ISIS out.  Moussa was killed by those coalition forces in September 2017.  Samantha herself could have easily died on any given day, as mortars and bombs did not distinguish between soldier and civilian.  This is not to say that many days wouldn't seem "normal," with shopping, cooking, and domestic affairs; however, every day could turn into a chaotic survival test.  Samantha ended up protecting three Yazidis, two of whom her husband would sexually abuse and rape.  It was hell, pure and simple.  Samantha somehow managed to

---

want the Court to think she did not accept responsibility for her disastrous decisions that put her and her children in harm's way.

[21] The government's position in this regard is like its position on many of the facts that occurred in Syria and that are addressed *infra*.  That is, while they do not dispute that these things happened to Samantha, they simply do not know it to be true one way or another. This head in the sand bob-and-weave flies in the face of the obvious fact that virtually everything Samantha says is consistent with what reportedly happened to ISIS captives.  The Court could rest well assured that if this was a prosecution of Moussa, Abdelhadi,  or some other ISIS member, the government would gleefully be citing chapter and verse of all the evidence in its intelligence archives that supports how brutal and terrible ISIS treated virtually all its captives.

survive and escape that hell, despite barely speaking Arabic and being American and non-Muslim. Rather than delving into the details of Samantha's daily life in Raqqa during wartime—which are truly worthy of a book rather than the limited space afforded here—counsel briefly focus on three topics: Samantha's imprisonment; the Yazidis; and Samantha's escape from ISIS.

In mid-2016, ISIS forces stormed into Samantha's house and forcefully interrogated her. Samantha recalls how a particular female ISIS member, who spoke with a French accent, put a gun to her head and accused her of being a spy. Moussa was also interrogated. and both of them were taken into custody. At the time, they had two children still, who were taken in by different neighbors. Samantha was approximately seven months pregnant. Samantha now understands that she was taken to the infamous Black Stadium, which was a soccer stadium that ISIS used as a detention and torture center.[22] There, she was "beaten and raped and left handcuffed for days." (PSR, p. 15, ¶98). She was denied food and water and was not allowed to use the bathroom. (PSR, p. 15, ¶98).

During her first interview with the FBI in November 23, 2017, Samantha told agents of her imprisonment. She specifically described how she was in the prison for "two months while a large Egyptian beat her with a hose and electrocuted her in the stomach. They handcuffed her above her

---

[22] Video of the Black Stadium is available in the Mother Jones article *Behind the Lines*, at: https://bit.ly/32VVybL) (last visited Aug. 15, 2020). Samantha's description of being handcuffed from the ceiling of a concrete cell is consistent with the account from another torture survivor who was interviewed in the Mother Jones video. Others corroborated ISIS would torture at the Black Stadium by "tying [their] hands for hours" and that detainees were "blindfolded and handcuffed for days, and even week[s], without water or food." (available at: https://bit.ly/3iO2dLL) (last visited Aug. 16, 2020). A 2013 report by Amnesty International also described how someone formerly detained by ISIS described being "tortured with electric shocks and beaten with a cable while suspended with only one foot touching the floor." (*Amnesty International Briefing*, December 19, 2013 (available at: https://bit.ly/2Y9OwyR) (last visited Aug. 16, 2020).

head for hours, and once handcuffed her behind her back on a cement floor for two days. Samantha was not given any food. After one and a half months, she was given one bowl of rice per day. The rice was placed into the same bowl that she used to catch her excrement." (FBI_00047950).  Both Yazidi girls, B.H. and S.K., recall seeing scars where she was hit in prison, and also being told by Samantha that ISIS "put electricity on her stomach."  (B.H. FD-302, p. 3).

Samantha was also kept in stress positions while handcuffed, and could not sleep because her captors would blast recordings of Quranic verses.  (PSR, p. 15, ¶98).  Her recollection of this experience is noted in the *Behind the Lines* article:

> "I was tortured, I was beaten—just the sickest things that you could possibly imagine happened to me," she recalls. "I was told that they were going to do everything to me that the Americans did to their brothers in Guantánamo Bay. You hear screams, you see blood on the floor. It's all night: sleep deprivation, hunger, living in your own filth, regular beatings, the humiliation, electrocution. You stay in a cell that you can't even stretch your legs in. There's no toilet, there's nothing. You just can't imagine. They hang you up by the ceiling and they strip you naked and they beat you in front of a bunch of men. They take their imagination and they just roll with it." Samantha was visibly pregnant. An Egyptian interrogator put cables on her belly and asked, "Does your child move when I electrocute you?"

(*Behind the Lines*).  These gruesome descriptions speak for themselves and should in many ways be punishment enough for whatever criminal liability she is exposed to in this case.  Surely, nothing this Court can impose can rival such atrocities.

As for the Yazidis, they are a minority ethnic and religious group indigenous to areas including what is now Northern Iraq.  As ISIS began its territorial expansion in that area in 2014, Yazidis were targeted for extermination because they of their monotheistic non-Muslim religious practices.  In August 2014, ISIS forces besieged the area around Sinjar, a city in Northern Iraq close to the Syrian border.  Tens of thousands of Yazidis fled to the surrounding mountains to escape ISIS.  A humanitarian crisis would ensue.  While Kurdish forces, including the YPG and

PKK held off ISIS forces to allow Yazidis to escape the mountains, ISIS captured and many others, who were killed or enslaved.  The United Nations has recognized that ISIS's actions amounted to genocide of the Yazidis in Iraq.[23]

B.S., S.K., and A.E. were three Yazidis who were captured by ISIS and literally enslaved. Counsel urge the Court to review the FD-302 interview reports.  *See* Exhibit C, Under Seal.  The reports describe their difficult experiences, their time with Moussa and Samantha, and their escape from Raqqa with Samantha.  B.S., S.K., and A.E. were each interviewed separately by the FBI in October 2019, after the defense moved to take the depositions of B.S. and S.K. pursuant to Rule 15, which was filed on August 25, 2019.  (Dkt. #79).  The defense sought their testimony for very good reason.  As reflected in the Rule 15 motion, the anticipated testimony of the Yazidis would elicit evidence showing how Samantha acted in a manner entirely inconsistent with someone who provided material support to ISIS.  (Dkt. #79, p. 4).   In many regards, the FBI reports corroborate that assessment, as B.S., S.K., and A.E. each speak positively of Samantha, who in the end was responsible for their escape from Raqqa.

Counsel do not suggest that Samantha's treatment of the Yazidis somehow excuses the atrocities that happened to them and their families.  But that is also the wrong analysis, and counsel would strongly urge the Court not to entertain it should the government advance Samantha's responsibility for what happened.  Doing so would risk holding responsible not only the conduct of her husband that she could not control, but it would also make her responsible for the brutality of ISIS, an organization she never joined and of which she is also every bit a victim.  Instead, it is important to focus on Samantha's own conduct.

---

[23] Wikipedia, Genocide of Yazidis by ISIL, available at https://bit.ly/1RVq3Q9 (last visited Aug. 15, 2020).

With regard to S.K., Samantha met her with Moussa, and then decided to sell her own jewelry to buy her from her captor. She understood that Moussa would not touch S.K. And, in fact, that turned out to be true for about three months, during which time S.K. said she "felt free" and "was able to go to the market." (S.K. FD-302, p. 3). But Moussa, in his brutality, would end up raping S,K, just as he had raped Samantha. After doing so, he told S.K. not to tell Samantha. (S.K. FD-302, p. 4). S.K. recalled how Samantha argued with Moussa about his treatment of S.K. and also B.H. (S.K. FD-302, p. 4). S.K. confirmed that Moussa was violent with both Samantha and M.S., and that he would physically assault them. (S.K. FD-303, pp. 4-5). Even A.E., who was approximately seven years old when he was with Moussa and Samantha, recalled that Moussa hit him and "also hit Sam." (A.E. FD-302, p. 2).[24]

B.H. described how Samantha would teach her things, including how to drive and sew, but only when Moussa was not around because he expressly ordered Samantha not to teach them anything. (B.H. FD-302, p. 5). B.H. also told the FBI how Samantha tried to defend her and S.K. against Moussa. On one occasion when Samantha told Moussa not to rape B.H. because "she was like [her] daughter," "Moussa hit Sam and locked Sam in a room." (B.H. FD-302, p. 6. Moussa then raped B.H. (*Id*.). B.H. also described how Moussa beat Samantha when she was nine months

---

[24] In an interview to the press, who tracked him down, young A.E. spoke favorably of Samantha and also recalled how she opposed the video that was made of him and M.S. Indeed, he specifically stated that Defendant indeed tried to stop the propaganda videos from being made. A.E. also recalled that Samantha would encourage him to remember the names of his parents and siblings in the hopes that he could reunite with them someday, which is contrary to the government's notion that Samantha was aligned with ISIS' genocidal aims. *See*, Salma Abdelaziz and Arwa Damon, *Kidnapped boy raised by American ISIS woman in Raqqa*, Jan. 23, 2018, available at https://cnn.it/2ZqgUhZ (last visited Aug. 15, 2020) ("One day, Ayham says, ISIS demanded that the pair appear in a foreign-language propaganda video. Sam tried to stop the group of militants from taking the boys away, but the fighters threatened her and said she had little choice."); CBS News, *Boy says he lived with U.S. family under ISIS rule*, Jan. 22, 2018, available at https://cbsn.ws/2E22ojA (last visited Aug. 15, 2020) ("He says the family treated him with kindness. They were forced to make the video by an ISIS gunman, he tells CBS News.").

pregnant, and how B.H. had to find blood for Samantha after she delivered her daughter.  (B.H. FD-302, p. 6).  Not only did Samantha prevent Moussa from selling B.H., but after his death, Samantha told her that she was free.  (*Id*.).

Out of all these absurd and nightmarish facts, what the government and Probation seem to fixate on is how S.K. and B.H. retrieved water for the house.  The PSR even says that "the defendant did not retrieve water during these times."  (PSR, p. 8, ¶31).  Any suggestion that Samantha recklessly endangered S.K. and B.H. by ordering them to get water while she sat back in the comfort of her home would be categorically false.   First, neither S.K. nor B.H. said that Samantha forced them to do anything, including getting water.  Second, the group had shared tasks for which they were responsible for their collective survival, especially after Moussa's death.  One of those tasks was getting water, which Samantha did as well.  But Samantha was also responsible for caring for her infant and toddler children.  Third, during the period which the PSR seems to focus on, B.H. could not go out to get water because her leg had been injured after their house was fired on by a plane, which she described as follows in her statement to the FBI:

> In Raqqa, the house they lived in was fired on by a plane and the room Badriya was staying in collapsed.  [B.H.] was stuck in the room under part of the house and Sam pulled her out from under a rock and set her free and saved her.  [B.H.] leg was injured from the rock and Sam took her to the hospital in Raqqa.  At the hospital they were only able to treat part of her injury.  This occurred when Raqqa was surrounded and there was no water.

B.H., FD-302, p. 7.  After rescuing B.H. from the rubble, Samantha also nursed her back to health.

In short, Samantha's relationship with the Yazidis was incredibly complex, and it is impossible for us now to render moral judgment about an absurd situation that by then was entirely out of her control.  Her actions, though, speak loudly regarding her attempts to help the Yazidi children in the extremely desperate times in which she found herself.  Perhaps most clearly indicative of Samantha's good intentions is how she smuggled them out of Raqqa with her own

four children. Needless to say, one does not take extra "chattels" on an escape attempt.  The simple fact of the matter is that Samantha—notwithstanding her atrociously bad decisions prompting her to end up in Syria—literally saved the Yazidi's lives.  Trying to color it any other way is simply wrong and inflammatory.

After Moussa died from his battle wounds in September 2017, Samantha was left with her own four children as well as the three Yazidis.  Abdelhadi attempted to take S.K., believing it was his "right" to do so, and in fact did for a short time period over Samantha's objections.  However, Samantha was able to get S.K. back, and in the process took a sum of money and a gun from him in order to fund her escape from Raqqa.  At that time, the coalition forces continued to advance on Raqqa, and bombings were more and more frequent.  Sensing she had to escape, in November 2017, Samantha carefully approached a neighbor who she had seen smoking outside of his house (which was forbidden by ISIS).  (00047948).  She then made arrangements to be smuggled outside of Raqqa in the back of a truck.  (*Id*.).  She paid the smuggler a ten-ounce gold bar and the gun she stole from Abdelhadi.  (*Id.*).

Significantly, Samantha took not only her own four children, but the three Yazidis.  She did so knowing full well that if she had been detected and caught by ISIS, she could have been shot on-sight or sent back to Raqqa to be imprisoned.  Further, after reaching SDF forces in Deir ez-Zur, Samantha would give S.K. money before they separated, which S.K. used to free her sister from ISIS.  (S.K. FD-302, p. 6).  A press story from a Kurdish news source from November 18, 2017, even reported how a family of eight Yazidis was liberated by the Syrian Democratic Forces, and shows a picture of Samantha with her children, the Yazidis, and SDF soldiers.[25]  Put simply,

---

[25] *See Yazidi family liberated during a SDF special operation*, Nov. 18, 2017, Hawar News Agency, (available at https://bit.ly/2Zehv7p) (last visited Aug. 15, 2020) ("Today, Saturday at 5:30 am, the Syrian

the Yazidis may very well not be alive today had Samantha not brought them with her during her escape.

Samantha's plight did not, of course, end with her escape from Raqqa. She would spend close to nine months in two different Kurdish SDF camps in Syria. The conditions were poor, and the food was scarce. (PSR, p. 16, 99). Her children were malnourished in the camps, and Samantha believes that her youngest son contracted hepatitis. (PSR, p. 16, 99). It was in the camps that the FBI interviewed Samantha in November 2017 on multiple occasions. Samantha would ask for assistance to return to the United States. But a quick return was not in store, and Samantha and her children were forced to continue to live in the squalid camp conditions.[26]

The FBI and government did not make arrangements for her return until July 2018—eight months after they first interviewed her. She and her children were flown back on a cargo jet. Shortly after landing, Samantha was placed under arrest on the under-seal indictment, which charged her with lying to the FBI in March 2015, over three years prior. That would be the last time that she saw her children.

### 6. Samantha's Detention Has Resulted in Ongoing Separation from Her Children and Infection by COVID-19.

After her arrest, Samantha was placed into custody and has remained there to this day. Those two years of confinement have been exceptionally arduous on Samantha for several reasons that have made her experience far more difficult than the average pre-trial detainee. And, to

---

Democratic Forces carried out a special operation in the western countryside of Deir ez-Zor. The forces liberated an 8-member of Yezidi family, 5 of them are children and 3 women, from IS mercenaries.").

[26] Doctors Without Borders (Médecins Sans Frontières) described the poor conditions of the camps as lacking "adequate access to hygiene and sanitation" and "overcrowded and unsafe conditions, with low vaccination coverage." *Médecins Sans Frontières*, Driven out by war, displaced in desperate conditions (available at: msf.org/syria-depth) (last visited Aug. 16, 2020).

compound matters almost to the level of the theater of the absurd, even in the protective confines of the Porter County Jail and having survived the chaos of ISIS controlled Syria, Samantha was infected with the coronavirus and contracted the new and deadly COVID-19.

First, the forcible separation from her children in July 2018, one of whom was an infant and another a toddler, was particularly devastating to Samantha. The continued separation and lack of any contact has been even more so. She shared with Probation "that she finds it difficult to live without her children." (PSR, p. 18, ¶118). She has now spent over two years in custody without saying a single word to any of her children—much less hug them. Samantha can only look on as other inmates at Porter County talk to their kids on the phone and even see them during visits. Others have observed how the separation from her children for two years now has been "beyond painful." (C. Daniels Letter, p. 2). This is particularly so given the special bond that the children had with Samantha as they together survived escaping ISIS and living in different SDF camps for close to a year. (A. Smith Letter, "The incredible bond that Samantha formed with her children and what they all went through together is a unique understanding that only they, together will have.").

Second, Samantha was also infected with the coronavirus and had COVID-19 while in pre-trial detention at the Porter County Jail. As described below, and as counsel trust this Court is well aware from the many Compassionate Release filings, COVID-19 has run rampant through jails and prisons, infecting hundreds of thousands of inmates and detainees across the nation. Samantha is, unfortunately, one of those detainees who had to fight off the virus behind bars. (Exhibit F, Medical Records (Under Seal)).[27] Fortunately, she lived, but the lasting physical and mental

---

[27] Selections from Samantha's medical records from Porter County Jail are submitted as under seal Exhibit F. These records have previously been provided to the Probation Officer.

consequences are still unknown.  Her parents recall the worry they had when, in April 2020, Samantha began describing symptoms and discomfort that were consistent with COVID-19.  (R. and L. Sally Letter, p. 3).  Initially, Samantha was not tested and did not receive medical attention, which required intervention of undersigned counsel with the jail.  The tests confirmed that Samantha had COVID-19.  She survived the difficult fight with the virus and would tell friends that she experienced anxiety in addition to fevers and shortness of breath.  (C. Daniels Letter, p. 3).  This, too, might well be another factor unto itself for this Court to decide that she has been punished enough.

### 7. Samantha Benefits from Ongoing Support From Her Parents Who Now Have Custody of Her Children and Hope to Reunify the Family in the Future.

Significantly, Samantha receives incredible support from friends and family.  In June 2020, Samantha's parents secured custody of Samantha's three youngest children through Indiana DCS proceedings.  (R. and L. Sally Letter, p. 1).  The kids are now seven, four, and three years old.  While Samantha cannot speak with her children and they cannot communicate with her, she speaks with her parents weekly and constantly asks about her kids.  (R. and L. Sally Letter, p. 1); (PSR, p. 14, ¶82) ("The defendant reported that she maintains weekly contact [with her parents] and that they are supportive of her.  Ms. Elhassani's father corroborated the same.").  Samantha's parents have made tremendous efforts to secure custody of their grandchildren and to provide them with a supportive home.  (*Id*.).  As they note in their letter, their "lives are focused on helping Sam's children." (*Id*., p. 4).  They report that, considering what they have been through, the children are "doing quite well, and things are getting better every day."  (R. and L. Sally Letter, p. 4).

Importantly, they recognize the importance of reuniting Samantha with her children—but only when the time is right and when proper approvals are obtained.  They know that Samantha

needs therapy and help before her transition back into society and motherhood. But the ongoing separation is negatively impacting the children as well. For instance, Rick and Lisa recall in their letter how Samantha's oldest daughter assumed that Samantha was dead. (R. and L. Sally Letter, p. 4). They had to explain to her that she was not, but of course they couldn't tell her where Samantha really was. Still, they have opened their home as a safe space "where relationships can be rebuilt and nurtured." (R. and L. Sally Letter, p. 5). Numerous other family members and friends recognize the importance of reunification. (*See* A. Smith Letter, "I want to see her raise her children and be back with our family once again."); (C. Daniels Letter, "I pray for Sam everyday, I pray for the healing of her PTSD, I pray for her freedom and I pray for her restoration of her and her children."); (B. Currier Letter, p. 2); (E. Wiegand Letter, "These children have been tramatized [sic] and punished for the sins of both their parents and it breaks my heart. They need their mother and she needs them."); (J. Abbott Letter, "Those kids need their mother, the woman who kept them safe, and took care of them in the worst conditions imaginable.").

Centered around the hope for a future reunification with the children, Samantha and her family have begun to heal the wounds caused by her decisions and influence by Moussa. Her parents poignantly write as follows:

> Sam thought that we did not care about her because of the length of time there was no communication. Since she has been back in the US, we've discussed this with Sam and assured her of our love for her. We've told her that what is in the past is behind us now, and we go forward from here. She cried when she heard those words from her Dad. She said "I thought you would never forgive me". Sam looks forward to getting all of this behind her and to come home to Mom and Dad, when everyone is ready and able, to her kids.

(R. and L. Sally Letter, p. 2). In addition to speaking weekly, her parents traveled to Indiana to see Samantha at her change of plea hearing on November 25, 2019. This was the first time that they were in the same room as their daughter in nearly <u>six years</u>. And they had to see her locked

in shackles, wearing a red jump-suit, and looking physically haggard and exhausted. They also had to watch her plead guilty to a terrorism charge.  But, nonetheless, it was a significant moment, as it signaled a step forward to reunification.   Ongoing conversations have buoyed Samantha's parent's hope that she is returning to the person who she once was, and that the reunification may come soon:

> We are encouraged by our conversations with Samantha that we have our daughter back—the old Samantha that existed when she was a young lady.  We have told her that she is welcome in our home, when she is able to return, as long as she tries to go down a right path.

(R. and L. Sally Letter, p. 4); (PSR, p. 14, ¶82) ("'the family feels that they got their old Samantha back.'").

### 8.  Samantha Suffers from Serious Mental Health Problems That Require Intensive and Persistent Treatment.

Samantha's difficult and tragic life experiences have left her with serious mental health problems that have gone untreated.  Dr. Stephen Xenakis, M.D., a psychiatrist and retired Brigadier General of the United States Army who has been qualified as an expert in numerous judicial proceedings regarding national security,[28] has diagnosed Samantha with PTSD and Major Depressive Disorder.  *See* Exhibit E, Dr. Xenakis, Jan. 17, 2020 Letter, p. 4 (Under Seal).  More specifically, Dr. Xenakis's DSM-V diagnoses are as follows:

> **309.81 Post-traumatic Stress Disorder,** manifested by re-experiencing, avoidance behaviors, anxiety, and dysregulation in mood and motions, secondary to imprisonment, torture, beatings, exposure to war zone, and childhood neglect and abuse.

> **296.23 Major Depressive Disorder,** severe, recurrent, manifested by persistent depressed mood, markedly diminished interests and pleasures in daily living, sleep disturbances, feelings of worthlessness, problems in thinking, and recurrent thoughts about death, significantly impairing daily life.

---

[28] A copy of Dr. Xenakis's CV was attached to Defendant's Emergency Motion for Pre-Trial Release on Conditions, which was filed on December 14, 2018.  (Dkt. #49).

(Exhibit E Dr. Xenakis, Jan. 17, 2020 Letter, p. 4).  Dr. Xenakis arrived at these conclusions after examining Samantha at Porter County Jail on August 28, 2018 and October 7, 2019.

Importantly, Dr. Xenakis observed that Samantha's life history and experiences, not just those in Syria, have culminated in her mental health problems:  "Ms. El Hassani endured tribulations in her childhood and adolescence that currently aggravated her conditions and problems. … Starting with high school, she engaged in sequential relationships, marriages, and living arrangements that were destabilizing and attributable to the consequences of abuse and neglect." (*Id.*, p. 2).  Thus, as Dr. Xenakis observes, the "cumulative impact of [her] early life, the brutality of domestic violence, and torture, cruelty, and harsh treatment as a prisoner and POW are the sources of debilitating symptoms and impairments that have erupted as post-traumatic stress disorder (PTSD) and major depressive disorder (MDD)."  (*Id.*); (PSR, p. 17, ¶111).  Consistent with those diagnoses, Samantha suffered and continues to experience from "nightmares, anxiety attacks, episodic crying spells, and social avoidance."  (*Id.,* p. 3); (PSR, p. 17, ¶112).  Medical records reviewed by Probation confirmed that Samantha suffers from anxiety and reported "having nightmares and waking up feeling terrified" and continues to experience "flashbacks of when she was in war-torn Syria."  (PSR, p. 17, ¶116).

Dr. Xenakis also concluded that Samantha failed to receive sufficient medical care at Porter County Jail and was unlikely to do so while in custody.  That prediction from January 2020 has sadly proven to be right.  More specifically, and after reviewing Samantha's medical records from the jail, Dr. Xenakis noted the absence of a "comprehensive neuropsychiatric assessment, despite the evidence of major depression and post-traumatic stress disorder."  (Exhibit E, Dr. Xenakis, Jan. 17, 2020 Letter, p. 3).  And while Samantha has received prescribed medications for anxiety,

including olanzapine, prazosin, and duloxetine, these medications have resulted in varying side-effects, including severe weight gain, which have not been properly managed by a psychiatrist, which has resulted in Samantha self-regulating and going on and off when the side-effects become too difficult.[29]  (*Id*.).  Significantly, Samantha "has not received substantive therapy and counseling of her symptoms."  (*Id*.).  That fact remains to be true, more than two years after her detention.  In Dr. Xenakis's opinion, the lack of medical treatment is only exacerbating Samantha's condition:  "She requires evaluation and prompt intervention for her impairments to mitigate debilitating symptoms that have worsened during her detention.  Prolonged and continued detention aggravate her mental state, as her symptoms are triggered by the environmental conditions of the prison setting."  (*Id.*, p. 4).  Dr. Xenakis also observed that Samantha desired treatment, and "expressed willingness to participate in comprehensive and multifaceted education, training, and therapy programs."  (*Id*.); (PSR, p. 17, ¶112).  Ultimately, Samantha requires further and more extensive evaluations in order to devise an appropriate treatment plan.  (*Id*.).  As Dr. Xenakis concluded, not only would this treatment plan be impossible to implement in prison, but Samantha has not even received the most basic forms of therapy.  (PSR, p. 17, ¶113-114).

Samantha's family members and friends corroborate these medical conclusions with their own lay opinions, which are well-informed by their familiarity with Samantha over the years.  Samantha's parents express their concern about her obtaining much-needed mental health treatment:  "Because of what Sam has been through, we feel that she is going to need intensive mental health therapies.  We are very concerned that she get the help she needs."  (R. and L. Sally

---

[29] Olanzapine, also known as Zyprexa, is anti-psychotic that is used to treat schizophrenia and bipolar disorder.  Prazosin is used to treat PTSD.  Duloxetine, or Cymbalta, is used to treat major depressive disorder.  Samantha has particularly had trouble with Zyprexa, which has led to severe weight gain and other problems.

Letter, p. 2).   They also recognize that this recovery could be a "long road," but affirm their commitment to "support her in any way that [they] can."   (*Id.*).   Friends who are in touch with Samantha recognize the same.  (C. Daniels Letter, p. 1, "Once Sam is released she will have the freedom to seek out the proper help to start the healing process.   Not only does she need professional help for her PTSD but she needs those closest to her to stand by her side through the healing process."); (E. Wiegand Letter, "I believe Samantha needs professional help with her periods of depression."); (K. Emmert Letter, "With everything that Samantha has been through, I am sure she needs counseling and mental health treatments.").   (J. Abbott Letter, "She is one of the strongest people I've ever met, but she still struggles on a daily basis.  She struggles with the things that happened in Syria.  She has frequent nightmares about the terrors of her time in Syria.  She really needs the help of a good therapist to help her deal with all of that trauma, help she cannot get in jail.").

## C. A Sentence Well Below the Advisory Guidelines Addresses the Factors Set Forth in § 3553(a)(2).

In fashioning its sentence, the Court also takes into account the need for the sentence to reflect the seriousness of the offense, promote respect for the law, and provide just punishment for the offense; to afford adequate deterrence (general deterrence) and protect the public from further crimes of defendant (specific deterrence); and to provide the defendant with needed educational or vocational training, medical care, or correctional treatment in the most effective manner.  18 U.S.C. § 3553(a)(2)(A)-(D).

### 1. Seriousness of the Offense.

Counsel do not quarrel with the offenses being labeled as "serious," as any national security prosecution must be considered.  Nonetheless, one size cannot fit all as the terrorism enhancement

is concerned and ample arguments have been advanced above as to how this case hardly fits the typical national security mode.

Still, counsel recognize that even Samantha's helping Moussa move money and gold to Hong Kong, while knowing it was possible that he would then transport the same to Syria is serious.  Due to his immigration status, Moussa could not himself travel internationally and return to the United States.  Samantha had to travel for him, and she did so on two separate occasions to Hong Kong, of all places.[30]  She helped facilitate the brothers' travel to join ISIS in Syria.  But even though that is serious conduct, it must be emphasized that Samantha did not even help conceal funds that she sent to ISIS directly.  Rather the funds were provided for her husband and brother-in-law, who in turn provided themselves (*i.e.*, personnel) to ISIS.   (PSR, p. 3, ¶8).  In considering the seriousness of the offense, the Court must distinguish Samantha's conduct from that of Moussa and Abdelhadi, who plotted to join ISIS on their own, and whose conduct was largely independent of and not foreseeable to Samantha.

Moreover, it cannot be reemphasized enough that Samantha shared *none* of their extremist views and in no way espoused any version of "radical jihad" that is typically  the government's primary sentencing argument in terrorism cases.  That, in large part, is what sets this case apart from most all others in terms of its relative seriousness, and may very well explain why the government will argue this offense is aggravated because of the harm to the minors, particularly M.S.  But if that is so, counsel submit, Samantha in large part suffered the same harms, if not worse.

---

[30] In undersigned counsel's combined experience with national security cases, including "ISIS traveler" cases, as well as research into numerous other similar national security cases, counsel are not familiar with any other case that used Hong Kong as a way-station on the way to Syria.

## 2.  **General Deterrence.**

With regard to deterrence, counsel recognize the government's interest in general deterrence.  But quantifying how much general deterrence results from a particular prosecution and sentence is, counsel submit, an exercise in abstraction that is even more theoretical based on the particularly unique facts of this case.  Realistically speaking, it is virtually impossible to imagine another individual or segment of the general public who was similarly situated to Samantha who would be deterred from an additional prison term tacked on top of what she has already served.  No one in their right mind would risk suffering through the hardship that Samantha experienced, including sexual abuse in the ISIS prison and escape from Raqqa with four children and three Yazidis in her care.  The aspirational objectives of general deterrence must, in some cases, bend to reality.  This is such a case.

Moreover, in considering general deterrence, we must also ask whether or not the "message" ever even reaches its target audience.  Setting that point aside, research has shown that "increases in the certainty of punishment, as opposed to the *severity* of punishment, are more likely to produce deterrent benefits."  Valerie Wright, Ph.D., *Deterrence in Criminal Justice:  Evaluating Certainty vs. Severity of Punishment*, p. 1, The Sentencing Project, Nov. 2010, *available at*: https://bit.ly/2rMuiIL (emphasis in original) (last visited Sept. 6, 2019).  Deterrence turns on potential offenders weighing the costs and benefits of a crime.  *United States v. Bannister*, 786 F. Supp. 2d 617, 660 (E.D.N.Y. 2011) ("General deterrence depends on potential offenders' rational assessment of the likely costs and benefits of crime.").  The "costs" are seen in terms of being caught, not necessarily the length of the sentence imposed.  Indeed, "[a]n avalanche of criminological studies have determined that this theoretical symmetry between severity of

punishment and certainty of detection does not exist in the real world." *United States v. Courtney*, 76 F. Supp. 3d 1267, 1304 n.13 (D.N.M. 2014) (citing studies).

Echoing that observation, Judge Weinstein of the Eastern District of New York analyzed the general deterrence argument and concluded: "Degree of certainty —as opposed to the length and severity—of punishment provides the strongest general deterrence effect." *United States v. Lawrence*, 254 F. Supp. 3d 441, 445 (E.D.N.Y. May 23, 2017). Judge Weinstein cited an expert report submitted by Dr. Jeffrey Fagan that specifically noted as follows: "[f]or gun crimes there is little reliable evidence 'of a general deterrent effect of lengthy sentencing enhancements that impose additional years of incarceration for crimes committed with a firearm.'" *Id.* at 444 (citing additional studies). It is the probability that one will be caught, not any increase in punishment— and not, specifically if a prison term is imposed—that has a greater impact on recidivism. *Id.* at 445. *See United States v. Woodard*, No. 17-CR-297-001, 2017 U.S. Dist. LEXIS 192738, at *5 (E.D.N.Y. Nov. 3, 2017) ("Extended sentences for gun crimes have not been shown to serve as a general or specific deterrent."). Thus, the reality that Samantha was prosecuted, convicted, and now stands to be sentenced, has deterrent value in and of itself regardless of the sentence.

Further, while § 3553(a) requires the Court to address the issue of general deterrence, the statute "does not require the goal of general deterrence be met through a period of incarceration." *United States v. Edwards*, 595 F.3d 1004, 1016 (9th Cir. 2010). To the contrary, as the Ninth Circuit has observed, legislative history suggests that, while Congress felt that probationary sentences were imposed in cases without recognition of a "heightened deterrent effect of incarceration," it also recognized that probation may very well be appropriate in certain circumstances when it stated as follows:

> This is not meant to imply that the Committee considers a sentence of imprisonment
> to be the only form of sentence that may effectively carry deterrent or punitive

weight. It may very often be that release on probation under conditions designed
to fit the particular situation will adequately satisfy any appropriate deterrent or
punitive purpose.

*Edwards*, 595 F.3d at 1016 n. 9 (quoting S. Rep. No. 98-225, at 92). Thus, a sentence of

incarceration is certainly not necessary to achieve general deterrence.

### 3. **Specific Deterrence.**

With regard to specific deterrence, counsel submit that the need for strict sentence is

extraordinarily low. Put simply, Samantha is not a risk for recidivism. There is similarly not a

need to impose a strict sentence to protect the public. She has no criminal history, and to the

contrary has a history of being a victim of domestic abuse.[31] She has also suffered tremendously

for her choices, and the consequences will continue to haunt her for the rest of her life. As one

family member writes, Samantha is incredibly remorseful and "realizes the poor choices she has

made has devasted her life." (B. Currier Letter). *See also* PSR, p. 18, ¶119 ("Ms. Elhassani

reported that she is remorseful for her actions and wished that it never happened. The defendant

concluded that she would benefit from further mental health evaluation and any recommended

treatment.").

It must also be noted that while in jail, Samantha has rediscovered Bible-study, as her

family members note. Samantha's parents note how their daughter has taken an interest in Bible-

---

[31] Many women who are incarcerated are also victims of domestic violence. Researchers of domestic
violence and advocates for domestic violence victims have long recommended that such abuse be
recognized, and that survivors are often better served in settings outside of prison where they can find
effective healing and therapy. *See, e.g.*, Melissa E. Dichter, *Women's Experiences of Abuse as a Risk
Factor for Incarceration: A Research Update*, National Online Resource Center on Violence Against
Women, July 2015 (available at: https://bit.ly/3g7MkxP) (last visited Aug. 16, 2020) ("Recognizing the
context of victimization is critical in understanding girls' and women's actions and experiences, particularly
with regard to involvement in the criminal legal system. …. Timely, sufficient, and effective protection and
support interventions may help to reduce women's engagement with criminal activity. Additionally,
thorough and sensitive individualized case assessment can help to avoid unjustified or misapplied
incarceration.").

study in jail, and has communicated with and learned from others at the jail.  (R. and L. Sally Letter, p. 2).  They believe that this Bible-study "could be the catalyst to choosing a better path for her life."  (*Id.*).  (*See also* B. Currier Letter, "So while she's been incarcerated she has asked to receive a Bible and bible publications.  Samantha says through her letters how much she enjoys reading the Bible and even sharing what she is learning with the other girls that are incarcerated with her.").  Perhaps the best and most succinct barometer of Samantha's progress is her parent's observation that they feel like they now have their old daughter back.  (R. and L. Sally Letter).  This is simply not a case where specific deterrence is a concern.

### 4.  A Lengthy Prison Sentence Would Not Provide Needed Mental Health Care, but Would Create Additional Health Risks for COVID-19.

Under §3553(a)(2), the Court must also address whether the sentence provides the "needed educational or vocational training, medical care, or correctional treatment in the most effective manner."  18 U.S.C. § 3553(a)(2)(D).  Samantha has both mental health and physical health needs that militate strongly in factor of a lenient sentence because prison would not only further delay the much-needed mental health care, but it would also expose her to further unnecessary health risks from COVID-19 that could very well have grossly disproportionate consequences.

### i.  Samantha's Mental Health Needs Are Better Met Through Persistent Treatment That is Not Available in Prison.

First, in terms of her mental health needs, a lengthy term of imprisonment would continue to keep Samantha from receiving the meaningful mental health treatment that she desperately needs.  It should be beyond any dispute that Samantha needs serious mental health treatment.  It should also be beyond debate that she cannot receive that treatment while incarcerated.  As case in point, she has received no therapy for over two years while in Porter County Jail.  Nor can it be expected that she would receive any better in the BOP.   While she has received some medication

to help her anxiety and quell her nightmares and PTSD, she suffered severe side effects and weight gain from the Olanzapine prescription.  She weaned herself off that medication, which resulted in improvements to her physical health, but has not been provided with an alternative medication to replace it.

As discussed above, it is Dr. Xenakis's professional psychiatric opinion that Samantha most certainly requires an intensive, comprehensive treatment plan that it is not available in a prison setting, which in many ways exacerbates her traumas that are caused by her life and captivity while in Syria. PSR, p. 17, ¶116.  In the context of the motion for pre-trial release, Dr. Xenakis recommended "comprehensive therapeutic & supportive wrap-around services" consistent with an appropriate standard of care.  (Exhibit E, Dr. Xenakis, Dec. 14, 2018 Letter and Dec. 15, 2018 Recommendations).  Those services included, among other things, "careful monitoring and prescription of psychotropic medications"; "verbal psychotherapy and adjunctive behavioral interventions"; and "weekly group therapy." (*Id.*)  And in his  January 17, 2020, Dr. Xenakis recommended a plan for further assessing and treating Samantha, which are worth quoting in full:

**Recommendations**

Ms. El Hassani expresses willingness to participate in comprehensive and multifaceted education, training, and therapy programs. She understands that effective programs require many months, if not years, of commitment and involve multiple modalities including individual and group therapy, education, vocational training, and religious services and teaching. She requires more extensive evaluation to assess her illnesses and impairments in psychological functioning, capacity to support and provide for her children, and requirements for suitable supervision and oversight.

A prison setting does not offer adequate and appropriate treatment and therapy for her conditions and illnesses. She requires trauma-informed therapy, medication management, therapy for sleep disturbances, and vocational and educational counseling. A fundamental element of successful therapy and treatment involves providing services and support in the community setting. She requires placement,

supervision, monitoring, and assistance in an environment with community mental health services, educational support, and vocational training. A major component of appropriate treatment for her includes counseling in caring for her children and setting up a functioning household. She is motivated to engage in a comprehensive wraparound program and recognizes the challenges she faces in succeeding. She desperately seeks support and assistance. It is prudent for her to return to the community under supervision as soon as possible and engage in necessary treatment and therapy. It is also in everyone's interest that she be expeditiously reunited with her children and receive appropriate support and guidance in caring for them.

(Exhibit E, Dr. Xenakis, Jan. 17, 2020 Letter, p. 5).   Samantha has received none of these recommended services to date, and that will most likely continue to be the case during any additional term of imprisonment imposed, especially considering the current widespread lockdowns in federal prisons due to the COVID-19 pandemic.

For their part, Samantha's family members universally recognize that she needs mental health treatment.  Their meaningful support will truly assist her obtain the care she desperately needs upon her release from prison.  Respectfully, it would run afoul of the §3553(a) factors to impose a sentence that continues to prevent Samantha from receiving needed treatment.

### ii.  Samantha Has Already Survived COVID-19, and a Lengthy Prison Sentence Would Unnecessarily Put Her at Risk for Re-infection and Further Health Consequences.

Second, the relentless and deadly presence of COVID-19 in prison facilities as well as in halfway houses presents a compelling reason to impose a lenient sentence.  This is not just a generalized fear, but one that is particularized by Samantha's experience with COVID-19, and her health factors that increase the risk for becoming re-infected, as well as her risk of suffering catastrophic health problems, including death, if that should occur.

Counsel respectfully submits that the Court should not ignore the realities of the COVID-19 pandemic in the federal prison system.  It is still impossible to predict precisely how long the

extremely dangerous conditions in the federal prison system will remain.  Conditions behind prison walls will of course be impacted by public health conditions on the outside, particularly insofar as guards and staff circulate in and out of the prison and as new inmates are introduced into the prison population.  And if current events are any indication, the recent spikes in COVID-19 infections across the country do not bode well.  It is also impossible to predict how severely Samantha's health would be impacted if she is imprisoned.  But several things are certain.  One is that Samantha certainly presents risk factors that make her more susceptible to COVID-19.  Counsel recognize that the Court is fully aware of arguments related to COVID-19 from having ruled on compassionate release motions brought under 18 U.S.C. §3582(c)(1)(A), so only brief background is offered in order to frame Samantha's sentencing arguments set forth below.

### 1.   The COVID-19 Pandemic.

The world is in the grips of a deadly pandemic caused by the novel coronavirus disease (COVID-19), a highly contagious respiratory illness that is caused by a novel strain of coronavirus (SARS-CoV-2).  There is no known cure or vaccine.  To date, over 19 million individuals across the globe have been infected by the virus, and over six-hundred thousand have succumbed to it.[32] Of those totals, the United States makes up for over 5 million cases and 162,000 deaths.[33]  On March 11, 2020, the World Health Organization declared a global pandemic.  On March 13, 2020, the President of the United States declared a national emergency due to the disease.[34]

---

[32] *See* https://www.worldometers.info/coronavirus/.  (last visited Aug. 6, 2020).

[33] *See* https://www.worldometers.info/coronavirus/#countries.  (last visited Aug. 6, 2020).

[34] Proclamation on Declaring a national Emergency Concerning the Novel Coronavirus Disease (COVID-19) Outbreak, The White House (Mar. 13, 2020) (available at: https://bit.ly/363Rd7N) (last visited May 16, 2020).

The incredibly infectious and deadly virus can stay on surfaces for days.[35]  It can also remain viable and infectious in droplets aerosols for hours.[36]  Individuals can easily contract and transmit COVID-19 without showing any symptoms.[37]  The incubation period for COVID-19 "is thought to extend to 14 days, with a median time of 4-5 days from exposure to symptoms onset."[38] Symptoms range from mild, such as fever, coughing, and difficulty breathing, to severe, including respiratory distress, severe pneumonia, septic shock, and multi-organ failure, or even death.[39] According to the CDC, serious illness or death occurs in 16% of all cases.[40]

Due to the highly infectious and potentially deadly nature of the virus, the Centers for Disease Control and Prevention (CDC) and various state governments have instructed individuals to take steps to help curb the transmission of the virus, especially because there is no cure.  These now-familiar steps involve practicing good hygiene, especially hand-washing and sanitizing when

---

[35] U.S. Dept. of Health & Human Services, National Institutes of Health, Study suggests new coronavirus may remain on surfaces for days, Mar. 24, 2020 (available at: https://bit.ly/3fMDOW9) (last visited May 14, 2020) ("SARS-CoV-2 remained active on plastic and stainless steel surfaces for two to three days under the conditions in this experiment. It remained infectious for up to 24 hours on cardboard and four hours on copper.").

[36] Id. ("The virus was detectable in aerosols for up to three hours."); Tanya Lewis, How Coronavirus Spreads through the Air:  What We Know So Far, Scientific American, May 12, 2020 (available at: https://bit.ly/2AviWmj) (last visited May 14, 2020) ("According to the U.S. Centers for Disease Control and Prevention and the World Health Organization, the novel coronavirus is primarily spread by droplets from someone who is coughing, sneezing or even talking within a few feet away. But anecdotal reports hint that it could be transmissible through particles suspended in the air.")

[37] Emily Landon, MD, COVID-19:  What we know so far about the 2019 novel coronavirus, UChicago Medicine, May 8, 2020 (available at: https://bit.ly/2T6kb1G) (last visited May 14, 2020) ("This virus is highly transmissible and can spread easily from person to person even before someone develops symptoms. It's carried on respiratory droplets when we talk, sneeze and cough and these can land on surfaces or in someone's mouth or nose.").

[38] CDC, Interim Clinical Guidance for Management of Patients with Confirmed Coronavirus Disease (COVID-19) ("CDC Interim Clinical Guidance")  (available at: https://bit.ly/2WXIO1B) (last visited May 14, 2020).

[39] CDC Interim Clinical Guidance.

[40] CDC Situation Summary, (available at: https://bit.ly/2zL4kP6) (last visited May 16, 2020).

possible; wearing masks and cloth coverings around others; social distancing and isolation; and, cleaning and disinfecting frequently touched surfaces.[41]

COVID-19 is especially dangerous for individuals with underlying health conditions.   In particular, the CDC warns that individuals "might be at higher risk for severe illness from COVID-19" if they suffer from underlying illnesses/health conditions including: cancer; chronic kidney disease; chronic obstructive pulmonary disease; immunocompromised state; obesity (defined as body mass index of 30 or higher); serious heart conditions; sickle cell disease; and, Type II diabetes.[42]   Underlying risk factors significantly increase the risk of fatality for those who are infected with the COVID-19.[43]   Individuals who are "high risk" are strongly advised to take additional "special precautions," including continuing active treatment for underlying medical conditions, obtaining vaccinations against other diseases, staying home, and remaining away from others "as much as possible."[44]

### 2.   COVID-19 is Especially Dangerous in Jails and Prisons.

Because COVID-19 is easily transmitted between individuals including those who are asymptomatic through droplets and aerosol, the CDC and other health agencies have stressed the

---

[41] CDC, *How to Protect Yourself & Others*, (available at: https://bit.ly/3cEsppG) (last visited May 14, 2020).

[42] CDC, *People with Certain Medical Conditions*, July 30, 2020 (available at: https://bit.ly/3gD5AED) (last visited Aug. 5, 2020).

[43] Kaiser Health News, *CDC Data Confirms Reports That Underlying Conditions Play a Large Role in Hospitalizations, Fatalities*, Apr. 1, 2020, (available at: https://bit.ly/2WyH9As) (last visited May 14, 2020) ("Of the 184 deaths with complete information on risk factors in the study, 173 occurred among patients with at least one underlying condition. The conditions include renal disease, heart and lung issues and diabetes, among others."); Karina Zaiets and Ramon Padilla, Coronavirus, diabetes, obesity and other underlying conditions: Which patients are most at risk?, USA Today, Apr. 15, 2020, (available at: https://bit.ly/2T6Ggx6) (last visited May 14, 2020) (noting the most common underlying health factor in patients hospitalized with COVID-19 in the United States was hypertension, followed by obesity, chronic lung disease, diabetes, and then cardiovascular disease).

[44] CDC, *Groups at Higher Risk for Severe Illness* (available at: https://bit.ly/2Lxe422) (last visited May 16, 2020).

importance of taking precautionary measures, particularly social distancing and frequently sanitizing surfaces and other shared areas.  The reality of prison living conditions makes those measures impossible in large regard, which imperils inmates and also the staff who work in the prisons.[45]  *See United States v. Ramirez*, No. 17-10328-WGY, 2020 U.S. Dist. LEXIS 83363, at *2 (D. Mass. May 12, 2020) ("COVID-19 is particularly contagious in prisons because inmates are forced into close quarters without access to personal protective equipment.").  Prisons can be "powder kegs" where he virus spreads quickly and uncontrollably.  *United States v. Rountree*, 2020 WL 2610923, at *5 (N.D.N.Y. May 18, 2020) (Prisons are "powder kegs for infection" that have allowed "the COVID-19 virus to spread with uncommon and frightening speed."  *See also United States v. Young*, 2020 WL 2514673, at *2 (D. Mass. May 15, 2020) ("the virus can appear suddenly and spread quickly in the prison population").

The CDC acknowledged the threat of COVID-19 transmission in correctional settings on March 23, 2020, when it recognized that correctional and detention facilities "present[] unique challenges for control of COVID-19 transmission among incarcerated/detained persons, staff, and visitors."[46]  *See also United States v. Amarrah*, No. 17-20464, 2020 U.S. Dist. LEXIS 80396, at *6-7 (E.D. Mich. May 7, 2020)  (observing that the CDC "noted that many detention conditions create a heightened risk of danger to detainees. These include low capacity for patient volume, insufficient quarantine space, insufficient on-site medical staff, highly congregational environments, inability of most patients to leave the facility, and limited ability of

---

[45] Laura Hawkes, *Covid-19 in Prisons and Jails in the United States*, JAMA Network, Apr. 28, 2020 (available at: https://bit.ly/3bzqWiI) (last visited May 14, 2020) ("Prior viral epidemics have wrought havoc in carceral settings.").

[46] CDC, *Interim Guidance on Management of Coronavirus Disease 2019 (COVID-19) in Correctional and Detention Facilities* (available at: https://bit.ly/2X24QQT) (last visited May 14, 2020) ("CDC Prison Guidance.").

incarcerated/detained persons to exercise effective disease prevention measures (*e.g.*, social distancing and frequent handwashing).").

Accordingly, the CDC has recommended that "all correctional facilities take preventative measures, including: ensuring an adequate supply of hygiene and medical supplies, allowing for alcohol-based sanitizer throughout facilities, providing no-cost soap to all inmates for frequent handwashing, cleaning and disinfecting frequently touched surfaces several times per day, performing pre-intake screening and temperature checks for all new entrants, increasing space between all detained persons to at least six feet, staggering meals, and having healthcare staff perform regular rounds. *Amarrah*, 2020 U.S. Dist. LEXIS 80396, at *7 (citing CDC Prison Guidance). In July, the American Medical Association confirmed that "COVID-19 case rates have been substantially higher and escalating much more rapidly in prisons than in the US population.[47] Additionally, inmates are more than three times as likely to die from the virus, compared to those outside of prison.[48] The numbers, scarily, speak for themselves.[49]

Moreover, the number of inmate infections and deaths have continued to rise in the BOP despite the fact that the BOP has taken measures such as a nationwide lockdown, cessation of transfers between facilities, and prohibition on visitation. Part of the lockdown procedures— which involves great restrictions on inmate's ability to move, access resources, participate in programs for self-improvement and classes—prisons often utilize solitary confinement for

---

[47] B. Saloner, Ph.D., et al., *Covid-19 Cases and Deaths in Federal & State Prisons*, J. Am. Med. Assoc., July 8, 2020 (available at: https://bit.ly/3jD9PBZ) (last visited Aug. 12, 2020).

[48] Tonya Simpson and Luke Barr, *As coronavirus spreads through nation's jails and prisons, lawmakers demand more transparency on toll*, ABCNews, Aug. 6, 2020 (available at: https://abcn.ws/2DlnQnM) (last visited Aug. 6, 2020) ("A recent analysis found infection coronavirus infection rates are five times higher in prisons than in the overall United States population. The report also found state and federal inmates are three times more likely to die from the virus.").

[49] To date, the Bureau of Prisons has reported 113 prisoner deaths due to COVID-19, which includes at least four women. (available at: https://www.bop.gov/coronavirus/) (last visited Aug. 17, 2020).

extended periods of time.[50]  The increased use of solitary confinement is particularly troubling, as it is typically reserved for inmates presenting security risks, but has now been used for those who are low or minimal risk. Still, despite these extreme measures, which result in pronounced hardships to inmates, and notwithstanding any good intentions behind the response by BOP officials, infection rates continue to grow, and deaths continue to mount.

In addition to the severe problems managing COVID-19 behind prison walls, halfway houses and other residential reentry centers have also had their fair share of problems with infections.  For one thing, these halfway houses typically permit movement between the facilities and community at large, which necessarily increases the risk of infection.  Moreover, many halfway houses are reported undercount COVID-19 cases and also ignore guidelines, such as receiving individuals from the country's virus hotspots.[51]

### 3. Samantha Has Risk Factors that Present Real Dangers to Her Health if Exposed Again to COVID-19 in Prison.

Samantha has already been infected with the COVID-19 virus while at Porter County Jail, which establishes that she was susceptible to the virus.  She fought off the virus after several arduous weeks in the jail.  Because she has not undergone thorough testing and examinations, at this point it cannot be said what long-term damage the virus wreaked on her body.  Studies have shown that many COVID-19 survivors suffer long-term harm, including "scarring, decreased lung function, decreased exercise capacity," cardiac damage, and lasting harm to the nervous system.[52]

---

[50] *See* Joseph Shapiro, *As COVID-19 Spreads In Prisons, Lockdowns Spark Fear of More Solitary Confinement,* (June 15, 2020), NPR (available at: https://n.pr/3gF3eoM) (last visited Aug. 5, 2020).

[51] *See* Liliana Segura, *As Coronavirus Spreads In Federal Prisons, Cases In Halfway Houses Are Being Undercounted,* The Intercept, May 28, 2020 (available at: https://bit.ly/2XDZyMG) (last visited Aug. 5, 2020).

[52] Jennifer Couzin-Frankel, *From 'brain fog' to heart damage, COVID-19's lingering problems  alarm scientists*, Science, July 31, 2020 (available at: https://bit.ly/33VGqxw) (last visited Aug. 12, 2020); Nicole

Other studies have confirmed persistent post-recovery symptoms, with over 44% of patients reporting worsened quality of life.[53]  In addition to ongoing physical problems, studies have observed serious mental health problems in recovered patients.[54]  Notably, Samantha has had no psychological counseling related to her survival from COVID-19, much less for her PTSD in general, which is strongly recommended by professional experts.[55]  These troubling facts are all the more concerning for Samantha, who already has diagnosed mental health problems, including PTSD, which have been found to inhibit immune systems and make individuals vulnerable to infection in the first instance.[56]

Moreover, simply because Samantha survived the virus does not mean that she is no longer at risk to re-infection, particularly in prison where social distancing and other CDC-required precautions are difficult, if not impossible to maintain.  Regarding the risk of re-infection, there is no conclusive evidence that people who have recovered from COVID-19 are immune and cannot

---

Lyn Pesce, *55% of coronavirus patients still have neurological problems three months later:  study*, MarketWatch, Aug. 9, 2020 (available at: https://on.mktw.net/3iNn41Z) (last visited Aug. 12, 2020).

[53] *See* Angelo Carfi, et al., *Persistent Symptoms in Patients After Acute COVID-19*, JAMA Network, July 9, 2020 (available at: https://bit.ly/3gViZrG) (last visited Aug. 12, 2020).

[54] *See* Kelly Servic, *For survivors of severe COVID-19, beating the virus is just the beginning*, Science, Apr. 8, 2020 (available at: https://bit.ly/2XUQ9jW) (last visited Aug. 12, 2020) (noting that doctors and researchers were "ring for a surge in mental health problems, among them anxiety, depression, and post-traumatic stress disorder following the psychological stress of severe disease.").

[55] Charlotte Huff, *Delirium, PTSD, brain fog:  The aftermath of surviving COVID-19*, American Psychological Association, July 1, 2020 (available at: https://bit.ly/2XVKHxk) (last visited Aug. 12, 2020).

[56] Indeed, courts have granted release based on defendants' mental health problems. *See Doe v. Barr*, No. 20-cv-02263 (RMI), 2020 WL 1984266 (N.D. Cal. Apr. 27, 2020) (ordering the release of a foreign national, detained in a county jail awaiting for his removal proceedings, in part because he suffers from PTSD and "[g]rowing evidence demonstrates that PTSD, anxiety/stress, and depression can lead to decreased immune response and increased risk of infections" and thus "compound his susceptibility" to COVID-19");

be infected again.[57]  The CDC simply states that "more information is needed to know" whether patients who recover from COVID-19 can be re-infected with SARS-CoV-2.[58]

Indeed, many courts have granted compassionate release under 18 U.S.C. §3582(c) for inmates who have tested positive for COVID-19, indicating that prior infection does not protect one from the risk of future infection.  *See United States v. Brown*, Case No. 2:18-cr-360, Dkt. No. 35 (N.D. Ala. May 22, 2020) (covid-positive, asthma, only one year into 60 month sentence); *United States v. Arreola-Bretado*, Case No. 3:19-cr-3410, Dkt. No. 50 (S.D. Cal. May 15, 2020) (granting compassionate release to defendant who tested positive for COVID-19 after concluding she will receive superior medical care outside of the custody of the Otay Mesa detention facility); *United States v. Kriglstein*, 1:16-cr-00663-JCH-1, ECF No. 60 (D.N.M. Apr. 27, 2020) (staying for 5 days release of defendant who was tested for COVID-19 as condition of order granting compassionate release, with positive result); *United States v. Huntley*, No. 13-cr-119-ABJ, ECF No. 263, at 8 n.9, 10 (D.D.C. May 5, 2020) (ordering compassionate release for defendant who tested positive for COVID-19 while motion was being litigated).

But it is not just the consequences of infection and the risk of re-infection that militate against a lengthy sentence that is anywhere close to the guidelines.  As noted above, prison operations have fundamentally shifted so that inmates cannot access programs or have visitors.

---

[57] World Health Organization, Scientific Brief, *"Immunity Passports" in the Context of Covid-19*, April 24, 2020 (available at: https://bit.ly/3kFXSfi) (last visited Aug. 12, 2020) ("There is currently no evidence that people who have recovered from COVID-19 and have antibodies are protected from a second infection."); James Gallagher, *Coronavirus Immunity:  Can you catch it twice?*, BBC News, July 17, 2020 (available at: https://bbc.in/3kFxOB6) (last visited Aug. 12, 2020) (noting that immunity to re-infection is "not guaranteed"); Colin Dwyer, *"No Evidence" Yet That Recovered COVID-19 Patients are Immune, WHO Says*, NPR, Apr. 25, 2020 (available at: https://n.pr/2Cm5jqK) (last visited Aug. 12, 2020); Allison Whitten, *Can You Get COVID-19 Twice?  Scientists Say It's Too Early to Tell*, Discover, July 31, 2020 (available at: https://bit.ly/3iyyPcj) (last visited Aug. 12, 2020).

[58] *See* CDC, Clinical Questions about COVID-19: Questions and Answers, "Can people who recover from COVID-19 be re-infected with SARS-COV-2" (available at https://bit.ly/3gUh6LZ) (last visited Aug. 12, 2020).

Solitary confinement and quarantine are commonly used for low-risk inmates like Samantha.  Not only will it be highly unlikely that she be able to access meaningful medical care or group therapy sessions, but she will continue to not be able to see and visit with her parents and other loved ones who have been immensely supportive.

> **5.   A Sentence in the 30-37 Month Range, and No More Than 48 Months, Combined with Strict Conditions of Supervised Release Would Reflect the Seriousness of the Offense, Promote Respect for the Law, and Provide Just Punishment.**

Under these extremely unique circumstances, an additional lengthy term of imprisonment, and in any event a sentence of more than 48 months, is not necessary to reflect the seriousness of the offense, promote respect for the law, and provide just punishment, factors to be weighed under 18 U.S.C. § 3553(a)(2)(A).  Indeed, a sentence within the 30-37 month range, without factoring the terrorism enhancement, followed by a term of supervised release with very strict conditions, would be sufficient and also appropriate in other regards.

Rather than a lengthy term of additional imprisonment, counsel respectfully submits that a sentence that is sufficient, but not greater than necessary, can be fashioned by focusing on strict conditions of supervised release.  Supervised release with strict conditions can carry with it real consequences and significant restrictions on liberty.  In *Gall*, the Supreme Court stated as follows when discussing probation:

> We recognize that custodial sentences are qualitatively more severe than probationary sentences of equivalent terms. Offenders on probation are nonetheless subject to several standard conditions that substantially restrict their liberty. *See United States v. Knights*, 534 U.S. 112, 119, 122 S.Ct. 587, 151 L.Ed.2d 497 (2001) ("Inherent in the very nature of probation is that probationers 'do not enjoy the absolute liberty to which every citizen is entitled'" (quoting *Griffin v. Wisconsin*, 483 U.S. 868, 874, 107 S.Ct. 3164, 97 L.Ed.2d 709 (1987))). [fn omitted]. Probationers may not leave the judicial district, move, or change jobs without notifying, and in some cases receiving permission from, their probation officer or the court. They must report regularly to their probation officer, permit unannounced visits to their homes, refrain from associating with any person convicted of a felony,

55

and refrain from excessive drinking. U.S.S.G. § 5B1.3. Most probationers are also
subject to individual "special conditions" imposed by the court.

*Gall*, 552 U.S. at 47-48.  The Supreme Court specifically acknowledged that a sentence of

probation constitutes a "substantial restriction of freedom" and that it is "not granted out of a spirit

of leniency" that "[lets] an offender off easy."  *Gall* 552 U.S. at 48, fn.4, quoting Advisory Council

of Judges of National Council on Crime and Delinquency, Guides for Sentencing 13-14 (1957).

To the contrary, "the probation or parole conditions imposed on an individual can have a

significant impact on both that person and society .... Often these conditions comprehensively

regulate significant facets of their day-to-day lives." *Gall*, 552 U.S. at 48, fn 4, quoting 1 N. Cohen,

The Law of Probation and Parole § 7:9 (2d ed. 1999).  The same can be said for supervised release

accompanied by strict conditions.

Counsel further submits that even a below-guideline sentence of imprisonment would be

unduly harsh on Samantha because she has absolutely no history of incarceration—aside from the

ISIS prison and the confinement in the SDF camps—which, if anything, militate strongly in favor

of a lenient sentence.  As such, prison time would have a disproportionately severe impact on her.

*See*, *e.g.*, *United States v. Baker*, 445 F.3d 987 (7th Cir. 2006) (affirming below-guideline sentence

for first-time offender because a prison term would mean more to him "than to a defendant who

previously been imprisoned"); *United States v. Cull*, 446 F. Supp. 2d 961 (E.D. Wisc. 2006) (below

guideline sentence is appropriate because defendant had never been confined before and sentence

was sufficient to "to impress upon him the seriousness of the offense and to deter others under

similar circumstances."); *United States v. Qualls*, 373 F. Supp. 2d 873, 877 (E.D. Wis. 2005)

("Generally, a lesser period of imprisonment is required to deter a defendant not previously  subject

to lengthy incarceration than is necessary to deter a defendant who has already served serious time

yet continues to re-offend.").[59]  Put simply, this is a case that cries out for a sentence tempered by mercy and humanity, and that does not delay the resources that Samantha desperately needs, so she can truly return to this world.

### V.    CONCLUSION

For the reasons set forth herein, and also those to be presented at the sentencing hearing, counsel respectfully request a sentence within the range of 30 to 37 months, and in no case, no more than 48 months.

Respectfully submitted,

/s/ Thomas Anthony Durkin
**THOMAS ANTHONY DURKIN,**

/s/ Joshua G. Herman
**JOSHUA G. HERMAN**
Attorneys for Defendant

**THE RERUM NOVARUM CENTER**
**FOR CIVIL & HUMAN RIGHTS OF CHICAGO**
515 W. Arlington Place
Chicago, IL 60614
Tel: (312) 981-0123
tdurkin@durkinroberts.com

**LAW OFFICE OF JOSHUA G. HERMAN**
53 W. Jackson, Blvd., Suite 457
Chicago, IL 60604
Tel: (312) 909-0434
jherman@joshhermanlaw.com

---

[59] *See also* 28 U.S.C. § 994(j) (Congress directs the Sentencing Commission to "insure that the guidelines reflect the general appropriateness of imposing a sentence other than imprisonment in cases in which the defendant is a first offender who has not been convicted of a crime of violence or an otherwise serious offense, and the general appropriateness of imposing a term of imprisonment on a person convicted of a crime of violence that results in serious bodily injury.").

## <u>CERTIFICATE OF SERVICE</u>

Joshua G. Herman, Attorney at Law, hereby certifies that the foregoing was served on August 17, 2020, in accordance with Fed.R.Crim.P.49, Fed.R.Civ.P.5, LR 5.5, and the General Order on Electronic Case Filing (ECF) pursuant to the district court's system as to ECF filers.

<u>/s/ Joshua G. Herman</u>
**JOSHUA G. HERMAN**

**LAW OFFICE OF JOSHUA G. HERMAN**
53 W. Jackson, Blvd., Suite 457
Chicago, IL 60604
Tel: (312) 909-0434
jherman@joshhermanlaw.com