# EXHIBIT A

No *Shepard's* Signal™
As of: October 23, 2020 8:37 PM Z

## *United States v. Amer Sinan Alhaggagi*

United States Court of Appeals for the Ninth Circuit

June 10, 2020, Argued and Submitted, San Francisco, California; October 22, 2020, Filed

No. 19-10092

**Reporter**

2020 U.S. App. LEXIS 33309 *

UNITED STATES OF AMERICA, Plaintiff-Appellee, v. AMER SINAN ALHAGGAGI, Defendant-Appellant.

**Prior History:  [*1]** Appeal from the United States District Court for the Northern District of California. D.C. No. 3:17-cr-00387-CRB-1. Charles R. Breyer, District Judge, Presiding.

**Disposition:** VACATED AND REMANDED.

## Core Terms

terrorism, enhancement, retaliate, terrorist, media, sentence, intimidation, calculated, chatroom, bombs, coercion, undercover, chats, prong, Guidelines, messages, users, bomb-making, propaganda, join, sympathetic, strychnine, storage, trigger, locker, sympathizers, enumerated, weapons, online, spread

**Summary:**

SUMMARY[**]

**Criminal Law**

The panel vacated a sentence and remanded for resentencing in a case in which the defendant was convicted of attempting to provide material support to a terrorist organization in violation of *18 U.S.C. § 2339B(a)(1)*.

The defendant opened six social media accounts for people he knew sympathized with ISIS, an offense the district court concluded was "calculated to influence or affect the conduct of government by intimidation or coercion, or to retaliate against the government conduct," and thus triggered application of a terrorism enhancement pursuant to *U.S.S.G. § 3A1.4*.

The panel explained that the *§ 3A1.4* enhancement does not automatically apply to all material support offenses. To trigger the enhancement, the government must prove elements distinct from those of the crime of conviction, specifically that the offense committed involved, or was intended to promote, a "federal crime of terrorism," as defined in *18 U.S.C. § 2332b(g)(5)*. Regarding the two prongs of the definition of "federal crime of terrorism," the parties agreed, and the panel held (1) that **[*2]** *18 U.S.C. § 2332b(g)(5)(A)*—providing that the offense was calculated to influence or affect the conduct of government by intimidation or coercion, or to retaliate against government conduct—imposes a specific intent requirement; and (2) that the defendant's conviction for violating *§ 2339B(a)(1)* is one of the enumerated statutes in *18 U.S.C. § 2332b(g)(5)(B)*.

[**] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

2020 U.S. App. LEXIS 33309, *2

Addressing the remaining question whether the defendant's conduct satisfied *§ 2332b(g)(5)(A)*, and noting that it was the government's burden to prove that element by clear and convincing evidence, the panel held (1) because the district court failed to determine whether the defendant knew how the accounts he opened were to be used, it could not find that he specifically intended that the accounts be used to coerce or intimidate a government; and (2) the district court did not find sufficient facts to indicate that the defendant's opening of social media accounts was intended to retaliate against government conduct.

The panel concluded that the district court therefore abused its discretion in applying the terrorism enhancement.

Dissenting, Judge Hurwitz wrote that, reviewing the district court's factual findings for clear error and its application of the Sentencing Guidelines to those facts for abuse of discretion, **[*3]** he could not find that the district court erred in finding that the government met its burden of proving by clear and convincing evidence that the defendant committed the enumerated offense with the specific intent to achieve one of the objectives stated in *§ 2332b(g)(5)(A)*.

**Counsel:** August Gugelmann (argued) and Mary McNamara, Swanson & McNamara LLP, San Francisco, California, for Defendant-Appellant.

S. Waqar Hasib (argued), Assistant United States Attorney; Merry Jean Chan, Chief, Appellate Division; David L. Anderson, United States Attorney; United States Attorney's Office, San Francisco, California; for Plaintiff-Appellee.

**Judges:** Before: MILAN D. SMITH, JR. and ANDREW D. HURWITZ, Circuit Judges, and

DAVID A. EZRA,[*] District Judge. Opinion by Judge Milan D. Smith, Jr.; Dissent by Judge Hurwitz.

**Opinion by:** Milan D. Smith, Jr.

# Opinion

M. SMITH, Circuit Judge:

Amer Sinan Alhaggagi appeals a judgment of conviction and sentence of the United States District Court for the Northern District of California imposing the Sentencing Guidelines' terrorism enhancement, *U.S.S.G. § 3A1.4*, to his conviction for attempting to provide material support to a terrorist organization in violation of *18 U.S.C. § 2339B(a)(1)*. Alhaggagi opened six social media accounts for people he knew sympathized **[*4]** with ISIS, an offense the district court concluded was "calculated to influence or affect the conduct of government by intimidation or coercion, or to retaliate against government conduct," *18 U.S.C. § 2332b(g)(5)*, and thus triggered application of the terrorism enhancement. We reverse and remand for resentencing.

**FACTUAL AND PROCEDURAL BACKGROUND**

**I. Alhaggagi's Background**

Amer Alhaggagi was born in Lodi, California to Yemeni immigrants. After September 11, 2001, Alhaggagi's mother moved him and his five siblings to Yemen, while his father remained in the United States. Alhaggagi spent the remainder of his childhood going back and forth between Yemen, where he lived with his mother, and California, where he lived with his father. In both places,

---

[*] The Honorable David A. Ezra, United States District Judge for the District of Hawaii, sitting by designation.

Alhaggagi had a strained relationship with his parents, who raised their children in an observant Muslim household.

In 2009, Alhaggagi and his mother and siblings returned to California to live with his father. Although he was raised in a Muslim home, Alhaggagi was not religious and adhered to few religious traditions. As an escape from his home life, Alhaggagi began spending a lot of time on the Internet, where his father had no insight into his activities. He developed **[*5]** a sarcastic and antagonistic persona online, provoking people by comments he made on YouTube videos. He displayed these characteristics even when he was not online—people could never tell whether he was serious.

## II. The FBI Investigation

In 2016, at the age of 21, Alhaggagi began participating in chatrooms, and chatting on messaging apps like Telegram, which is known to be used by ISIS. He chatted both in Sunni group chats sympathetic to ISIS and Shia group chats that were anti-ISIS. He trolled users in both groups, attempting to start fights by claiming certain users were Shia if he was in a Sunni chatroom, or Sunni if he was in a Shia chatroom, to try to get other users to block them. He was expelled from chatrooms for inviting female users to chat, which was against the etiquette of these chatrooms, as participants in those chats followed the Islamic custom of gender segregation.

In one Sunni chatroom, in late July 2016, Alhaggagi caught the attention of a confidential human source (CHS) for the FBI when he expressed interest in purchasing weapons. In chats with the CHS, Alhaggagi made many claims about his ability to procure weapons, explaining that he had friends in Las Vegas who **[*6]** would buy firearms and ship them to him via FedEx or UPS. Alhaggagi also made disturbing claims suggesting he had plans to carry out attacks against "10,000 ppl" in different parts of the Bay Area by detonating bombs in gay nightclubs in San Francisco, setting fire to residential areas of the Berkeley Hills, and lacing cocaine with the poison

strychnine and distributing it on Halloween. He claimed to have ordered strychnine online using a fake credit card, of which he sent a screenshot to the CHS, bragging that he engaged in identity theft and had his own device-making equipment to make fake credit cards. He said he would be able to receive deliveries of strychnine undetected, by having packages shipped to an address that did not belong to him and waiting at that address to intercept the deliveries.

In Alhaggagi's view, all of this talk was "pure bullshit and full of absurdities and contradictions"—it was his "chat persona." One minute his persona was selling weapons, the next he claimed to need them, all in the same chatroom. His persona allegedly had associates in Mexican cartels who could get him grenades, bazookas, and RPGs, offered to join a user in Brazil to attack the Olympics, **[*7]** and was considering conducting attacks in Dubai.

Not surprisingly, the FBI was alarmed by Alhaggagi's statements and launched a months-long investigation, including 24-hour surveillance of Alhaggagi. The FBI had the CHS arrange for Alhaggagi to meet an undercover agent (UCE) in person, whom the CHS described as hating "kuffar," non-believers of Islam, and being interested in carrying out a suicide mission. The CHS encouraged and expressed interest in joining Alhaggagi's plans.

At the UCE's request, Alhaggagi met with the UCE on several occasions in late July and early August 2016. Alhaggagi shared the same plans he had discussed with the CHS on Telegram. The two discussed bomb-making, a topic in which the UCE claimed to have experience. On a second occasion, Alhaggagi met with the UCE to visit a storage space where the UCE had allegedly arranged to store supplies they needed to carry out the attacks. Alhaggagi offered to help purchase bomb-making materials, and on the drive there and back, he and the UCE continued to speak of their many plans, discussing car bombs, targeting AT&T Park, and Alhaggagi's plan to join a local police department so he could more easily obtain weapons. On a **[*8]** third occasion, the UCE met

again with Alhaggagi at the storage locker, where the FBI had left several barrels of mock explosives. In the moment, Alhaggagi expressed excitement upon seeing the explosives, and on the drive back, he pointed out places he believed would be good targets for bombs.

After that meeting, however, Alhaggagi began distancing himself from the CHS on Telegram and the UCE. He told the district court that upon seeing the explosives, "it only hit me at that moment that I've been talking to these people for far too long and had no idea what I've gotten myself into and now I'm kinda freaked out . . . I never took it seriously and I never realized how serious he was until he was ready to make a bomb (so I believed at the time) which I wanted no part of!"

From late August to September 2016, Alhaggagi skipped meetings intended to practice the attacks with the UCE, and ignored many attempts by the UCE to contact him. On September 23, 2016, the UCE approached Alhaggagi on the street and asked if they could share a meal. Alhaggagi agreed, but said he needed to get something from his house first. He never returned to meet the UCE, and they never communicated with each other **[*9]** again.

### III. Alhaggagi's Arrest, Indictment, and Guilty Plea

On November 29, 2016, Alhaggagi was arrested on identity theft charges, and the FBI searched his home. Searches of Alhaggagi's electronic devices indicated that about a month after cutting ties with the UCE, Alhaggagi began chatting online with people whom he believed to be ISIS members in a particular chatroom with posts from ISIS supporters and people expressing hate toward the United States and Syrian and Iraqi governments.

Around that time, Alhaggagi agreed on two occasions to open social media and email accounts for purported ISIS members. Specifically, on October 31, 2016, Alhaggagi opened a Facebook, Twitter, and Gmail account and passed the account information on to the person with whom he was chatting. That person asked him,

"Brother, do you support the Caliphate State?" and Alhaggagi responded, "of course." On November 15, 2016, a Telegram user called Abu Muharib Iraqi[1] introduced himself to Alhaggagi, said he was sent from a supporter of the caliphate, and asked Alhaggagi to open Twitter accounts. Alhaggagi agreed, believing he needed to curry favor with certain users to continue his trolling and retaliatory games. **[*10]** He opened Twitter and Gmail accounts and passed along the account information. Some of the accounts Alhaggagi opened were later used to report ISIS attacks in Mosul, Iraq, destroyed tanks, planes, and Humvees, and the deaths of Peshmerga and Iraqi soldiers. The posts were attributed to Amaq, which is known to be ISIS's propaganda organization.

The FBI search also revealed that Alhaggagi had at some point accessed a bomb-making manual he had previously downloaded and exchanged messages with users on Telegram about bomb-making. It revealed a powerpoint presentation about strychnine and internet searches around mid-October for large Halloween events. Other internet history revealed searches for information on flammable liquids, rocket igniters, electric matchers, and sulfuric acid. Alhaggagi had also posted in chatrooms materials about jihadist courses, instructions to build a napalm bomb and chloroform, and links to a training video for ISIS supporters about how to assist in cyberattacks.

On July 18, 2018, Alhaggagi pled guilty without a plea agreement to the four counts alleged in the indictment: Count One, attempting to provide material support to a designated foreign terrorist organization, **[*11]** _18 U.S.C. § 2339B(a)(1)_; Count 2, possessing device-making equipment, _18 U.S.C. § 1029(a)(4)_; Count 3, using an unauthorized access device, _18 U.S.C. § 1029(a)(2)_; and Count 4, aggravated identity theft.

---

[1] Abu Muharab Iraqi, a 17-year-old, was later captured and interviewed by FBI agents in Iraq. He confirmed that he swore an oath of allegiance to Abu Bakr al-Baghdadi, the deceased leader of ISIS, and recognized Alhaggagi by one of his usernames.

## IV. Sentencing

The probation office prepared a presentence report (PSR), which concluded that the terrorism enhancement, *U.S.S.G. § 3A1.4*, did not apply in Alhaggagi's case. The PSR calculated the total offense level at 26, with a 3-point reduction for acceptance of responsibility, and a Criminal History Category I. This put the guidelines range at 46-57 months, and the probation office recommended a 48-month sentence.

Alhaggagi presented the expert opinion of Dr. Marc Sagemen, a forensic psychiatrist and anti-terrorism expert, who conducted a multi-day evaluation of Alhaggagi. Dr. Sagemen opined that Alhaggagi was not radicalized, did not harbor anti-American sentiment, and "demonstrates a lack of ideological commitment to jihad." Rather, Dr. Sagemen concluded Alhaggagi was an "immature young man who bragged online about being a dangerous terrorist to impress gullible young men communicating with him."

In its sentencing memorandum, the government argued that the terrorism enhancement was applicable, and calculated the total offense level at 38, with a criminal history **[*12]** category VI, yielding a guidelines range of 360-564 months. The government recommended a sentence of 396 months.

Following a two-day evidentiary hearing, the district court sentenced Alhaggagi to 164 months on Count One, 164 months on Count Two, 120 months on Count Three, and 24 months on Count Four. The court ordered the sentences on Counts One, Two, and Three to run concurrently, and the sentence on Count Four to run consecutively, as required by statute, for a total of 188 months.[2] The court also imposed a term of 10 years' supervised release on Count One and 3 years on each remaining count, to run concurrently.

In a separate written order, the district court explained its application of the terrorism

enhancement.[3] Reciting the definition of "federal crime of terrorism" from *18 U.S.C. § 2332b(g)(5)*, the court recognized that the crime of conviction, attempting to provide material support, was one of the enumerated statutes to which the enhancement applies. It concluded that the only dispute was whether Alhaggagi's material support offense "constituted an offense that is 'calculated [1] to influence or affect the conduct of government by intimidation or coercion, or [2] to retaliate against government conduct." **[*13]**

Evaluating the first prong, the district court concluded that Alhaggagi knew the social media and email accounts he opened would "influence or affect the conduct of government by intimidation or coercion." *18 U.S.C. § 2332b(g)(5)(A)*. The district court reasoned that Alhaggagi need not have seen the anti-government posts in the Telegram chatroom to understand the anti-government purpose of the accounts he opened because "what other purpose would the accounts serve?" The district court further noted:

> Defendant splits hairs in asserting that "it can be safely presumed that he understood the accounts would be used (if at all) to spread information sympathetic to ISIS. But he did not know that they would be used to influence government conduct by coercion or intimidation." Spreading information sympathetic to ISIS strengthens ISIS, which combats hostile governments through intimidation and force. This is a rather straightforward cause and effect, not nearly as convoluted as Defendant contends.

The district court, therefore, saw no difference between general propaganda and propaganda aimed to influence or affect government conduct by intimidation and force. Accordingly, the court found that the government demonstrated **[*14]** by clear and convincing evidence that the terrorism enhancement applied to Alhaggagi's sentence

---

[2] Alhaggagi does not challenge the sentence on Count Four on appeal.

[3] The order also explained the district court's reasoning for departing from a criminal history category of VI, as provided by *U.S.S.G. § 3A1.4*, to a criminal history category of I. The district court's well-reasoned decision on this point is not at issue on appeal.

pursuant to the first prong.

With respect to the second prong, the court concluded "for essentially the same reasons" that Alhaggagi had the specific intent to commit an offense that was calculated to "retaliate against government conduct." The court reasoned retaliation against government conduct "is one of the central features of ISIS," is "a central feature of the propaganda ISIS distributes through social media," and was "a theme in the chatroom Defendant frequented." The court thus concluded that opening social media accounts for ISIS to be used to "spread[] information sympathetic to ISIS[,] strengthens ISIS and recruits adherents to ISIS, which leads to retaliation against governments with acts of terror." Accordingly, it found that Alhaggagi had the specific intent to commit an offense that was calculated to "retaliate against government conduct."

Alhaggagi timely appealed his sentence.

## JURISDICTION AND STANDARDS OF REVIEW

We have jurisdiction pursuant to _28 U.S.C. § 1291_. "We review a district court's construction and interpretation of the Guidelines de novo and its application of the Guidelines to **[*15]** the facts for abuse of discretion." _United States v. Simon, 858 F.3d 1289, 1293 (9th Cir. 2017)_ (en banc) (alteration and citation omitted).

## ANALYSIS

In this appeal, we consider whether the district court abused its discretion in applying the terrorism enhancement in sentencing Alhaggagi.[4]

## I. Distinguishing the terrorism enhancement

_____

[4] Alhaggagi also argued on appeal that the district court committed procedural error by not articulating the reasoning for the sentences on Counts Two and Three, and that the sentences are substantively unreasonable. Because we remand for resentencing, we need not consider those arguments.

## from the elements of the underlying crime

The terrorism enhancement, _U.S.S.G. § 3A1.4_, imposes a significantly harsher punishment on those who commit certain types of crimes of terrorism. The enhancement increases a defendant's offense level to a minimum of 32 and designates a defendant's criminal history category as Category VI, regardless of whether the defendant has previously committed a crime. _U.S.S.G. § 3A1.4_. To trigger this enhancement, the government must prove elements distinct from those of the crime of conviction, specifically that the offense committed "involved, or was intended to promote, a federal crime of terrorism." _Id._

The term "federal crime of terrorism" is defined as "an offense that is . . . calculated to influence or affect the conduct of government by intimidation or coercion, or to retaliate against government conduct," _18 U.S.C. § 2332b(g)(5)(A)_, and that "is a violation of" certain enumerated statutes, _18 U.S.C. § 2332b(g)(5)(B)_. Both parts of _§ 2332b(g)(5)_ must be satisfied for the enhancement **[*16]** to apply. _See United States v. Tankersley, 537 F.3d 1100, 1113 (9th Cir. 2008)_; _United States v. Parr, 545 F.3d 491, 504 (7th Cir. 2008)_.

The material support statute, by contrast, requires proof that a defendant attempted to, conspired to, or did provide "material support or resources to a foreign terrorist organization," knowing "that the organization is a designated terrorist organization" or "that the organization has engaged or engages in terrorism." _18 U.S.C. § 2339B(a)(1)_. It is possible for a defendant to provide material support to a terrorist group in violation of _18 U.S.C. § 2339B(a)(1)_ without intending that the support or resources would influence, affect, or retaliate against government conduct to satisfy the first prong of the definition of federal crime of terrorism. _See, e.g._, _United States v. Chandia (Chandia I), 514 F.3d 365, 376 (4th Cir. 2008)_.

The enhancement, therefore, does not automatically apply to all material support offenses. Congress created this distinction in order to punish certain dangerous terrorists more severely than

persons who committed non-violent crimes. *See Tankersley, 537 F.3d at 1113*. Thus, to warrant a substantial increase in punishment pursuant to the terrorism enhancement, a defendant must have the requisite intent necessary to satisfy the definition of federal crime of terrorism, beyond the intent required to establish a violation of the material support statute.

## II. The terrorism enhancement requires [*17] examining the specific intent with respect to the offense of conviction

The parties agree, consistent with the district court's decision and those of our sister circuits that have addressed the issue, that *§ 2332b(g)(5)(A)* imposes a specific intent requirement. *See, e.g., United States v. Hassan, 742 F.3d 104, 148-49 (4th Cir. 2014); United States v. Wright, 747 F.3d 399, 408 (6th Cir. 2014); United States v. Mohamed, 757 F.3d 757, 760 (8th Cir. 2014); United States v. Stewart, 590 F.3d 93, 138 (2d Cir. 2009)* ("[C]omission of a federal crime of terrorism . . . incorporates a specific intent requirement.") (quoting *Chandia I, 514 F.3d at 376* (cleaned up)).

We agree with this interpretation of *§ 2332b(g)(5)* and the reasoning of our sister circuits in adopting it.[5] As the Second Circuit explained, *§ 2332b(g)(5)* "does not require proof of a defendant's particular motive," which is "concerned with the rationale for an actor's particular conduct." *United States v. Awan, 607 F.3d 306, 317 (2d Cir. 2010)*. Rather, "'[c]alculation' is concerned with the object that the actor seeks to achieve through planning or contrivance." *Id.* The appropriate focus thus is not "on the defendant, but on his 'offense,' asking whether it was calculated, *i.e.*, planned—for whatever reason or motive—to achieve the stated object." *Id.* In other words, 2332b(g)(5) "is better

understood as imposing a requirement 'that the *underlying felony* [be] calculated to influence or affect the conduct of government by intimidation or coercion, or to retaliate against government conduct." **[*18]** *Id.* (quoting *Stewart, 590 F.3d at 138*).[6]

Against that backdrop, we consider whether the evidence supports a finding that Alhaggagi's conduct meets the definition of federal crime of terrorism required for *§ 3A1.4* to apply.

## III. The terrorism enhancement does not apply in this case

The parties do not dispute that Alhaggagi's conviction satisfies the second prong of the definition of federal crime of terrorism. The crime of conviction here—attempt to provide material support in violation of *18 U.S.C. § 2339B(a)(1)*—is one of the enumerated statutes in *18 U.S.C. § 2332b(g)(5)(B)*.

The remaining question is whether Alhaggagi's conduct satisfies the first prong: whether his attempt to provide material support to a terrorist organization by opening social media accounts was "calculated to influence or affect the conduct of government by intimidation or coercion, or to retaliate against government conduct." *18 U.S.C. § 2332b(g)(5)(A)*. The parties agree it was the government's burden to prove that element by clear and convincing evidence, because

---

[5] Although we previously acknowledged that the terrorism enhancement requires a showing of intent, *Tankersley, 537 F.3d at 1113*, we did not decide the level of intent required. *See id.* (holding a sentence was not per se unreasonable where the terrorism enhancement was inapplicable but the district court imposed a twelve-level upward departure to mirror the punishment had the enhancement applied).

[6] The government argues Alhaggagi's acts and statements related to the attacks he purportedly planned throughout the Bay Area are circumstantial evidence of him opening the accounts with the specific intent to influence or affect government by intimidation or coercion. This argument misunderstands the text of the terrorism enhancement, which explicitly requires the *underlying offense*—the offense that violates one of the enumerated crimes in the second prong—be calculated to influence or affect government conduct. *See 18 U.S.C. § 2332b(g)(5)(A)*. Thus, in determining whether the terrorism enhancement applies here, the court must analyze whether Alhaggagi provided material support with the specific intent of influencing or affecting government conduct. *See 18 U.S.C. § 2332b(g)(5)(A)*. Alhaggagi's specific intent from other unrelated offenses is not sufficient to trigger the enhancement under *§ 3A1.4*.

application of the enhancement here increased the guidelines range from a low end of 51 months to a low end of 324 months, an increase of over 22 years. *See* United States v. Jordan, 256 F.3d 922, 926 (9th Cir. 2001).

Alhaggagi contends the district court erred in applying the terrorism **[*19]** enhancement because it centered its analysis on ISIS, not on Alhaggagi's conduct or mental state. The enhancement, Alhaggagi argues, specifically requires the district court to consider the latter, whereas the offense itself implicates the former. Alhaggagi concludes that because the district court failed to determine whether he knew how the accounts he opened were to be used, it could not find that he specifically intended that the accounts be used to coerce or intimidate a government. We agree.

## A. Calculated to influence or affect the conduct of government by intimidation or coercion

Alhaggagi opened six social media accounts on two occasions for people he understood to be ISIS sympathizers. The district court concluded that this conduct was calculated to influence or affect government conduct by intimidation or coercion because Alhaggagi knew he was providing support to ISIS sympathizers and he knew that ISIS is a terrorist organization.

The district court's logic holds true in the broadest sense—any support given to a terrorist organization ultimately inures to the benefit of its terrorist purposes. *See* Holder v. Humanitarian Law Project, 561 U.S. 1, 29 (2010). This reasoning, however, misses the mark in the context of the terrorism enhancement **[*20]** because it fails to properly differentiate between the intent required to sustain a material support conviction pursuant to 18 U.S.C. § 2339B(a)(1) and the intent required to trigger the terrorism enhancement pursuant to U.S.S.G. § 3A1.4. As explained above, the material support statute requires only that the defendant have "knowledge of the foreign group's designation as a terrorist organization or the group's commission of terrorist

acts." Id. at 12. Section 3A1.4, in contrast, requires the defendant's specific intent that the offense "influence or affect the conduct of government by intimidation or coercion." 18 U.S.C. § 2332b(g)(5)(A).

In cases involving violent acts of terrorism, specific intent is relatively easy to identify, either from the statements or admissions of the defendant or the nature of the offense.[7] But, where the conduct underlying the conviction does not involve violent terrorist acts, as is true in many material support cases, those "acts cannot, standing alone, support application of the terrorism enhancement." Chandia I, 514 F.3d at 376. In such cases, evidence beyond the facts underlying the offense conduct must reflect that the defendant had the enhancement's requisite intent.[8]

The Second Circuit's decision in *United States v.*

---

[7] *See, e.g.*, United States v. Mandhai, 375 F.3d 1243, 1247 (11th Cir. 2004) (upholding application of § 3A1.4 where the defendant "admitted he was planning to blow up electrical sites and then demand the release of Muslim prisoners and changes to the U.S. Middle East policy"); United States v. McDavid, 396 F. App'x 365, 372 (9th Cir. 2010) (terrorism enhancement applied for conspiring to bomb federal facilities where defendant and his co-conspirators "discussed a number of different ways to disrupt the government and the economy" and defendant "had clearly expressed his goals and objectives in disrupting the government"); Wright, 747 F.3d at 410 (terrorism enhancement applied for attempting to bomb a bridge); United States v. Dye, 538 F. App'x 654, 666 (6th Cir. 2013) (enhancement applied given "natural inference" that defendant intended to retaliate against court for charges pending against him when he firebombed the chambers of a judge presiding over those cases).

[8] *Compare* Mohamed, 757 F.3d at 760 (enhancement applied to conviction for conspiracy to provide material support to terrorists in violation 18 U.S.C. § 2339A(a) where defendant assisted men who were traveling to Somalia "so that the men could fight against Ethiopian troops who were in Somalia assisting the internationally-recognized Transitional Federal Government"), *with* United States v. Arnaout, 431 F.3d 994, 997-98, 1002 (7th Cir. 2005) (enhancement did not apply to conviction of a charity director who used donated funds to provide supplies to Bosnian and Chechen soldiers, given that there was no evidence defendant "intended the donated boots, uniforms, blankets, tents, X-ray machine, ambulances, nylon or walkie talkies to be used to promote a federal crime of terrorism").

*Stewart* is instructive. **[\*21]** *590 F.3d at 93*. In *Stewart*, defendant Mohammed Yousry served as a translator between a convicted terrorist and his legal team. Some of these translated messages concerned the terrorist's support for the termination of a cease-fire and a return to violence between al-Gama'a, a terrorist organization in Egypt, and the Egyptian government. *Id. at 103-07*. Yousry was ultimately convicted of providing and concealing material support to that conspiracy in violation of *18 U.S.C. § 2339A*. *Id. at 108*. The district court, however, did not apply the terrorism enhancement to Yousry's conviction, finding that "he did not act with the requisite state of mind." *Id. at 136*. On appeal, the Second Circuit agreed. *Id. at 136-37*. The court held that, despite Yousry's proximity to the messaging scheme and the scheme's role in benefiting al-Gama'a, the government failed to show that Yousry sought to influence or affect the conduct of government. *Id. at 138*.

Similarly, Alhaggagi's actions—even though the social media accounts inured to the benefit of ISIS and its terrorist purpose in the long run—are not accompanied by the necessary mental state to trigger the enhancement. The district court abused its discretion in concluding otherwise.

The district court's conclusion rests on the erroneous **[\*22]** assumption that in opening the social media accounts for ISIS, Alhaggagi necessarily understood the purpose of the accounts was "to bolster support for ISIS's terrorist attacks on government and to recruit adherents."[9] Unlike conspiring to bomb a federal facility, planning to blow up electrical sites, attempting to bomb a bridge, or firebombing a courthouse—all of which have triggered the enhancement—opening a social media account does not inherently or unequivocally constitute conduct motivated to "affect or influence" a "government by intimidation or coercion." *18 U.S.C. § 2332b(g)(5)(A)*. In other words, one can open a social media account for a terrorist organization without knowing how that account will be used; whereas it is difficult to imagine someone bombing a government building without knowing that bombing would influence or affect government conduct. The district court's "cause and effect" reasoning is insufficient because the cause—opening social media accounts—and the effect—influencing government conduct by intimidation or coercion—are much too attenuated to warrant the automatic triggering of the enhancement. Instead, to properly apply the enhancement, the district court had to determine that **[\*23]** Alhaggagi knew the accounts were to be used to intimidate or coerce government conduct. *See Awan, 607 F.3d at 317-18*; *Chandia I, 514 F.3d at 376*.

The district court did not make sufficient factual findings concerning Alhaggagi's knowledge of how the accounts he opened were to be used. Although Alhaggagi participated in a chatroom replete with posts praising ISIS, denouncing the United States, and planning "to kindle strife and chaos" in the United States through Twitter, there is no evidence that Alhaggagi saw those posts, opened the accounts because of those posts, or had contact with the authors of the posts. Furthermore, Alhaggagi himself did not post to the social media accounts, he did not control how those accounts would be used, and his statements contemporaneous to the opening of the accounts demonstrate that he did *not* know how the accounts would be used. (Muharib: "I think you read about the [social media campaign] that I want, brother." Alhaggagi: "No, I did not read about it."). While he expressed his support for ISIS in conversations about creating the account, he did not indicate that he hoped or intended that those accounts would be used to spread any specific type of content. *See Awan, 607 F.3d at 317* ("'Calculation' is concerned with the **[\*24]** object that the actor seeks to achieve through planning or contrivance.").[10]

---

[9] The government makes a similar argument for the first time on appeal, that "[a]iding ISIL's social media operation is, in and of itself, an act calculated to influence or affect the conduct of government through intimidation or coercion."

---

[10] Alhaggagi's case is therefore distinguishable from the cases on which the government relies, where the evidence underlying the offenses includes defendants' statements specifically demonstrating the intent to intimidate and coerce government conduct. *See United States v. Ali, 799 F.3d 1008, 1016, 1031-32 (8th Cir. 2015)* (material support conviction for

## B. Calculated to retaliate against government conduct

Alhaggagi further disputes the district court's conclusion that in opening the social media accounts, he had the specific intent to retaliate against government conduct.

Cases applying the retaliation prong rely on evidence that the defendant intended to respond to specific government action. For example, in *United States v. Van Haften*, the defendant, a registered sex offender, was apprehended while travelling to Turkey to try to join *ISIS. 881 F.3d 543 (7th Cir. 2018)*. His Facebook posts and notes reflected his belief that the United States government had ruined his life by placing him on the sex offender registry. *Id. at 544-45*. The district court concluded that he "sought to join ISIS, at least in part, because he wanted to retaliate against the government for its treatment of Muslims in general and specifically for its treatment of [the defendant] as a designated sex offender." *Id. at 544*. *See also United States v. Salim, 549 F.3d 67, 76-77 (2d Cir. 2008)* (finding the retaliation prong satisfied where the defendant's attack "was in retaliation for judicial conduct denying [the d]efendant's applications or substitution of counsel"); *United States v. Abu Khatallah, 314 F. Supp. 3d 179, 198 (D.D.C. 2018)* (finding that the defendant "joined **[*25]** the attack

---

sending money to al Shabaab in Somalia triggered terrorism enhancement where al Shabaab leaders directly communicated to defendants about victorious battles and suicide bombings, defendants vocally supported and expressed gratitude for al Shabaab's anti-government effort, and defendants raised funds to support that effort); *United States v. Chandia (Chandia II), 675 F.3d 329, 332, 334 (4th Cir. 2012)* (enhancement applied to material support conviction where defendant assisted a known leader of LET by helping secure equipment for LET, assisting the leader "in shipping paintballs to Pakistan for LET use in military training operations," and discussing "the training that occurred at the LET camp and [the necessary] clothing"); *United States v. El-Mezain, 664 F.3d 467, 485, 487, 571 (5th Cir. 2011)* (enhancement applied to material support conviction of officers and directors of fundraising arm of Hamas where defendants' statements in organization meetings "demonstrated the defendants' support for Hamas's goal of disrupting the Oslo accords and the peace process, as well as their agreement with Hamas's goals of fighting Israel").

[on the U.S. Special Mission in Benghazi] in order to retaliate against the U.S. government for its presence in Libya.").

Here, the district court relied on "essentially the same reasons" that it found supported the "influence or affect" prong to find the retaliation prong satisfied. The court reasoned that retaliation against government conduct is a "central features of ISIS," is "a central feature of the propaganda ISIS distributes through social media," and was "a theme in the chatroom Defendant frequented." The court thus concluded that opening social media accounts for ISIS to be used to "spread[] information sympathetic to ISIS[,] strengthens ISIS and recruits adherents to ISIS, which leads to retaliation against governments with acts of terror."

While providing support to terrorist groups inevitably strengthens their ability to retaliate against government conduct, it is not enough that such support will generally "lead[] to" more acts of terrorism. That reasoning does not distinguish between conduct that satisfies the material support statute and the specific intent required to establish calculated retaliation for purposes of the terrorism enhancement. We instead look **[*26]** to whether the offense itself is "calculated . . . to retaliate against government conduct." *18 U.S.C. § 2332b(g)(5)(A)*.

Thus, for the reasons explained above, the district court abused its discretion by failing to find Alhaggagi committed the underlying offense with the specific intent to retaliate against government conduct. Specifically, the district court did not find sufficient facts to indicate that Alhaggagi's opening of social media accounts was intended to retaliate against government conduct. The district court did not find that Alhaggagi harbored retaliatory intent against any particular government, or that he posted retaliatory messages from the social media accounts he created, that he had a particular purpose in mind as to how the accounts would be used, or that he knew how ISIS sympathizers would use them. The district court's reasoning instead focused on ISIS's conduct, and that retaliation was a theme in the chatroom Alhaggagi visited. Generally assisting a terrorist organization

2020 U.S. App. LEXIS 33309, *26

with social media does not necessarily demonstrate an intention that the accounts are to be used to retaliate against a government, and there is no evidence that Alhaggagi sought revenge on any particular government **[*27]** or for any specific government conduct. We therefore conclude that clear and convincing evidence does not establish Alhaggagi opened social media accounts calculating that they would be used to retaliate against government action, and the district court erred by applying the sentencing enhancement.

## CONCLUSION

We conclude that the district court abused its discretion in applying the terrorism enhancement to Alhaggagi's sentence. We vacate Alhaggagi's sentence and remand for resentencing.

**VACATED AND REMANDED**.

**Dissent by:** HURWITZ

# Dissent

HURWITZ, Circuit Judge, dissenting:

In light of the evidence, the district court did not abuse its discretion in applying the terrorism enhancement to Amer Alhaggagi's sentence. I therefore respectfully dissent.

## I

The terrorism enhancement in the Sentencing Guidelines applies to a "felony that involved, or was intended to promote, a federal crime of terrorism." *U.S.S.G. § 3A1.4*. A federal crime of terrorism is defined in relevant part in *18 U.S.C. § 2332b(g)(5)* as an enumerated offense "calculated to influence or affect the conduct of government by intimidation or coercion." Alhaggagi was convicted of an enumerated offense, attempting to provide material support to a terrorist organization. *See 18*

*U.S.C. § 2332b(g)(5)(B)(i)*. Thus, the critical **[*28]** issue is whether he committed that offense with the specific intent to achieve one of the objectives stated in *§ 2332b(g)(5)(A)*. *See United States v. Awan, 607 F.3d 306, 317 (2d Cir. 2010)*.

The district court found that the government met its burden of proving that intent by clear and convincing evidence. We review the district court's factual findings for clear error and its application of the Guidelines to those facts for abuse of discretion. *United States v. George, 949 F.3d 1181, 1184 (9th Cir. 2020)*. Applying this highly deferential standard of review, I cannot find that the district court erred.

## II

## A

Alhaggagi came to the attention of the FBI in July 2016 after posting in a private chatroom about acquiring weapons from an individual associated with ISIS. Over the next week, Alhaggagi engaged in several conversations with an FBI source. Alhaggagi initially urged the source to travel with him to Syria to join ISIS, but eventually focused on plans for terrorist attacks in the Bay Area. These plans included detonating bombs at crowded locations, setting fire to the Berkeley Hills, and distributing strychnine-laced cocaine in San Francisco nightclubs. After the source offered to introduce Alhaggagi to a purported ISIS sympathizer who was in fact an undercover FBI agent, Alhaggagi eagerly agreed to a meeting.

During **[*29]** his first meeting with the undercover agent, Alhaggagi discussed the logistics of his planned attacks in detail, expressing interest in the agent's supposed bomb-making experience. Alhaggagi showed the undercover agent a fake credit card he claimed to have used to order strychnine and a fake driver's license he planned to use to rent a locker to store materials in preparation for the attacks. As the two explored Berkeley in the agent's car, Alhaggagi identified various locations he wanted to attack. Alhaggagi

hoped that his attacks would "make it to the point where every American here . . . thinks twice or three times before he leaves his home."

About a week later, Alhaggagi met the undercover agent to inspect a storage locker. Alhaggagi detailed the steps he had taken to carry out the attacks since the previous meeting. Alhaggagi claimed, for example, he had obtained cocaine, identified AT&T Park as a possible attack location because it was always crowded, and researched cell phone detonators, car bombs, and backpack bombs because they offered the best opportunity to escape. Alhaggagi volunteered to collect supplies for the attacks and bring them to the storage locker. Alhaggagi then **[*30]** marveled at the possibility that "the whole state would shut down," claiming that they would be responsible for "the biggest attack . . . in America since Pearl Harbor."

The undercover agent subsequently met with Alhaggagi once again to visit the storage locker. On the drive there, Alhaggagi described a plan for a coordinated attack in which he would park a car bomb outside a San Francisco nightclub and then place backpack bombs throughout the East Bay. When the two arrived at the storage locker, the undercover agent showed Alhaggagi several barrels containing mock explosives; Alhaggagi responded with excitement. Alhaggagi told the undercover agent that he wanted to match the death toll of the September 11 attacks.

Alhaggagi broke off contact with the undercover agent and the FBI source in mid-August 2016 after concluding that the undercover agent worked for the government. But, Alhaggagi continued to engage in illegal activity until his arrest in November 2016. During a search of his residence, the government discovered an SD card, which contained a suicide note detailing attack plans virtually identical to those previously shared. The government also discovered dozens of encrypted **[*31]** messages in which Alhaggagi volunteered to open social media and email accounts for members of ISIS. On Alhaggagi's electronic devices, the government found an ISIS-produced bomb-making manual that had last been accessed only a few days before Alhaggagi's arrest, research on strychnine, an ISIS propaganda magazine, and a video of Alhaggagi speaking while recording a car burning on the side of a highway. In the video, Alhaggagi issued a warning to all Americans, claiming he had killed a police officer and set fire to the officer's vehicle as part of a soldier's mission on behalf of ISIS.

**B**

After Alhaggagi pleaded guilty, the district court held a two-day evidentiary sentencing hearing. Although Alhaggagi claimed he never seriously intended to commit acts of terrorism, the court found to the contrary, citing his extensive preparations to carry out the planned attacks. The court also observed that Alhaggagi's statements to the undercover officer and constant references to his violent plans evidence "a total lack of empathy." The district court therefore applied the terrorism enhancement.

The district court later issued a written order explaining its decision. The court incorporated its remarks **[*32]** from sentencing about Alhaggagi's "dangerousness and stark lack of empathy for the people of his community, as well as his understanding of ISIS." Addressing the provision of social media and email accounts (the offense conduct), the court observed that Alhaggagi had admitted to creating these accounts for members of ISIS who had approached him after he posted pro-ISIS messages in an ISIS chatroom. The court concluded that the offense conduct was consistent with Alhaggagi's support of ISIS, including its aims of intimidating and retaliating against hostile governments.

**III**

Because the issue of intent is highly fact specific, we must view the record cumulatively and with significant deference to the district court. *See, e.g.*, *United States v. Stafford, 782 F.3d 786, 792 (6th Cir. 2015)*; *United States v. Siddiqui, 699 F.3d 690, 709 & n.14 (2d Cir. 2012)*. "A district court need not wait for the defendant to confess a specific intent

to influence the government. The court can find this intent based on circumstantial evidence and reasonable inferences from the facts presented." *United States v. Wright, 747 F.3d 399, 419 (6th Cir. 2014)*. The cases therefore focus on the defendant's support of the terrorist organization and awareness that the offense conduct works in furtherance of the organization's goals. *See, e.g., United States v. Ali, 799 F.3d 1008, 1031-32 (8th Cir. 2015)*; *Wright, 747 F.3d at 419*; *United States v. Hassan, 742 F.3d 104, 149-50 (4th Cir. 2014)*; *United States v. El-Mezain, 664 F.3d 467, 571 (5th Cir. 2011)*; *Awan, 607 F.3d at 317-18*.

There was ample evidence from which the district **[\*33]** court could conclude that Alhaggagi intended to support ISIS's terrorist activities. Alhaggagi initially tried to recruit the FBI source to travel with him to fight on behalf of ISIS. After abandoning that idea, Alhaggagi repeatedly shared a set of plans for terrorist attacks in the Bay Area. Alhaggagi stated that the planned attacks were designed to instill fear in Americans, and cause drastic government reaction. Alhaggagi also possessed a myriad of ISIS-related material, including an ISIS-produced bomb-making manual and a video in which he pledged to fight Americans on behalf of ISIS. In light of the steps taken to carry out the planned attacks, the district court did not clearly err in rejecting Alhaggagi's contention that he never seriously aligned himself with ISIS.[1]

The district court also reasonably inferred that Alhaggagi knew that the social media and email accounts would be used to influence or affect the conduct of government. *See Awan, 607 F.3d at 317-18*. In the factual basis for his plea, Alhaggagi explained that he was contacted by two ISIS supporters to open those accounts after they saw him post pro-ISIS messages in an ISIS chatroom.

Alhaggagi admitted that he believed that these **[\*34]** individuals were ISIS supporters and "understood that these accounts might be used to disseminate statements sympathetic to ISIS." Other evidence revealed that Alhaggagi was familiar with ISIS propaganda, as he possessed an issue of ISIS's Dabiq magazine, which was replete with praise for ISIS's fight against foreign governments.[2] Placed in context, the offense conduct was consistent with a larger pattern of behavior in which Alhaggagi supported the most violent aspects of ISIS's ideology.[3]

I do not dispute that the district court could have reached a contrary conclusion on this record, but our job is limited—even in cases involving heightened burdens of proof—to determining whether a reasonable trier of fact could have reached the conclusions at issue. *See United States v. Gasca-Ruiz, 852 F.3d 1167, 1173 (9th Cir. 2017)* (en banc). Because the district court's conclusion was based on substantial evidentiary support, I respectfully dissent.[4]

_____

[1] Even assuming that Alhaggagi's views were in some respect inconsistent with ISIS's ideology, that does not preclude a finding that he supported the organization. *See United States v. Van Haften, 881 F.3d 543, 544-45 (7th Cir. 2018)*; *see also United States v. Young, 916 F.3d 368, 378-79 (4th Cir. 2019)* ("Other circuits have recognized that seemingly inconsistent belief in a terrorist group's ideology does not preclude a finding by a court that a defendant either supported that group in a criminal fashion or was predisposed to do so.").

[2] Although Alhaggagi now argues that not all of ISIS's social media presence relates to its terrorist activity, none of the evidence he offers on appeal was before the district court. *See United States v. Geozos, 870 F.3d 890, 895 (9th Cir. 2017)* (explaining that we are typically limited to the evidence before the sentencing court).

[3] Because there was sufficient evidence that Alhaggagi knew the aims of ISIS included influencing and affecting the conduct of the government by intimidation and coercion, I do not address the district court's conclusion that the offense conduct was also intended to retaliate against government conduct. *See 18 U.S.C. § 2332b(g)(5)(A)*.

[4] The majority does not address Alhaggagi's other challenges to his sentence; I would reject them. The district court did not erroneously impose an above Guidelines sentence on the non-material support counts. The district court was required to conduct a combined offense level calculation and then use that offense level to determine the appropriate sentence on each count. *See United States v. Moreno-Hernandez, 48 F.3d 1112, 1117-18 (9th Cir. 1995)*. The sentence on the material support count was not substantively unreasonable because the record "reflects rational and meaningful consideration of the" sentencing factors. *United States v. Ressam, 679 F.3d 1069, 1089 (9th Cir. 2012)* (en banc) (cleaned up). While acknowledging the statements from members of the community on Alhaggagi's behalf, the district court analyzed

2020 U.S. App. LEXIS 33309, *34

---

**End of Document**

---

the circumstances of the offense and determined that the sentence was necessary to protect the public. The district court was not prohibited from considering uncharged conduct in arriving at a sentence. *See United States v. Fitch, 659 F.3d 788, 795, 797, 799 (9th Cir. 2011)*.