1          UNITED STATES DISTRICT COURT
          NORTHERN DISTRICT OF INDIANA
2               HAMMOND DIVISION

3  UNITED STATES OF AMERICA,      )
                                 )
4  vs.                           ) 2:19-CR-159
                                 )
5  SAMANTHA ELHASSANI.           )

6
            **TRANSCRIPT OF SENTENCING HEARING**
7                 November 9, 2020
          BEFORE THE HONORABLE PHILIP P. SIMON
8             UNITED STATES DISTRICT JUDGE

9

10  A P P E A R A N C E S:

11  FOR THE GOVERNMENT:

12                  ABIZER ZANZI
                   JENNIFER CHANG
13                 NATHANIEL WHALEN
                   U.S. Attorney's Office
14                 5400 Federal Plaza, Suite 1500
                   Hammond, Indiana  46320
15                 (219) 937-5500

16  FOR THE DEFENDANT:

17                  THOMAS A. DURKIN
                   Durkin & Roberts
18                 515 W Arlingtgon Place
                   Chicago, Illinois  60614
19                 (312) 981-0123

20                  JOSHUA G. HERMAN
                   Law Office of Joshua G. Herman
21                 53 W Jackson Boulevard, Suite 1650
                   Chicago, Illinois  60604
22                 (312) 909-0434

23  ALSO PRESENT:    Troy Sabourin, U.S. Probation
                   Martin D'Amico - FBI
24

25

```
 1          (The following proceedings were held in open court

 2          beginning at 9:57 a.m., reported as follows:)

 3              DEPUTY CLERK:  All rise.

 4              THE COURT:  All right.  You can be seated.

 5          Good morning, everyone.

 6              MR. ZANZI:  Good morning.

 7              MS. CHANG:  Good morning.

 8              THE COURT:  We're on the record in Cause

 9  No. 2:18-CR-33, United States versus Samantha Elhassani.  We're

10  here this morning for the sentencing of Ms. Elhassani who is

11  here with her lawyers, Mr. Herman and Mr. Durkin.  We have

12  Ms. Chang, Mr. Whalen, and Mr. Zanzi --

13          Who is this gentleman?

14              MR. ZANZI:  This is the case agent, Special Agent

15  Martin D'Amico.

16              THE COURT:  -- who is here on behalf of the

17  government.

18          So the defendant appeared before the Court back on

19  November 25 of last year and entered a plea of guilty to the

20  one-count Information that was filed against her, and she was

21  adjudged guilty on that plea at that time.  And I ordered the

22  preparation of a presentence report, which we received back in

23  April of this year in Document Number 18.

24          I have studied the report and the addendum to the report.

25  I have also received, well, a number of other filings, sort of
```

1    a deluge here.  So there was a very, very lengthy addendum to

2    the presentence report that I have reviewed.

3         And then there were initial filings that were made by each

4    party on August 17, comprehensive filings, and then there were

5    supplemental filings that were made simultaneously on

6    September 4 of this year, one from each party, Document 31 and

7    32.  And then there's hundreds and hundreds of exhibits that

8    were filed in conjunction with those filings.

9         And then just recently, last Thursday or Friday, the

10   defense filed a supplemental sentencing submission dealing with

11   a case that was recently released or handed down by the Ninth

12   Circuit.

13        So that's all of the material that I have reviewed in

14   advance of the hearing today.  Does that sound like the, sort

15   of, corpus of information I have in front of me for purposes of

16   sentencing?

17        Mr. Durkin?

18           **MR. DURKIN:**  Yes, Judge.

19           **THE COURT:**  Mr. Zanzi?

20           **MR. ZANZI:**  Yes, Your Honor.

21           **THE COURT:**  All right.

22        Mr. Durkin, did you have a chance to sit down with your

23   client and thoroughly go over the contents of the presentence

24   report sometime before the hearing today?

25           **MR. DURKIN:**  Either I or Mr. Herman did, Judge.

1          THE COURT:  Okay.

2      Ms. Elhassani, is that true, did you sit down with these

3  gentlemen, or one of them, and thoroughly go over this report

4  before the hearing?

5          THE DEFENDANT:  Yes, sir.

6          THE COURT:  Mr. Zanzi, I assume you did as well; is

7  that correct?

8          MR. ZANZI:  That's correct, Your Honor.

9          THE COURT:  All right.  So the presentence report and

10  the addendum are placed in the record under seal.  It's

11  directed if an appeal is taken counsel on appeal shall be

12  permitted access to the sealed report.

13      Did both of you also receive Mr. Bošnjak's sentencing

14  recommendation in this case?

15      Mr. Durkin?

16          MR. DURKIN:  Yes, Judge.

17          THE COURT:  Mr. Zanzi?

18          MR. ZANZI:  Yes, Your Honor.

19          THE COURT:  All right.  So the addendum to the

20  presentence report sets forth the objections that I need to

21  resolve.

22      Does the addendum accurately identify what's in dispute?

23      Mr. Zanzi?

24          MR. ZANZI:  Yes, Your Honor.

25          THE COURT:  Mr. Durkin?

1          **MR. DURKIN:**  Yes, Judge.

2          **THE COURT:**  All right.  So would both of you agree

3    that everything else in the presentence report, other than

4    what's identified in the addendum as being in dispute, is

5    everything else materially accurate?

6       Mr. Durkin?

7          **MR. DURKIN:**  If I can have a second.

8          **MR. HERMAN:**  Yes, Judge.  To make sure we understand

9    the question, aside from what's set forth in the addendum, is

10   everything else in the presentence report correct?

11         **THE COURT:**  Yeah, that's right.

12         **MR. HERMAN:**  Yes, Your Honor.

13         **THE COURT:**  Okay.

14      Mr. Zanzi?

15         **MR. ZANZI:**  Correct.

16         **THE COURT:**  All right.  So I do adopt the factual

17   statements contained in the presentence report as my own

18   findings of fact unless otherwise objected to in the addendum,

19   and we have a couple of guideline issues that we need to argue

20   about before I hear your presentation of whatever evidence you

21   wish to present.

22      So let's deal with the two guideline issues first.  The

23   first one relates to whether an enhancement should be -- a

24   two-level enhancement under 2M5.3.

25      This is an increase in the guidelines, so, obviously, the

 1  burden is on the government because it's an increase in the

 2  guidelines.

 3       So, Mr. Zanzi, I'll hear whatever you want to present to

 4  me by way of proffer or evidence on that first objection.

 5           MR. ZANZI:  Your Honor, we've laid out our position

 6  on this enhancement, and it's in the addendum, Document 19,

 7  page 43, that fully states our position why this enhancement

 8  applies, and we rest on that argument.

 9           THE COURT:  Mr. Herman, do you want to be heard on

10  this?

11           MR. HERMAN:  Yes, briefly, Judge.

12       And in making these objections to the two enhancements

13  found at paragraphs 58 and 60 of the final PSR, we recognize,

14  as we set forth in the pleading, that it ultimately would not

15  affect the final guideline conclusions, so with that in mind,

16  I'll make my comments brief.

17       But we do think, especially because this argument bleeds a

18  little into the 3553(a), that the -- this particular

19  enhancement for 2M5.3(b)(1) requires proof that Ms. Elhassani,

20  Samantha, had the intent, knowledge, or reason to believe that

21  the funds or resources were used to commit or assist in the

22  commission of a violent act.

23       The facts of this case are incredibly, incredibly unique

24  and very much unlike the typical case where you see this

25  enhancement applied where a defendant is providing funds

 1  directly to a terrorist organization or, more specifically,

 2  firearms or other resources that will, obviously, have only one

 3  purpose.

 4      This is a case where Ms. Elhassani has pled guilty to

 5  concealing financial transactions for her husband and her

 6  brother-in-law prior to them even being members of any type of

 7  terrorist organization.

 8      The government in the addendum cites a couple of cases

 9  that really refer to a different guideline, firearm guideline,

10  2K -- I forget the subsection -- where somebody is providing

11  guns to a gang and it's knowledge that those firearms could be

12  used for another criminal offense.  This is much more specific.

13      And our point is only because of the levels of

14  attenuation, the timeline, and the lack of proof of

15  Ms. Elhassani's mental state at the time, at the time regarding

16  the use specifically for violence, that this guideline should

17  not apply.  And, again, we say this recognizing that the

18  ultimate calculus is probably not going to be affected, so with

19  that caveat.

20          THE COURT:  Mr. Zanzi, you want to respond to that?

21      MR. ZANZI:  I think this turns on what she knew at

22  the time, Your Honor, and it's clear to us, and clear in the

23  record, that she knew that her husband and brother-in-law

24  wanted to fight for ISIS, just join or become members.  Whether

25  or not they actually were card-carrying members at the time,

1  the whole purpose for this was for them to fight for ISIS; and

2  at the time that she agreed to help them and at the time she --

3  you know, there is a --

4      The plea agreement states that she moved this money

5  knowing that they were going to be used to benefit ISIS.  So

6  when she did this, she knew that they wanted to fight for ISIS

7  and she knew what ISIS was.  She knew she had seen the videos

8  of Jihadi John that were all over the Internet were they were

9  beheading individuals.  She knew this was a violent

10 organization and they were going over there to commit violence.

11 They weren't just going over there as a place to move.  They

12 were going over there to commit violence and to fight for ISIS.

13 So it does require Your Honor to find that, and we believe the

14 record reflects that.

15         **THE COURT:**  All right.  I'm going to overrule the

16 objection.  I do believe that the government has shown by a

17 preponderance of the evidence that 2M5.3(b)(1) has been met.

18     What that provision says is that if the offense involved a

19 provision of dangerous weapons, firearms, explosives, funds,

20 with the intent or knowledge or reason to believe that the

21 funds would be used as material support in the commission of

22 violent acts, then you get a two-level enhancement under this

23 provision.

24     And I do think, based on the preponderance of the evidence

25 here and, frankly, on what the defendant admitted to at her

1   plea hearing, that she engaged in a series of financial

2   transactions in advance of their ultimate move to Turkey and

3   then into Syria, that she engaged in a number of financial

4   transactions in an effort to assist her husband and

5   brother-in-law in joining ISIS.

6       And the natural and probable consequence of that and the

7   clear foreseeable consequence of that is that they were joining

8   ISIS not just in, sort of, spirit alone but with intent to join

9   the Caliphate and to engage in violent acts on behalf of ISIS.

10      And I do think the cases cited by the government in the

11  firearms portions of the guidelines are, you know, by analogy

12  apt here.  *United States v. Jemison*, for example, 237 F.3d 911

13  at 918, it is a Seventh Circuit case from 2001, stands for the

14  proposition that somebody who provides guns to a gang, like the

15  Gangster Disciples, has good reason to believe that those guns

16  are going to be used for violent purposes.

17      And at least, by analogy, I think the same can be said

18  here.  That Ms. Elhassani's actions in moving thousands and

19  thousands of dollars overseas into Hong Kong and then into

20  Turkey, all the while knowing she's doing that because her

21  husband and brother-in-law have the intention of joining ISIS,

22  for the purpose of being ISIS fighters, she surely knew that

23  those funds were going to be used to help commit violent acts.

24      So on the preponderance of the evidence, I believe the

25  government has demonstrated the applicability of this guideline

 1    provision, and so the objection to that is overruled.

 2        All right.  The next objection deals with 3B1.4 of the

 3    guidelines, and that's if the defendant used or attempted to

 4    use a person less than 18 years of age to commit the offense,

 5    either in assisting in the offense or avoiding detection of the

 6    offense, then you increase by two levels.

 7        Again, this is an increase in the guideline range, so the

 8    burden is on the government to prove it.

 9        So, Mr. Zanzi, I'll hear from you on this.

10            MR. ZANZI:  Yeah.  In addition to what we've filed

11    and what's available in the presentence report addendum,

12    Your Honor, this is a crime of concealment, of concealment of

13    funds.  The whole government theory of the case is that

14    defendant was -- brought this money over to Hong Kong because

15    it wouldn't draw attention.  She was chosen because she

16    wouldn't draw attention.  She was a U.S. citizen traveling with

17    a minor son; additionally, wouldn't draw attention.  There's no

18    reason to bring a minor on these trips.

19            THE COURT:  How do we know that?

20            MR. ZANZI:  Is that --

21            THE COURT:  How do we know there was no reason to

22    bring him on the trip?

23            MR. ZANZI:  Well, Your Honor, just from the fact.  To

24    bring him twice on -- especially, one of those trips was less

25    than 24 hours.  Was there -- this is an inference based on the

1    facts drawn.  I know that defendant has argued in their

2    response that because she was afraid to leave him alone, but we

3    responded with that as well, Your Honor.

4        That's not what is reflected in defendant's own words.

5    That's not the relationship that existed in February of 2015

6    between Moussa and the son, that they had a close relationship.

7    There's no indication that she was afraid to leave the son with

8    him.

9            **THE COURT:**  I thought she left the other child with

10   somebody else, not Moussa.

11           **MR. ZANZI:**  No.

12           **THE COURT:**  Is that wrong?

13           **MR. ZANZI:**  No, the other child was home with Moussa

14   while they were in -- there's nothing in the record that

15   reflects otherwise.

16           **THE COURT:**  Okay.

17           **MR. ZANZI:**  So two white people going to Hong Kong is

18   less likely to draw attention, frankly, Your Honor, and --

19           **THE COURT:**  I don't see why.  Why is a woman --

20   30-year-old woman traveling to Hong Kong alone more likely to

21   draw suspicion than a 30-year-old woman with an eight-year-old

22   child to draw suspicion?  I mean, I don't understand that.

23           **MR. ZANZI:**  Well --

24           **THE COURT:**  Other than you're just sort of telling me

25   that it's so.

1      **MR. ZANZI:**  Yeah.  Well, I think it's also evidence

2  by the communications with other people.  Look, she's

3  communicated with her friend, look, we're going to Disney

4  World.  We're going here on a vacation.  It provides a cover

5  story of why they are going.  We are going to travel.  We're

6  going to have fun.

7      If it wasn't such a big deal, then why not tell the father

8  of the son they were going to Hong Kong?  She took him there

9  and didn't tell the father, and the father is about to testify,

10  Your Honor.  He's going to say that he wouldn't have had any

11  issue with his son going to Hong Kong for vacation.  He wanted

12  his son to see the world.  That's why he approved it.  But she

13  didn't tell him that.  This is all part of the subterfuge,

14  Your Honor.

15      Whether or not it's great effective subterfuge, I don't

16  know; but it certainly is -- the conclusion -- we think the

17  evidence supports that conclusion, that mother traveling with a

18  child and using it allows further opportunity to create a story

19  and an explanation for why they are going to Hong Kong.

20      **THE COURT:**  Okay.  I understand your argument.

21      Mr. Herman.

22      **MR. HERMAN:**  Yes, Your Honor.

23      **THE COURT:**  I mean, this is a close call.

24      **MR. HERMAN:**  Yeah.  I think you put your finger on

25  some of our concerns.  One is that there's an argument -- and

```
 1   this is one that's equally balanced, and, therefore, you can't

 2   make the preponderance that traveling with a child during the

 3   school year, especially for a one-day turnaround trip, is apt

 4   to raise greater concerns, especially to Hong Kong, than it

 5   would be to act as some type of subterfuge.

 6       The government mentioned a couple of times that you look

 7   at the communications, but in the addendum, there are two

 8   communications that are identified.  One is an email with

 9   Cassie Daniels, and in that email from February 21, 2015,

10   Cassie says something like, "I wish I was with you guys" --

11   mentioning Sam and M█████ -- and Sam responds, "Sorry I didn't

12   tell you I was leaving.  It was very last minute.  We were

13   trying to make a business deal that kept going south."

14       There's no reference to M█████ here.  There's no

15   reference to going on a vacation.  It's the opposite of using

16   M█████ as a subterfuge when Cassie is saying, "I wish I was

17   with you guys," and Sam says, "I'm on a business deal.  I had

18   to leave last moment."

19       The government has also mentioned Disney World, and

20   there's a citation.  And the citation is to a recorded call

21   with a reporter, so I hope I'm not missing another document,

22   and if I am, I'll address it.  But that conversation with the

23   reporter is, obviously, years afterwards; and on that call at

24   about the 10-minute mark -- apparently, you've listened to it

25   already -- she tells the reporter:  "I didn't tell Moussa we
```

```
 1  were going to Disney World.  I treated this.  I did this as --
 2  if he wanted me to go over there, I took it upon myself to take
 3  some time on my own without telling Moussa," because -- we'll
 4  get into this -- because Moussa might have disapproved of her
 5  going on a vacation and showing M█████ a good time.
 6      And the other point about the child's father.  The
 7  government just acknowledged that she didn't tell the child's
 8  father where they were going.  How is the child acting as a
 9  decoy if, again, she doesn't tell the child's father where
10  they're going?  This is a mere presence case, and the presence
11  is because she didn't want to leave M██████ with Moussa.
12      One second.
13      And when Sam left, the daughter, the minor daughter, which
14  was the only other one alive at the time, stayed with a friend
15  named Cassie Daniels.
16          THE COURT:  Mr. Zanzi, I'll give you the last word on
17  this.
18          MR. ZANZI:  I have nothing further, Your Honor.
19      One thing I would just ask though.  I know we're -- just
20  in mentioning names, the father has asked that we refer to the
21  child by initials M.S. going forward, if we could.
22          THE COURT:  I've just been referring to him by his --
23  I haven't yet on the record, but sort of in my mind and
24  internally as I prepared my notes, just by his first name.  But
25  what is his initials?
```

```
 1          MR. ZANZI:  M.S.  And the father's initials are J.S.

 2   There's just a concern about --

 3          THE COURT:  I understand.

 4          MR. HERMAN:  You can tell from our pleadings that we

 5   were very conscious of that.

 6          MR. ZANZI:  They were.

 7          MR. HERMAN:  If I said something like that, it just

 8   wasn't --

 9          THE COURT:  Okay.  So let's just call the son by M.S.

10   and the father by J.S. just to protect their anonymity.

11       I think this is a close call, but I do think this is a

12   weak application of 3B1.4 of using a minor to commit a crime.

13       What that provision says is that if the defendant used or

14   attempted to use a person less than 18 years of age to commit

15   the offense or assist in avoiding detection of or apprehension

16   for the offense, you increase by two levels.

17       There's no question that the defendant brought her son on

18   these two trips to Hong Kong, and I think we can all agree that

19   it wasn't a good idea by any stretch of the imagination.  We'll

20   talk about that later.  But whether that was done specifically

21   for the purpose of avoiding detection, which is what the

22   government's argument is, I think is just supposition at this

23   point.  I don't have any real evidence that that was what she

24   was intending to do.

25       It may have been that her husband couldn't handle both
```

1    kids.  It may have been that there -- you know, she really did

2    want to take him to see Hong Kong.  I have no idea.  It also

3    could have been that she did want to use him as a subterfuge,

4    but I'm not going to decide the issue based on just conjecture.

5    I just don't think I have enough evidence in front of me to

6    demonstrate that her intended purpose in bringing her son was

7    to avoid detection.

8        Intuitively, it doesn't make a lot of sense to me, whether

9    she was traveling alone or traveling with her son, one would

10   have drawn more suspicion over the other.  I just don't see how

11   that's necessarily the case.  I think it's a close call, but I

12   on balance think the defense has the better of the argument.

13   So I'm going to sustain their objection to the 3B1.4

14   enhancement for using a minor to commit a crime.

15       The last thing I want to talk about -- and we had a

16   discussion off the record prior to coming out here.  I do want

17   to discuss on the record this supplemental filing that was made

18   by the defense in this case back on November 5.

19       In the plea agreement in this case, the parties agreed

20   that the defendant would be held accountable for the terrorism

21   enhancement under the guidelines; that's 3A1.4.  Of course,

22   that enhancement has a massive effect on the application of the

23   guidelines.

24       If the terrorism enhancement applies, then there's a

25   12-level increase in the offense level and the defendant is

 1    launched into criminal history category VI.  So it has a

 2    substantial effect on the application of the guidelines.

 3        I have an independent obligation to determine whether or

 4    not that guideline enhancement applies, and the agreement in

 5    this case is an 11(e)(1)(B) agreement that these are merely

 6    recommendations to the Court.  They're not binding the Court on

 7    the application of this enhancement.  I have some misgivings

 8    about the applicability of this enhancement, candidly.

 9        And I want to ask the defense, first, what is your

10    intended purpose for filing Document Number 37 and bringing

11    this Ninth Circuit case that held that the enhancement does not

12    apply, you know, in bringing it to the Court's attention?  I

13    want you to make a record, if you could, on the reason for this

14    filing.

15        **MR. DURKIN:**  Judge, as we told you in chambers, we

16    filed this knowing that we had committed to a plea agreement in

17    which we agreed to the applicability of the enhancement.

18        At the time we made that agreement, it was our general

19    understanding that in virtually any case charging terrorism

20    that enhancement applied.  In fact, I think we had cited -- we

21    have cited in our pleadings the opinion of a judge in the

22    Eastern District of New York who was very critical of what he

23    called and what we've been calling the "one size fits all

24    enhancement."  That was our understanding of the law at the

25    time.

1    Now, whether there were some exceptions to that, I don't

2    specifically know; but this was presented to us as a

3    non-negotiable issue.  And for the reasons that we, I think,

4    have made clear in our pleadings, the defendant wanted to plead

5    guilty.  She did not want to have to go through the ordeal of a

6    trial, and we believe that there was sufficient evidence for

7    the government to present that is consistent with guilt under

8    this particular statute.

9    We would not have agreed -- as you know, we wanted -- the

10   lawyers wanted to try this case.  We would not have permitted a

11   plea under 2339A or B.  We thought that was not consistent with

12   the facts; and when C was presented, we thought that was, at

13   least, more consistent with the facts as we understood them.

14   Whether our contesting them or not, it was a different issue,

15   at least -- from a professional, ethical standpoint, we thought

16   there were sufficient facts to permit a plea under 2339C.

17   We did not provide that case to the Court to advocate

18   something that we cannot advocate.  That's simply how we viewed

19   it.  We presented it to you under 3553(a) in the same sense

20   that we have argued no matter what guidelines you find the one

21   size fits all terrorism enhancement, whether that's the current

22   law in the country or not -- I still think the general law in

23   the country is it applies, except maybe in some rare

24   instances -- this being one of them -- the Ninth Circuit case.

25   But if there was ever a case to suggest or state, as we

 1   have, that the criminal history category VI and the draconian

 2   consequences of the terrorism enhancement simply overstate this

 3   conduct, so that's why we submitted it.  If Your Honor, as I

 4   said earlier, thinks we made a mistake and should not have done

 5   that, I'll have to live with it.

 6       I think -- I don't want to start advocating.

 7           THE COURT:  I understand.

 8           MR. DURKIN:  If you want my opinion -- if you want my

 9   opinion.

10           THE COURT:  No, I don't.

11           MR. DURKIN:  Okay.

12           THE COURT:  I want to know why you made this filing,

13   and you told me why you have done that, that you really are

14   telling me that it's a filing to show that, the harshness of

15   the applicability of this enhancement, under these facts, and

16   it's a 3553(a) argument; it is not an argument that the

17   terrorism enhancement doesn't apply.  That's what I'm taking

18   from you.

19       Is that fair?

20           MR. DURKIN:  Right.

21       In simple terms, it seems to me, logical, that if there

22   would be an argument that would cause anyone, you, the

23   government, me, Joe man on the street to think that maybe it

24   doesn't apply, that's a good 3553(a) argument.

25           THE COURT:  All right.

1        Mr. Zanzi, what I would like to hear from you, because,

2   again, I have an obligation to properly arrive at the proper

3   application of the sentencing guidelines, and given the drastic

4   nature of the 3A1.4 terrorism enhancement, you know, I would

5   like to hear from you why you think it applies.

6        And, in particular, comment on -- as I understand it, this

7   is a two-prong standard.  The government has to show, first,

8   that the defendant committed an underlying offense that's

9   specifically delineated in the statute, and, of course, she

10  did.  It's listed in 2332b.  One of the underlying predicates

11  is financing of terrorism under 2339C, such that that part of

12  the definition of federal crime of terrorism is readily met.

13       The part I want you to comment on is what evidence do you

14  have that the defendant had the specific intent when she

15  engaged in the conduct that she engaged in, specific intent, to

16  influence or affect the conduct of government by intimidation

17  or coercion or to retaliate against government conduct?  That's

18  the second prong that the government would have to prove to

19  show the applicability of the terrorism enhancement.

20       Do you agree with how I have just laid that out,

21  Mr. Zanzi?

22         **MR. ZANZI:**  Yes, Your Honor.  We agree that those are

23  the two prongs, except that -- I guess the second prong is that

24  her conviction is designed for the crime of conviction, that

25  the facts support that she intended to affect government

1    change -- or that the purpose of her actions was to affect

2    government change, Your Honor.

3        First of all, I want to start by saying that I do -- for

4    the record, the government finds that the supplemental filing

5    is an advocacy for the non-application of the enhancement and

6    that appears to be the desired effect, to question Your Honor

7    about whether or not this enhancement applies.  We're not

8    seeking to withdraw from the plea agreement or --

9        **THE COURT:**  I mean, that's your right if you think

10   that that's what they're doing.

11       **MR. ZANZI:**  We understand that.  And we're not going

12   to do that.

13       But that being said, Your Honor, we do believe that this

14   case is very distinguishable from the *Alhaggagi* case that was

15   provided by the defense.  That was a case where -- and I'll

16   start by reading a quote from that case, and then I'll explain

17   why the evidence is different in this case.

18       On page 22 of that opinion, the district court says,

19   "Opening a social media account" -- which is what the defendant

20   in that case did -- "does not inherently or unequivocally

21   constitute conduct motivated to 'affect or influence' a

22   government by intimidation or coercion.  In other words, one

23   can open a social media account for a terrorist organization

24   without knowing how that account will be used; whereas, it is

25   difficult to imagine someone bombing a government building

 1    without knowing that bombing would influence or affect

 2    government conduct."

 3        Your Honor, this is -- it is not the government's position

 4    that the terrorism enhancement applies in every single

 5    financing case.  It wouldn't, for example, apply in a case

 6    where someone provided funds for -- ISIS was designed to

 7    establish a Caliphate.  There were people there who were going

 8    to just become doctors, to live in the Caliphate and provide

 9    civilian work.  Investing in that or providing financing for

10    that might not apply, but that is not this case, Your Honor.

11        We provided defendant's diary, "The Truth," as she called

12    it.  Whether it is a diary, a memoir, it is what she has spoken

13    to the world of how she wants to sell this story.  And early on

14    in this, it's page 8 of that diary, she says, "He never tried

15    to teach me anything about Islam.  In fact, I didn't know about

16    the prayers, about the prophet.  I didn't know anything.  Now

17    he is telling me he wants to fight in the cause of Islam."

18        Defendant -- it's important to remember what defendant

19    knew at the time that she provided this assistance, that she

20    was moving money.  When defendant learned that her husband

21    wanted to join ISIS, she was aware.  She had seen the videos of

22    beheading.  She expressed, in this diary, she was shocked that

23    he wanted to be a part of this.  She knew that ISIS was a

24    violent organization, and anybody -- you would have to be

25    living under a rock to not know -- to have seen those videos.

1    Those videos were beheading of American journalists, and they

2    were designed to influence government -- to influence western

3    governments.

4        But separate and apart from that, what was ISIS doing?

5    What were fighters in ISIS doing at that time?  Fighting in the

6    cause of Islam.  ISIS believed in creating a new government, in

7    destabilized areas in the Middle East fighting against

8    governments.  The enhancement does not refer to just the

9    American government.  It is to affect government change.

10       Now, that's designed to -- because this affected American

11   national interest.  Whether or not they were directly fighting

12   Americans there or -- this was -- America has strong national

13   security interests.  That's why they were designated a foreign

14   terrorist organization.

15       And that was the goal.  That was the goal.  That was very

16   clear from all of the emails that the brothers in the family

17   were sending.  They wanted to go there to fight, to fight and

18   to impact change, to create a new state.  There couldn't be

19   anything that is more directed at impacting government change.

20   She knew that this was what they wanted to do.  When she helped

21   them procure tactical gear, she knew that.

22       This is relevant conduct to her charge.  She knew -- she

23   stated that she thought, oh, they were going to sell some

24   binoculars for hunting in Morocco.  We don't believe the facts

25   support that at all, Your Honor.  She knew they were going to

1    ISIS.  What was this for?  It was to be used for their cause of

2    becoming snipers and fighters for ISIS, Your Honor.

3        So unlike a case where a social media account is being

4    created or funds might be used to support the noncombative

5    aspects of ISIS, she knew that her husband wanted to become a

6    fighter for ISIS, and that was the purpose of this.  And that's

7    what they were doing at this time, was affecting government

8    change.  So we believe this is a very clear case based on the

9    purpose and intent of the financing and the concealment of

10   funds and why they were moving money there and why they were

11   going to Syria, that this enhancement applies, Your Honor.

12           THE COURT:  Okay.

13       MR. DURKIN:  Judge, could I just respond?

14           THE COURT:  Sure.  But you better not argue that it

15   doesn't apply.

16           MR. DURKIN:  I'm not.

17           THE COURT:  Go ahead.  Whatever you want to say.

18       MR. DURKIN:  I am not going to advocate against the

19   applicability of the guideline because I'm bound by the plea

20   agreement.

21       But I want to respond to what I think is an improper

22   selection of this diary, and I want to put it in context for

23   you so you understand it because it affects everything, not

24   just whatever you're trying to resolve on the guideline, which

25   I leave to you.

 1        Can I simply put something into context for you --

 2            **THE COURT:**  Sure.  Go ahead.

 3            **MR. DURKIN:**  -- and not be accused of advocating?

 4            **THE COURT:**  Proceed, Mr. Durkin.

 5            **MR. DURKIN:**  All right.  The same diary, which, as a

 6    general matter, we have commented on -- it's kind of like, as

 7    Mr. Herman says, the government's wanting to play both red and

 8    black.  When they don't believe the information she provides to

 9    somebody, she's a liar; but when she writes in her journal,

10    she's telling the truth and, therefore, this is proof positive

11    for them.

12        But in the same thing, let's assume this is all true in

13    this journal.  Right after what he just read, it says, "I told

14    him I couldn't believe what I was hearing and I needed some

15    time to think."  This is after he tells her he wants to go to

16    Syria.  "I stayed away for a few days.  I just worked and tried

17    to think of a solution.  After a few days" -- and this is why I

18    felt obligated to comment.  "After a few days, he actually came

19    to me apologizing.  He told me he had spoken to another of his

20    brothers and they came up with a good plan.  Me and my husband

21    were planning to buy a house so he made the suggestion we buy a

22    house in Morocco.  It could be a vacation home and my cousin

23    could renew his visa from Morocco."

24        And then further down she says -- and just before where he

25    started, where he read -- and I think this is important --

 1   she's talking about it sometime when some people were over:

 2   "After our guests left, my husband said he wanted to talk about

 3   Syria.  I had been following the news, but I didn't know he was

 4   talking about the Islamic state.  Once he explained to me, I

 5   was in shock, complete shock.  Yes, my husband was a Muslim,

 6   but he didn't even pray regularly.  He never tried to teach me

 7   anything about Islam.  In fact, I didn't know about the prayers

 8   about his prophet.  I didn't know anything.  And now he's

 9   telling me he wants to fight in the cause of Islam," which is

10   what they read.

11        So, I mean --

12           THE COURT:  Anything else you want to say, Mr. Zanzi,

13   in response to that?

14         MR. ZANZI:  You know, I'm going to address this,

15   Your Honor, later, but this is what troubles us about this case

16   and this plea agreement, is that, you know, the plea agreement,

17   the factual basis of the plea agreement -- the only way she can

18   even plead guilty to this case -- otherwise there is no guilty

19   plea, there is no crime here -- is that when she did this she

20   knew at the time that it was going to be used to support ISIS

21   and she knew at the time that they wanted to fight for ISIS.

22        If she still thought that they were going to Morocco, she

23   thought that they were buying thousands of dollars of tickets

24   and going to Hong Kong because they were really going to buy a

25   vacation home -- cheap vacation property in Morocco or to get

1  knee surgery in Morocco, then how is she guilty of this crime?

2  How is she guilty of this crime?  Defense says over and over

3  that they want to try this case.  Well, you know, they are sort

4  of advocating for it.

5      She is guilty of this crime because she knew at the time

6  that she was moving the money that the purpose was for them to

7  join ISIS.  You can't have it both ways, Your Honor.  You can't

8  have it both ways.  You can't say that she moved money to Hong

9  Kong because she thought she was going to Morocco, because then

10  she's not guilty.  And I have no problem -- I don't want her to

11  plead guilty to something that she's not guilty of.  I have no

12  problem trying this case, but this is the problem that I have

13  with this argument that's been made repeatedly.

14          THE COURT:  Okay.  We'll get into that when we -- I

15  hear 3553.  Right now I'm focusing on the terrorism

16  enhancement.

17          MR. ZANZI:  I understand, Your Honor.

18          THE COURT:  And under 3A1.4, as I sort of alluded to

19  earlier, if the offense is a felony that involved or intended

20  to promote a federal crime of terrorism, increase the offense

21  level by 12.  And in such case, the defendant's criminal

22  history category is automatically a category VI, sort of the

23  worst -- it is the worst out of the six categories of criminal

24  history.

25      So the question becomes:  Was this intended to promote a

 1   federal crime of terrorism?  Now, on the face of it, just

 2   reading that section, the answer is, well, of course, it is a

 3   federal crime of terrorism.  That's what she's pled guilty to.

 4   She's financing -- assisting her husband and brother-in-law to

 5   join ISIS and become fighters on ISIS's behalf.

 6        But it's really not that simple because in the application

 7   notes there's a very specific definition of, quote/unquote,

 8   "federal crime of terrorism," and it sends you to Title 18,

 9   United States Code, Section 2332b(g)(5).

10        And that position says that a "federal crime of terrorism"

11   means an offense that is a violation of 2339C -- that's, of

12   course, met here by virtue of her plea -- and that the conduct

13   or the offense is calculated to influence or affect the conduct

14   of government by intimidation or coercion or to retaliate

15   against government conduct.

16        So in order to get this gigantic terrorism enhancement,

17   that's what the government has to prove.  I have substantial --

18   candidly, substantial misgivings about the application of the

19   federal terrorism enhancement under 3A1.4.

20        I have found a number of cases that have given me pause.

21   They all say that it's incumbent on the government to show that

22   the defendant acted with the specific intent to disrupt or

23   intimidate the operations of government, essentially.

24        And so, for example, *United States v. Chandia*,

25   C-H-A-N-D-I-A, 514 F.3d 365 at 376.  It is a Fourth Circuit

1  case from 2008.  What that says is, "To get the 3A1.4

2  enhancement, the government must show that the defendant had

3  the specific intent to affect the conduct of government by

4  intimidation or coercion."

5      A number of other cases that stand for that proposition,

6  *United States v. Hassan*, 742 F.3d 104 at 148, Fourth Circuit

7  case from 2014; *United States v. Wright*, 747 F.3d 399 at 408,

8  Sixth Circuit case from 2014; *United States v. Mohammed*,

9  757 F.3d 757 at 760.  It is an Eighth Circuit case from 2014.

10 *United States v. Stewart*, 590 F.3d 93 at 138.  It's a Second

11 Circuit case from 2009.  *United States v. Awan*, A-W-A-N,

12 607 F.3d 306 at 317.  It's a Second Circuit case from 2010.

13     What they said in that case was that 2332b(g)(5), the

14 section I'm just referring to, "is better understood as

15 imposing a requirement that the underlying felony be calculated

16 to influence or affect the conduct of government by

17 intimidation or coercion."  It is not just enough that you be

18 convicted of 2339C.  Again, you have to have the specific

19 intent to influence or affect the conduct of government.

20     There are cases that go both ways that are all over the

21 board, frankly, based on my research.  And so I do have some

22 misgivings about the application of this enhancement, but given

23 the agreement of the parties that -- and the stipulation that

24 the application -- that this enhancement applies, and based on

25 the proffer and argument of Mr. Zanzi, I do find that the

1    terrorism enhancement does apply.

2        But it is worth noting, I think, that it's a very, very

3    close call, contrary to what the parties think.  I think it's

4    actually really a very close call.  And it is really important.

5    The ultimate disposition of this guideline enhancement makes

6    all the difference in the world.

7        By finding that the defendant should be tagged with this

8    terrorism enhancement, her guideline range, as I've now

9    computed it, she's a level 31 and a criminal history VI.  That

10   leads to a range of suggested incarceration under the

11   guidelines of 188 to 235 months, essentially 15 to 20 years.

12   Of course, that is capped by virtue of the fact that she's pled

13   guilty to an offense that has a statutory maximum of 120

14   months.

15       Had I not found that the terrorism enhancement applied,

16   the defendant would have been a level 22 and a criminal

17   history category I and her guideline range would have been 41

18   to 51 months.  So this decision has a two-and-a-half times

19   difference in the exposure, at least under the guidelines, so

20   it's a very consequential decision.

21       But, as I said, on balance, based on the government's

22   proffer and, frankly, the agreement of the parties that the

23   terrorism enhancement does apply, I'm going to go along with

24   that agreement.

25            **MR. DURKIN:**  Judge, if we could, could we just have a

```
 1    minute to explain this to Ms. Elhassani?

 2              THE COURT:  Let me finish and then we'll take a break

 3    here.

 4              MR. DURKIN:  All right.

 5              THE COURT:  So the guidelines in this case are as

 6    follows:  As I just said, based on the rulings that I have just

 7    made, there's a total offense level in this case of 31.  The

 8    criminal history category is VI.  And by virtue of the

 9    operation or the statutory cap, that means the guidelines are,

10    again, the statutory maximum here of 120 months.  The

11    supervised release range is one to three years.  The fine range

12    is 17,500 to 175,000.  There's no restitution applicable, and

13    there's a $100 special assessment.

14        Based on all the rulings that I have just made, is that

15    accurate?

16        Mr. Durkin?

17              MR. DURKIN:  Yes, sir.

18              MR. ZANZI:  Your Honor, supervised release, the

19    maximum is life under -- if the terrorism enhancement applies,

20    Your Honor.

21              THE COURT:  Okay.

22        Troy; is that right?

23              THE PROBATION OFFICER:  Yes.

24              THE COURT:  In my sentencing --

25              THE PROBATION OFFICER:  On the statutory column, it
```

1  shows zero to life.

2       THE COURT:  Okay.  So it's zero to life, but I was

3  speaking as to the guideline.  The guidelines are one to three

4  years; is that right?

5       THE PROBATION OFFICER:  Correct.

6       MR. ZANZI:  Yes, Your Honor.

7       THE COURT:  Of course she can go all the way up to

8  life, but the guidelines recommend one to three years.

9       MR. ZANZI:  I misunderstood you then, Your Honor.

10  Yeah.

11       THE COURT:  Okay.

12     All right.  I do now accept the plea agreement entered

13  into between the United States and the defendant filed with

14  this Court back in November of last year.  The judgment and

15  sentence will be consistent with it because I'm satisfied that

16  the agreement adequately reflects the seriousness of the actual

17  offense behavior and that accepting the plea agreement will not

18  undermine the statutory purposes of sentencing.

19     So do you want --

20     Noel, do you want to turn on the overhead noise there so

21  Mr. Durkin and Ms. Elhassani can talk with one another.

22     (Defendant and her counsel confer.)

23       THE COURT:  Okay.  You all set, Mr. Durkin?

24       MR. DURKIN:  Yes, sir.

25       THE COURT:  Okay.  So we will kind of transition now

 1    to -- I understand that the government has one witness and

 2    maybe wants to make some proffers as well, and I understand the

 3    defense also has some proffers that it intends to make.  And

 4    then I'll give both sides a full opportunity for allocution,

 5    along with the defendant as well.

 6         So let's do, sort of, the evidentiary part of it first and

 7    then we'll hear from you by way of allocution.

 8         I'll ask the government to proceed first.  Tell me what

 9    you intend to do here, Mr. Zanzi, in that regard.

10              MR. ZANZI:  Yes, Your Honor.  We are going to present

11    one witness, J.S., the father of M.S.  And we also will be

12    playing a short video clip by way of proffer as well.  It is

13    about a minute and 15 seconds.  It doesn't relate to the

14    witness, but other than that -- so it should be a pretty short

15    presentation.

16              THE COURT:  Okay.  Why don't we get J.S. in here and

17    we'll take his testimony first.

18              MR. ZANZI:  I should remain seated here, right?

19              THE COURT:  Yes.  We are going to put the witness up

20    in the corner there.

21              MR. ZANZI:  Okay.  Thanks.

22         Does he have a screen in front of him, Your Honor?

23              THE COURT:  We can use this one if you're okay with

24    that.  I also think he has a screen in front of him as well,

25    just as the juror would.

```
 1          Sir, would you raise your right hand to be sworn in.

 2          (The oath was administered.)

 3               THE WITNESS:  I do.

 4               THE COURT:  Okay.  Sir, you may be seated.

 5          Sir, during your examination, if you would, remove your

 6     mask just so I can sort of see you talking and have a human

 7     exchange here.  Then, when you are done, I will have you put

 8     your mask back on, okay.

 9               THE WITNESS:  Yes, sir.

10               THE COURT:  All right.  Mr. Zanzi, you may proceed.

11               MR. ZANZI:  Thank you, Your Honor.

12                    J.S., GOVERNMENT'S WITNESS, SWORN

13                         DIRECT EXAMINATION

14     BY MR. ZANZI:

15     Q.   Sir, I'm going to refer to you, as we have discussed

16     previously, as J.S., okay.

17     A.   Okay.

18     Q.   I'm going to refer to your son as M.S., okay.

19     A.   Okay.

20     Q.   I know people make mistakes, but we'll just try our best

21     to follow that, okay.

22     A.   All right.

23     Q.   Do you know the defendant, Samantha Elhassani?

24     A.   Yes.

25     Q.   And I'm asking you just to speak into the microphone so we
```

1   can all hear you, okay.

2   **A.**    All right.

3   **Q.**    So you know the defendant, Samantha Elhassani?

4   **A.**    Yes.

5   **Q.**    How do you know her?

6   **A.**    We were in a relationship together, and we have a child

7   together.

8   **Q.**    How long have you known her?

9   **A.**    Since around 2003 -- or '4 or '5, 2004 or '5.

10  **Q.**    And how old was -- when did you separate?

11  **A.**    We separated when M.S. -- or my son was around three years

12  old.

13  **Q.**    Okay.  And how old is M.S. now?

14  **A.**    Thirteen.

15  **Q.**    Initially, when you separated with defendant, who did your

16  son stay with?

17  **A.**    He stayed with me.

18  **Q.**    For how long?

19  **A.**    For about a year.

20  **Q.**    Briefly -- I don't need all the details -- but why did the

21  relationship end?

22  **A.**    Mostly because of deception.  Sam was staying after work

23  and partying with her friends and not coming home.

24  **Q.**    And after the year that your son stayed with you, what

25  happened regarding custody?

1    **A.**    Well, there never was a custody agreement, but my son

2    ended up living with Samantha due to the fact my babysitter got

3    pregnant, and she was stable enough that he was safe to live

4    there.

5    **Q.**    And after your son started living with defendant, did you

6    try to maintain a relationship with your son?

7    **A.**    Yes, I did maintain a relationship.

8    **Q.**    Were you successful in doing so?

9    **A.**    Yes.

10   **Q.**    Do you maintain a relationship with defendant's parents?

11   **A.**    Yes.

12   **Q.**    How would you describe that relationship?

13   **A.**    Very good.

14   **Q.**    You get along with them?

15   **A.**    Yes.

16   **Q.**    And how did you become aware of defendant's relationship

17   to Moussa Elhassani?

18   **A.**    After -- Sam told me, eventually.

19   **Q.**    Do you remember, approximately, when that was?

20   **A.**    After she moved to Indiana, but I don't have a time frame.

21   **Q.**    Okay.  And did your relationship with your son change

22   after defendant became involved with Moussa?

23   **A.**    Yes.

24   **Q.**    How so?

25   **A.**    The visits became less frequent and the phone calls became

 1  less frequent.

 2  **Q.**   Why is that?

 3  **A.**   I'm not sure.  I wasn't there on her side.

 4  **Q.**   Did you try to maintain your relationship with your son?

 5  **A.**   Yes.

 6  **Q.**   But you weren't successful?

 7  **A.**   Correct.

 8  **Q.**   Based on what you knew and what you were able to observe,

 9  did you have any concerns about your son living with Moussa and

10  defendant?

11  **A.**   No.

12  **Q.**   Did you become aware of an effort by Moussa to adopt your

13  son?

14  **A.**   Yes.

15  **Q.**   How did you become aware?

16  **A.**   Samantha's sister called me and notified me.

17  **Q.**   And were you -- did anyone inform you about that ahead of

18  time?

19  **A.**   No.

20  **Q.**   Or request your permission?

21  **A.**   No.

22  **Q.**   Do you know the details of anything that was relayed to

23  the Court regarding that?

24  **A.**   The only details I know is that Samantha was attempting to

25  file for the adoption under the premise that I was not in

1    communication with her, that I had abandoned my son.

2    **Q.**    And was that true?

3    **A.**    No.

4    **Q.**    How was that issue resolved?

5    **A.**    I showed up for the Court hearing, and then it -- Samantha

6    and Moussa no longer pursued it.

7    **Q.**    During the -- in the last year, before your son left for

8    abroad, did it become harder for you to maintain contact with

9    your son?

10   **A.**    Yes, it became less and less communication.

11   **Q.**    Did you notice -- in the times that you were able to spend

12   with your son, did you notice any changes in him?

13   **A.**    Yes.  Once when he came to visit, he started practicing

14   Islam.  I walked into a bathroom and found him praying on the

15   floor.

16   **Q.**    Anything else that led you to believe he was practicing

17   Islam?

18   **A.**    He also would not eat pork, and he directly told me that

19   he was practicing Islam at home.

20   **Q.**    So this would have been sometime in 2014?

21   **A.**    Yes.

22   **Q.**    I want to direct your attention to December of 2014.

23            **MR. DURKIN:**  I'm sorry.  December when?

24            **MR. ZANZI:**  December 2014.

25   \\\

1   BY MR. ZANZI:

2   Q.   Did defendant ask you to meet with her in Chicago?

3   A.   Yes.

4   Q.   For what purpose?

5   A.   To visit with my son and to sign a paper for a passport --

6   a temporary passport is what I was told.

7   Q.   Who paid for that trip?

8   A.   Samantha did.

9   Q.   And was your son present?

10  A.   Yes.

11  Q.   Did you get to spend some time with him?

12  A.   Yes.

13  Q.   Did defendant need your approval to obtain a passport for

14  your son?

15  A.   Yes.

16  Q.   Because you were his biological father?

17  A.   Correct.

18  Q.   Did she tell you why she needed a passport?

19  A.   Yes.

20  Q.   What was the reason?

21  A.   Sam told me that she needed the passport to take M.S. to

22  visit Moussa's mother who was dying in Paris.

23  Q.   In Paris?

24  A.   Yes.

25  Q.   In Paris, France?

1    **A.**    Correct.

2              **MR. DURKIN:**  I'm sorry.  Could I either ask him to

3    restate that answer or have it read back.  I didn't understand

4    part of it.

5              **THE COURT:**  Could you repeat your answer, sir.

6              **THE WITNESS:**  Yes.  Which part of the answer?

7    BY MR. ZANZI:

8    **Q.**    Let me re-ask the question.  And I'll just ask that you --

9    you might need to move the microphone closer to you so we can

10   all hear you.  Just speak as loud as you can.

11       What did defendant tell you was the reason she needed the

12   passport?

13   **A.**    Samantha told me that she needed the passport to take M.S.

14   to visit Moussa's mother who was dying in Paris, France.

15   **Q.**    Did you agree to allow your son to get a passport?

16   **A.**    I did.

17   **Q.**    And why is that?

18   **A.**    Because even though we had issues in the past, I don't

19   have a problem with my son traveling to see the world, and I

20   thought we had resolved everything.

21   **Q.**    At that time, did you have any problems with them going to

22   France?

23   **A.**    No.

24   **Q.**    Why is that?

25   **A.**    I feel everyone should get out and see the world,

1   including my son, honestly, regardless of my relationship with

2   his mother.

3   **Q.**   Would you have given approval if defendant said they were

4   going to Morocco to visit Moussa's parents?

5   **A.**   No.

6   **Q.**   Why is that?

7   **A.**   I was told that Moussa's parents lived -- well, his

8   father.  I don't know where his mother -- except for France --

9   but I was told that his father lived on a compound and they had

10  armed guards, so it just doesn't seem like a safe environment

11  for a child.

12  **Q.**   Would you have given approval if defendant said they were

13  traveling to Hong Kong?

14  **A.**   Yes.

15  **Q.**   Why is that?

16  **A.**   For the same reason that I would give approval for France,

17  just to see the world.

18  **Q.**   Did you believe defendant when she said she was going to

19  France?

20  **A.**   Yes.

21  **Q.**   Did you communicate with defendant via Facebook Messenger

22  when she was abroad?

23  **A.**   Yes.

24  **Q.**   I'm going to show you a document that has been previously

25  submitted to the Court as Exhibit 4 to the government's

1    sentencing memorandum.  And have you seen this before?

2    **A.**    (No response.)

3    **Q.**    This is a Facebook record, correct?

4    **A.**    Correct.

5    **Q.**    You have seen this document before?

6    **A.**    Yes.

7    **Q.**    This is a communication between you and the defendant

8    occurring January 16, 2015; is that correct?

9    **A.**    Yes.

10   **Q.**    And there is -- on the bottom of the page, you state,

11   "You're also in a country that was just attacked by terrorists

12   last week in Paris," correct?

13   **A.**    Correct.

14   **Q.**    Can you explain the context of what's happening in this

15   communication and why you made that statement?

16   **A.**    I made the statement because I was trying to get ahold of

17   Samantha, and she would not reply back to my text messages or

18   Messenger.

19   **Q.**    Why were you trying to get ahold of her?

20   **A.**    Because of the terrorist attack, and I was under the

21   impression that she was in Paris at the time.

22   **Q.**    Was there a terrorist attack that had happened around this

23   time in France that had made the news?

24   **A.**    Yes.

25   **Q.**    During the course of this communication, did she ever

1    admit to you that she was not actually in Paris, France, or in

2    France at all?

3    **A.**    No, she did not.

4    **Q.**    Has she ever admitted to you that she wasn't in France

5    during this time?

6    **A.**    No.

7    **Q.**    Did she do anything or say anything to indicate that she

8    was in France?

9    **A.**    No.

10   **Q.**    Or that she was still in France?  Did she lead you to

11   believe that she was still in France?

12   **A.**    Correct.

13   **Q.**    What did she say?

14   **A.**    As you can see here, she says that she was the one that

15   conducted the attack, and then she did, like, an LOL and a

16   smiley face.  But I was under the impression that she was in

17   France.

18   **Q.**    That was just a joke?  You took that as a joke, correct?

19   **A.**    Right.

20   **Q.**    But that led you to believe that she was still in France?

21   **A.**    Correct.

22   **Q.**    When defendant asked for your permission to approve a

23   passport for your son, did she tell you that her husband,

24   Moussa, wanted to join ISIS?

25   **A.**    No.

1    **Q.**    Now, sir, have you ever served in the U.S. military?

2    **A.**    Yes.

3    **Q.**    What branch?

4    **A.**    The Navy.

5    **Q.**    And when was that?

6    **A.**    May of 2001 until August of '04.

7    **Q.**    And were you ever deployed to the Middle East or anywhere

8    near Syria?

9    **A.**    In the Persian Gulf twice, Operation Enduring Freedom and

10   Operation Iraqi Freedom.

11   **Q.**    And did the defendant know that about you?

12   **A.**    Yes.

13   **Q.**    How did you become aware that your son was in Syria?

14   **A.**    I was contacted by the FBI.

15   **Q.**    And did you ever receive videos or images of your son in

16   Syria?

17   **A.**    Yes.

18   **Q.**    How did you receive these?

19   **A.**    Via email from Samantha's sister, Laurie Elhassani.

20   **Q.**    And describe the videos and what you saw?

21   **A.**    The first video I saw appeared as a propaganda film for

22   ISIS, and my son was walking around with a high-powered rifle

23   practicing the movements of the rifle, looking down the scope,

24   walking around rubble, and I believe that is the same video

25   that he addressed Donald Trump and called him the puppeteers of

1    the Jews and a bunch of other -- just a terrible video.

2    Q.   And were there other, sort of, like, homemade videos that

3    you saw as well?

4    A.   Yes.  The second video I saw was my son putting on a

5    suicide vest -- or holding the suicide vest and speaking with

6    someone off camera about what he was going to do and to say

7    that he was an American and when they come to rescue him to

8    blow them up.

9    Q.   What was your reaction to that?

10   A.   I was devastated by that.  I kind of had a slight

11   emotional breakdown.  I had to call my boss.  I was working out

12   of state at the time, and he had to send me back home and put a

13   relief in.  I took time off work.

14   Q.   How did you feel when you found out that -- when you first

15   found out that your son was in Syria?

16   A.   I was in disbelief.  Angered mostly, at first, and then,

17   just -- I didn't know how to take it, to be honest.

18   Q.   Where does your son reside now?

19   A.   He currently lives with me.  I have sole custody.

20   Q.   How long has he been living with you?

21   A.   For the last year.

22   Q.   And how is he doing?

23   A.   He's doing -- he's doing well now.

24   Q.   How was he doing when he first came to you?

25   A.   When he first came to me, he was very quiet, very scared,

1    malnutritioned.  His weight was very low.  And he's very

2    standoffish from large crowds, and even peers his age, he

3    doesn't really -- still doesn't communicate with them or really

4    have any social interaction.

5    Q.   Does he have any trouble sleeping or anything like that?

6    A.   Yes.  He does have trouble sleeping in the dark, and it

7    seems that he always has to have a TV on or some background

8    noise.

9    Q.   Anything else that is a trigger for him or something he

10   struggles with?

11   A.   Yes.  Anytime there's going to be fireworks or anything

12   set off, we have to give advance notice.  If he's in the house

13   and just hears fireworks, he kind of goes a little bit into a

14   panic mode, and he -- unfortunately, he probably feels like

15   he's being bombed or that bombs are out there.

16   Q.   You mentioned that he's doing better.  What challenges --

17   has he gone through therapy?

18   A.   Yes.  He's been through a year of therapy and requested

19   not to go anymore, so I have stopped therapy on his request.

20   And he's just -- just socially, he'd rather stay online

21   constantly than actually have face-to-face interactions with

22   other kids.

23   Q.   Does he talk about Syria?

24   A.   He talks about Syria.  He's -- yes.

25   Q.   What does he tell you?  What has he been willing to share

1    with you about it?

2    **A.**    He's told me stories of seeing his friends, children his

3    age, blown up in car bombs; seeing Moussa attacked by a drone;

4    seeing buildings exploded; people shot; ISIS shootouts with

5    Americans.

6    **Q.**    Has he talked about Moussa?  What has he said about him?

7    **A.**    All he really says about Moussa is that he was mean and

8    that he wasn't as tough as he acted.

9    **Q.**    Has he talked about the trips to Hong Kong?  Did he say

10    anything about that?

11    **A.**    Yes.  He did say that he went to Hong Kong with his mother

12    and that he knew that they were going over there to take money

13    to someone.

14    **Q.**    Did he say what that was for or no?

15    **A.**    He just said that it was for what they were doing in

16    Syria, what they were going to go do in Syria.

17    **Q.**    Did he have any understanding of what that was?

18    **A.**    Yes.

19    **Q.**    Does he talk about the videos that were created of him?

20    **A.**    He does not.  The only thing that he says about them is

21    that he hopes that no one sees them.

22    **Q.**    What about the --

23            **THE COURT:**  I'm sorry.  I didn't hear what you just

24    said.

25            **THE WITNESS:**  His fear is that people will see them

1   and recognize him in the community.

2            THE COURT:  I see.

3   BY MR. ZANZI:

4   Q.   What about defendant, has he said anything to you about

5   her?

6   A.   That he doesn't want to see her or talk to her and that he

7   doesn't know when or if he will ever decide to.

8   Q.   Okay.

9            MR. ZANZI:  Nothing further, Your Honor.

10           THE COURT:  Mr. Durkin.

11                      **CROSS-EXAMINATION**

12  BY MR. DURKIN:

13  Q.   Can you see me?

14  A.   Yes.

15  Q.   Okay.  I didn't want you to think I was trying to avoid

16  you, but you have to forgive me.  I have never had to

17  cross-examine under these circumstances.  Usually we use the

18  podium and you are up there, so this is a little unusual.  If I

19  seem like I'm a little out of my element, bear with me, okay?

20  A.   All right.

21  Q.   I think you said that you had met Samantha in either 2003,

22  '4, or '5; am I right?

23  A.   It was in 2000 -- late 2004, 2005-ish, I believe.

24  Q.   And that was in what state?

25  A.   Arkansas, Fayetteville.

1    **Q.**    And you were raised in Florida, if I'm right.  Am I right?

2    **A.**    Correct.

3    **Q.**    Okay.  And the reason you were in Arkansas is because you

4    and your brother got arrested for drugs and got out on bond; am

5    I right?

6    **A.**    No.  Who would go to a state to get arrested?

7    **Q.**    I'm sorry?

8    **A.**    No, I did not go to a state to get arrested.

9    **Q.**    No, no.  I didn't say you went to the state to get

10   arrested.

11   **A.**    The reason I was in Arkansas was because I was traveling

12   across the country; and, yes, I went to jail in Arkansas for

13   possession of under 3 grams of marijuana, seeds.

14   **Q.**    I'm not trying to be critical.  Just bear with me.

15        The reason you ended up in Arkansas was because you had

16   been arrested in Arkansas, correct?

17   **A.**    No.

18   **Q.**    Did you plan to stay in Arkansas when you left to go

19   across the country?

20   **A.**    No.

21   **Q.**    What caused you to stay in Arkansas?

22   **A.**    We decided to get an apartment there and live there, my

23   brother and myself.

24   **Q.**    Okay.  And the other reason you stayed was because you met

25   Samantha, right?

1  **A.**    Correct.

2  **Q.**    Okay.  And the fact of the matter is is that the two of

3  you were very much in love with each other back then, weren't

4  you?

5  **A.**    Yes.

6  **Q.**    Okay.  And I think you said you still stay in touch with

7  her parents, correct?

8  **A.**    Correct.

9  **Q.**    You have a good relationship with them, right?

10  **A.**    Yes.

11  **Q.**    And the truth of the matter is is that you still really

12  care about Sam, don't you?

13  **A.**    No.

14  **Q.**    You don't?

15  **A.**    I do not.

16  **Q.**    When did that change?

17  **A.**    When she decided to join an organization and take my son

18  out of the country.

19  **Q.**    Do you think she joined ISIS?

20  **A.**    Yes.

21  **Q.**    And what is that based on?

22  **A.**    The fact that she was in Syria in an ISIS camp.  You don't

23  accidently end up in Syria, I believe.

24  **Q.**    Well, let me ask you this.  Do you know Moussa at all?

25  **A.**    I do not.

1   **Q.**    Okay.  You testified that up until Moussa came into the

2   picture, even though you guys were separated, you had a pretty

3   good relationship; am I right?

4   **A.**    Correct.

5   **Q.**    Okay.  And at that point you still had -- at least between

6   the two of you, you had mutually good feelings about each other

7   even though you had separated, right?

8   **A.**    We were cordial to each other, yes.

9   **Q.**    All right.  Well, you were more than cordial because you

10  testified earlier about coming to Chicago over the passport

11  issue, right?

12  **A.**    Yes.

13  **Q.**    Okay.  And even then you had strong feelings for Samantha,

14  didn't you?

15  **A.**    No.

16  **Q.**    You didn't ask her to come to your hotel room?

17  **A.**    She insisted on coming to my hotel room because my son was

18  there, and she wanted to see the area that we were at.

19  **Q.**    You never asked her to come alone to your hotel room to

20  have sex while your son and someone else was in the swimming

21  pool?

22  **A.**    I did not.

23  **Q.**    Okay.  Let me ask this.  Moussa insisted that two women go

24  along with Sam for this meeting in Chicago, correct?

25  **A.**    I have no idea.

1    **Q.**    Well, did you notice that there were two women along?

2    **A.**    Yes.

3    **Q.**    And these were people who worked for Moussa, correct?

4    **A.**    I also do not know.

5    **Q.**    Okay.  Did Sam explain to you that the reason she couldn't

6    come to your room by herself was because she had been under the

7    watch of these two people at Moussa's behest?

8    **A.**    No.

9    **Q.**    She never told you that?

10   **A.**    No.

11   **Q.**    But these people were pretty much in constant contact with

12   Samantha, weren't they?

13   **A.**    Yes.

14   **Q.**    Okay.  Do you know anything about domestic abuse?

15   **A.**    No.

16   **Q.**    Do you know anything about the psychological affects of

17   controlling behavior?

18   **A.**    No.

19   **Q.**    Do you think that it was Samantha who decided to begin to

20   cut off your communication with M.S., or was it Moussa?

21   **A.**    I'm not sure.

22   **Q.**    Well, we do know, don't we, that up until Moussa was in

23   the picture there was no interference with your visitation with

24   M.S., was there?

25   **A.**    No.

1  **Q.**   Do you think it's possible that it was Moussa that was

2  controlling her rather than her deciding that?

3  **A.**   I'd rather not speculate.

4  **Q.**   Well, you're speculating that she joined ISIS, aren't you?

5  **A.**   No.  She was in Syria in an ISIS camp.

6  **Q.**   Well, would it surprise you to know she was not ever in an

7  ISIS camp, she was in an ISIS prison where she was tortured and

8  raped?

9  **A.**   No.

10 **Q.**   Have you ever heard that?

11 **A.**   Yes.

12 **Q.**   Who told you that?

13 **A.**   A reporter did.

14 **Q.**   And do you think that ISIS would rape and torture their

15 own members?

16 **A.**   Yes.

17 **Q.**   Okay.  So you don't dispute that she was raped and

18 tortured in Syria, do you?

19 **A.**   I don't affirm or dispute it.  I don't know.  I wasn't

20 there.

21 **Q.**   Okay.  So since you weren't there, you wouldn't know

22 whether she was a member of ISIS either, would you?

23 **A.**   Correct.

24 **Q.**   You mentioned in your testimony that you noticed, the time

25 your son came to visit you in 2014, that there had been some

1  changes in him, right?

2  **A.**    Correct.

3  **Q.**    And all of a sudden he was acting like he was a practicing

4  Muslim, right?

5  **A.**    Correct.

6  **Q.**    Well, you know that Samantha wasn't a practicing Muslim,

7  right?

8  **A.**    I'm not sure.

9  **Q.**    Well, did you ever know her to practice Islam?

10  **A.**    No.

11  **Q.**    Did she ever tell you she was?

12  **A.**    No, but I didn't ask her either.

13  **Q.**    I see.

14       When your son came to see you in 2014 and started acting

15  like a Muslim and wanting to pray, he was only four years old,

16  wasn't he?

17  **A.**    Yes -- no.

18  **Q.**    I'm sorry?

19  **A.**    I believe he was around five or six by then.

20  **Q.**    What year was he born?

21  **A.**    '07, I believe.

22  **Q.**    What year was he born?

23  **A.**    '07, I believe.

24  **Q.**    So he might have been seven then?

25  **A.**    Correct.

1  **Q.**   Okay.  Did he tell you that it was his mother that was

2  forcing Islam on him?

3  **A.**   He didn't tell me anyone was forcing Islam on him.

4  **Q.**   What did you surmise?

5  **A.**   I just assumed that he was practicing Islam because he

6  lived with someone else who practiced Islam.

7  **Q.**   And that someone else was Moussa, right?

8  **A.**   Correct.

9  **Q.**   Now, you said that you learned that your son was in Syria

10  because you were contacted by the FBI, right?

11  **A.**   Correct.

12  **Q.**   And you were contacted several times while he was

13  overseas; am I right?

14  **A.**   Correct.

15  **Q.**   First time being in March of 2016, correct?

16  **A.**   I'm not sure of the exact date.

17  **Q.**   Would you take my word for it if I told you that's the

18  date that was on a memo that we have?

19  **A.**   Yes.

20  **Q.**   By the way, when you and Samantha met, she was only 19,

21  right?

22  **A.**   I don't recall her age, to be honest.

23  **Q.**   Well, you were 22; am I right?

24  **A.**   Correct.

25  **Q.**   Would you agree with me that Samantha's relationships with

```
 1  men, perhaps other than your relationship, have been rather

 2  disastrous?

 3  A.   Some of them, but I'm not aware of all her relationships.

 4  Q.   Well, you know that she's had multiple relationships,

 5  hasn't she?

 6  A.   Yes.

 7  Q.   In fact, that was an issue between the two of you, right?

 8  A.   No.

 9  Q.   Well, I thought you said that one of the issues, when you

10  answered Mr. Zanzi, was that she was staying out and partying

11  all night?

12  A.   Correct.

13  Q.   Well, wasn't there a time, that you were aware of, because

14  you were there, when she was -- ended up in a sexual assault by

15  one of her bosses and a secretary at a place where --

16  A.   She told me --

17  Q.   Hold it.

18       -- at a place where you also worked?

19  A.   Yes.

20  Q.   And when was that?

21  A.   I'm not sure when that was.

22  Q.   Where were you working?

23  A.   I was working for an independent contractor in Arkansas.

24  Q.   Was that Springdale?

25  A.   Yes.
```

1   **Q.**   Okay.  And that was pretty traumatic for the both of you,

2   wasn't it?

3   **A.**   Yes.

4   **Q.**   In fact, after that, you sobbed in her arms and apologized

5   for not being able to protect her; am I right?

6   **A.**   No.

7   **Q.**   Did you -- what happened from your vantage point or as you

8   recall?

9   **A.**   As I recall it -- Samantha told me what happened.  I did

10  not witness the situation.  And then shortly thereafter, we

11  left Arkansas for Florida.  She no longer felt safe where we

12  were.

13  **Q.**   Okay.  Now, you're aware of the fact, are you not, that

14  she ran away from home with someone when she was 16 or 17 years

15  old, right?

16  **A.**   Yes.

17  **Q.**   Okay.  You're also aware of the fact that she was sexually

18  abused when she was young, correct?

19  **A.**   No.

20  **Q.**   You're not aware of that?

21  **A.**   No.

22  **Q.**   Would you -- you wouldn't dispute that though, would you?

23  **A.**   I don't have anything to say about it.  Sam never

24  mentioned being abused as a child.

25  **Q.**   Okay.  But you were aware that at 16 she ran off with some

J.S. - CROSS                                                    Page 58

1    guy and, ultimately, had to get her parents' permission to get

2    married; am I right?

3    **A.**    Yes.

4    **Q.**    You're also aware that she's had all these multiple bad

5    relationships with men, correct?

6    **A.**    Yes.

7    **Q.**    Do you know anything -- let me ask you something.  Hold

8    on.

9         When you were first contacted -- how did you end up coming

10   to testify today?

11   **A.**    I was --

12   **Q.**    Did you ask to come here, or did the government ask you to

13   come?

14   **A.**    I was sent a subpoena to appear.  I was asked to appear.

15   **Q.**    So you didn't volunteer to come here today, right?

16   **A.**    Correct.

17   **Q.**    Did they tell you why they wanted you to come?

18   **A.**    To testify.

19   **Q.**    Did they tell you what they wanted you to testify about?

20   **A.**    No.

21   **Q.**    When did they first explain to you what they were going to

22   ask you today?

23   **A.**    Last night we discussed --

24   **Q.**    Who was that that explained what they wanted?

25   **A.**    Abizer did not explain what he wanted.  He explained to me

1    to tell the truth while I'm in the courtroom.

2    **Q.**    Okay.  That's fair.

3           Did Abizer show you any of the pleadings in this case?

4    **A.**    He did not.

5    **Q.**    Did he tell you what the dispute at this sentencing is

6    about?

7    **A.**    He did not.

8    **Q.**    And he didn't show you any of the psychiatric reports that

9    have been submitted about Samantha?

10   **A.**    No, sir.

11   **Q.**    Okay.  Let me just ask you this.  And I'm referring to one

12   of the reports.  I want to see whether you would agree with

13   this -- page 2 of the January 17, 2020 -- report.

14          Would you agree with this statement from the report?

15   "Starting with high school, she, Samantha, engaged in

16   sequential relationships, marriages, and living arrangements

17   that were destabilizing and attributable to the consequence of

18   abuse and neglect."  Would you agree with that?

19   **A.**    Can you re-read that?  I'm not sure what all of that

20   means.

21   **Q.**    "Starting with high school, she engaged in sequential

22   relationships, marriages, and living arrangements that were

23   destabilizing and attributable to the consequences of abuse and

24   neglect."  Would you agree with that?

25   **A.**    I'm not a doctor to agree with it.  I'm not sure what

 1  leads to these things, so I don't -- I don't know.

 2  **Q.**   I'm just talking about that factual statement.  You don't

 3  disagree with that, do you?

 4          **MR. ZANZI:**  I object to the foundation.  He clearly

 5  has no basis for knowing.

 6          **THE COURT:**  Sustained.

 7  **BY MR. DURKIN:**

 8  **Q.**   Well, would you agree with this statement?  "Her marriages

 9  and relationships as a young adult were unstable and troubled,

10  including the suicide of a man that had had impregnated her."

11  Would you agree with that?

12  **A.**   I'm not sure even what you're speaking about, someone that

13  committed suicide or anything.

14  **Q.**   Are you aware of a relationship in which she became

15  impregnated, other than yours and with Moussa?

16  **A.**   Yes.

17  **Q.**   Okay.  And when was that?

18  **A.**   That was just before she left to Indiana to meet with

19  Moussa, and she said his name was Raphael.  And she said that's

20  when she left to Indiana to get an abortion.

21  **Q.**   Okay.  And would you agree that -- or if you can -- that

22  her marriage to Moussa was controlled and abused and he

23  manipulated her?

24  **A.**   I wasn't present for any of her relationship with Moussa,

25  physically, so I'm not sure what happened on that side.

1   **Q.**   Did she ever discuss with you how manipulative he was?

2   **A.**   She did not.

3   **Q.**   She never told you that?

4   **A.**   She did not.

5   **Q.**   Did you ever ask her what happened, why there was a change

6   in the -- in your ability to see M.S. once she became married

7   to Moussa?

8   **A.**   I asked her -- yes.

9   **Q.**   What did she say?

10  **A.**   She just said that Moussa would stand and monitor phone

11  calls but that was her only reasoning.

12  **Q.**   Did you find it odd that Moussa would stand and monitor

13  her phone calls with you?

14  **A.**   No.

15  **Q.**   Why not?

16  **A.**   I've witnessed many two-family homes, and I have seen that

17  a lot in my lifetime where the other family member in the new

18  family is insecure so he monitors, or she monitors, all the

19  phone calls between the child and the parent.

20  **Q.**   Now, one of the other reasons that you guys broke up was

21  that Sam wanted more children and you didn't; am I right?

22  **A.**   No.

23  **Q.**   Did you guys ever discuss having more children?

24  **A.**   No.

25          **MR. DURKIN:**  Could I have a second, Judge?

```
 1              THE COURT:  Sure.

 2         Noel, can you turn on the white noise, please.

 3              MR. DURKIN:  She's going to write a note.

 4              THE COURT:  Okay.

 5   BY MR. DURKIN:

 6   Q.   So were you ever trying to have another child with Sam?

 7   A.   I do believe that we tried, yes.

 8   Q.   And when was that in relationship to when you broke up?

 9   A.   I'm not sure.

10   Q.   Okay.  And you also have a son from another relationship

11   who is older than M.S., correct?

12   A.   Correct.

13   Q.   How old is that son now?

14   A.   Eighteen.

15   Q.   And did he live with you?

16   A.   No.

17   Q.   Did he grow up with you?

18   A.   He did not.

19   Q.   He grew up with his mother?

20   A.   Correct.

21   Q.   Do you see him?

22   A.   I do sometimes.  I visit him.  He lives in Florida.

23   Q.   When he was growing up, how often did you see him?

24   A.   Quite often while I lived in Florida.  Not so often once I

25   moved out of Florida.
```

J.S. - CROSS

1   **Q.**   You moved out of Florida in either 2003 or 2004; am I

2   right?

3   **A.**   Sounds right, yes.

4   **Q.**   And how old was he when you moved out of Florida, your

5   son?

6   **A.**   He was still young.  I'm not sure the age.  I think he was

7   around four.  Three or four, I'm not sure.

8   **Q.**   Did you ever provide support money for M.S.?

9   **A.**   Yes.

10   **Q.**   When?

11   **A.**   I don't have the dates and times of all the money I sent

12   Samantha.

13   **Q.**   You didn't send any money once she was married to Moussa,

14   did you?

15   **A.**   Once she was married to Moussa, I went to send her money;

16   and Sam said not to worry about it, they no longer required it.

17   I offered to put M.S. on my healthcare.  She said it was not an

18   issue.

19   **Q.**   One of the times you talked to the FBI was on February 10

20   of 2017, right?

21   **A.**   I'm not sure of the exact dates when I spoke with the FBI.

22   **Q.**   Did you speak to them once in Oklahoma City?

23   **A.**   Yes.

24   **Q.**   Would you take my word for it that it was February 10,

25   2017?

1    **A.**    Yes.

2    **Q.**    You told them that you believed M.S. had broken his arm

3    and that M.S. told you that Moussa and Sam were abusive; is

4    that right?

5    **A.**    No.  I did say that M.S. did have his arm broke and that

6    it was Samantha.

7    **Q.**    That what?

8    **A.**    That he said it was Samantha.

9    **Q.**    That broke his arm?

10   **A.**    Correct.

11   **Q.**    M.S. told you that Samantha broke his arm?

12   **A.**    Correct.

13   **Q.**    And what did you do about that?

14   **A.**    I called Samantha and spoke with her, and she said that it

15   wasn't true and that it did not happen.  I later asked M.S.,

16   and he said that it was a lie.  I also told the FBI the same

17   thing and that Sam said nothing happened to him.  And he

18   apologized to her later for lying, he says.

19   **Q.**    That was M.S. that said that?

20   **A.**    Correct.

21   **Q.**    And did you also tell the FBI, then, that you knew from

22   M.S. that Moussa took M.S. shooting and got him involved in the

23   martial arts; am I right?

24   **A.**    Yes.

25   **Q.**    Did you approve of that?

1   **A.**   Yes.

2   **Q.**   So it was okay to you that Moussa was teaching your son

3   how to shoot?

4   **A.**   Correct.

5   **Q.**   And as I think you said, you have no idea what happened

6   when Sam and M.S. -- I'm sorry -- your son were in Turkey, do

7   you?

8   **A.**   Can you repeat the question.

9   **Q.**   You have no idea what happened when your son and Samantha

10  were in Turkey with Moussa, correct?

11  **A.**   Correct.

12  **Q.**   Okay.  And has anybody told you about an incident at the

13  border where Sam had to make an instantaneous decision about

14  getting in a white van and going with Moussa and the children

15  or staying behind and watching him take the children into

16  Syria?  Anybody ever tell you that?

17  **A.**   Yes.

18  **Q.**   Who?

19  **A.**   A reporter.

20  **Q.**   You have any reason to doubt that?

21  **A.**   Yes.  Well, I mean, that's an odd question to ask 'cause

22  it's opinion based, and we're trying to operate off of facts.

23  And I don't -- it's not good to ask my opinion about something

24  like that.

25  **Q.**   Well, that's for me to decide, and the judge.  So my

1  question was, you don't have any reason to dispute what that

2  reporter told you, do you?

3  **A.**    No, I wasn't there to witness it.

4  **Q.**    Right.  Just like you weren't aware of anything that was

5  going on in the Moussa Elhassani household in relationship to

6  Samantha, correct?

7  **A.**    Yes.

8  **Q.**    Just like you have no idea how much he abused her or

9  whether he abused her, do you?

10  **A.**    Correct.

11  **Q.**    All you know is she became a different person when she got

12  married to Moussa, correct?

13  **A.**    Yes.

14  **Q.**    And that affected you dramatically, didn't it?

15  **A.**    Yes.

16  **Q.**    Because you cared for her, correct?

17  **A.**    No, because I cared for my son.

18  **Q.**    Well, you didn't make any efforts to get your son back,

19  did you?

20  **A.**    Make an effort to go into war-torn Syria, is that what you

21  are asking me?

22  **Q.**    No, before they went to Syria.

23  **A.**    No.  I spoke with M.S.  He said that he was happy there.

24  He didn't want to come away from his mother and his other

25  siblings.

1  **Q.**   Okay.  But did you also testify earlier that somehow M.S.

2  said something about Moussa thinking he was a tough guy but he

3  really wasn't?  Did I hear that correctly?

4  **A.**   Correct, in Syria.

5  **Q.**   That was in Syria?

6  **A.**   Correct.

7  **Q.**   Did he tell you what he based that on?

8  **A.**   Gun fights with Americans.

9  **Q.**   Okay.  But he certainly didn't tell you that his mother

10  was engaged in any gun fights with Americans, did he?

11  **A.**   No.

12  **Q.**   Did he ever talk about -- does he ever talk about what Sam

13  did to save the lives of some Yazidis?

14  **A.**   No.

15  **Q.**   Does he ever mention them?

16  **A.**   No.

17  **Q.**   Have you ever heard of them?

18  **A.**   The name is not familiar to me.

19  **Q.**   Did you ever hear about some Yazidis -- these are a

20  nationality -- two women that were brought into the household

21  while they were in Syria?

22  **A.**   Yes.

23  **Q.**   Okay.  Who told you about that?

24  **A.**   The reporter told me that Sam told him, and I saw the

25  interview on CNN about some people that were staying with them.

1    **Q.**   But M.S.'s never discussed that with you?

2    **A.**   No.

3    **Q.**   Okay.  And has M.S. ever discussed what happened when they

4    were trying to get out of Syria?

5    **A.**   M.S. does not discuss anything that happened in Syria

6    almost at all except for the few stories that I've already

7    mentioned.

8    **Q.**   Okay.  And you told us that M.S. had been in therapy but

9    wanted to stop, correct?

10   **A.**   Correct.

11   **Q.**   And that was okay with you?

12   **A.**   Yes.

13   **Q.**   Why is that?

14   **A.**   Because the therapist didn't recommend ongoing treatment.

15   **Q.**   Oh, so it was the therapist that didn't recommend it?

16   **A.**   No.  When I spoke to the therapist about ending treatment,

17   they were fine with M.S.'s -- where he was at the time.

18   **Q.**   And that was okay with you too?

19   **A.**   Yes.

20   **Q.**   Okay.  And you have remained very close with her family,

21   particularly her father, correct?

22   **A.**   Yes.

23   **Q.**   And he's here in the courtroom today; am I right?

24   **A.**   Yes.

25   **Q.**   In fact, he even offered to bring you up here together to

J.S. - REDIRECT                                              Page 69

1   save money, correct?

2   **A.**   Correct.

3   **Q.**   But you had already had a ticket from the government,

4   right?

5   **A.**   Correct.

6   **Q.**   Otherwise, you would have come up here with him, wouldn't

7   you?

8   **A.**   It's possible, yes.

9   **Q.**   Okay.  'Cause the two of you are close, right?

10  **A.**   Yes.

11  **Q.**   He's a good guy, right?

12  **A.**   Yes.

13          **MR. DURKIN:**  That's all I have.

14          **THE COURT:**  Do you have any redirect, Mr. Zanzi?

15          **MR. ZANZI:**  A few questions, Your Honor.

16          **THE COURT:**  Okay.  Why don't we do it then.

17                      **REDIRECT-EXAMINATION**

18  **BY MR. ZANZI:**

19  **Q.**   At the time that -- in 2014, when your son visited with

20  you and you observed that he was practicing Islam, did you have

21  any problem with that?

22  **A.**   I didn't agree with it, and I mentioned it to Sam that I

23  did not agree.  But I'm not a xenophobe, so just because he's

24  practicing a religion doesn't mean anything bad to me.

25  **Q.**   Okay.  And did you have any concerns about his -- you

1  explained that the nature of your -- how frequent you were able

2  to spend time with him had changed and things had changed.  Did

3  you have any reason to believe that he was in danger or unsafe

4  or not in a good situation with Moussa and defendant?

5  **A.**    I did not.  Sam made everything seem very kosher.

6  **Q.**    And any information that you have testified about

7  defendant's past relationships, what is that based off of, your

8  own personal knowledge or what defendant told you?

9  **A.**    What the defendant told me.

10 **Q.**    So you don't personally know if they are true or not,

11 correct?

12 **A.**    Correct.

13 **Q.**    Based on what you know of the defendant, is she someone

14 who makes her own decisions and is independent?

15 **A.**    Yes.

16 **Q.**    Based on what you know about her and her character, do you

17 believe that she went there willingly to Syria, knowingly?

18 **A.**    I do.

19 **Q.**    And why do you say that?

20 **A.**    Sam is very free-spirited, and she doesn't generally

21 just -- I don't know how to explain it, honestly.  I just --

22 Samantha usually doesn't just take directives from people and

23 follow them.

24          **MR. ZANZI:**  Nothing further, Your Honor.

25          **THE COURT:**  Mr. Durkin, do you have anything else

 1  based on that?

 2          MR. DURKIN:  Yes.

 3                    **RECROSS-EXAMINATION**

 4  **BY MR. DURKIN:**

 5  **Q.**   I thought that when I questioned you you said you didn't

 6  know what happened at the border and you didn't know what

 7  happened in Turkey; am I right?

 8  **A.**   Correct.

 9  **Q.**   So what is it that makes you say she went to Syria

10  willingly or not under the control or the thumb, the emotional

11  thumb, of Moussa Elhassani?  What makes you say that?

12  **A.**   As stated, Sam is usually very independent and doesn't

13  follow directives.  Also, my experience with flying is that

14  your destination is on your ticket and you know where you're

15  going.

16  **Q.**   Well, this ticket went to Morocco.  Did you know that?

17  **A.**   No.

18  **Q.**   Did somebody tell you she had a ticket for Turkey and only

19  Turkey?

20  **A.**   No.

21  **Q.**   So why did you just say what you just said?  What makes

22  you think she only had a ticket to Turkey?

23  **A.**   She -- 'cause she did fly to Turkey.  I never said it was

24  her only ticket.

25  **Q.**   You didn't know -- so the government didn't tell you that

1    there was a connecting flight to Morocco?

2    **A.**    No.

3    **Q.**    Do you know anything about Moussa and Sam looking for

4    houses in Morocco to live?

5    **A.**    I do not, no.

6    **Q.**    You never heard that?

7    **A.**    No.

8    **Q.**    Nobody told you that?

9    **A.**    No, sir.

10   **Q.**    And you agree with me that you know nothing about domestic

11   abuse and the psychological affects of living with a

12   controlling man in an environment -- in a controlling

13   environment?  You know nothing about that, correct?

14   **A.**    Correct.

15   **Q.**    So if a psychiatrist were to find that that was true, you

16   wouldn't quarrel with that, would you?

17   **A.**    No.

18   **Q.**    Thank you.

19            **THE COURT:**  You have anything else, Mr. Zanzi?

20            **MR. ZANZI:**  No, Your Honor.

21            **THE COURT:**  Sir, thank you.  You may step down.  You

22   are excused.

23       Mr. Zanzi, you told me that you have also a couple of

24   video clips.

25            **MR. ZANZI:**  One video.  It is a minute and, like, 15

 1    seconds.

 2         THE COURT:  Why don't we go ahead and do that.  Then

 3    I'm going to take -- we'll probably just take a lunch break at

 4    this point because it's five minutes to 12, and after lunch,

 5    we'll hear the defense factual proffer.

 6         MR. DURKIN:  We're not going to call any witnesses.

 7         THE COURT:  Okay.  I was under the impression you

 8    were going to proffer some information about -- from this

 9    Dr. Xenakis.

10         MR. DURKIN:  Just what he's already said.

11         THE COURT:  Okay.

12      Are you going to contest any of that by way of, you know,

13    a witness or anything of the sort?

14         MR. ZANZI:  No.

15         THE COURT:  Can we just do that all when we do our

16    allocution here?

17         MR. ZANZI:  Sure.

18         THE COURT:  Okay.  All right.  So let's just watch

19    the video and then we'll take a break.

20         MR. ZANZI:  Your Honor, I'm about to play a video.

21    It's a clip from -- wait a minute.

22      Let me set the foundation.  This is a video from July 24,

23    2018.  It was tendered in discovery.  I provided this to

24    defense counsel early this morning, what the Bates number was.

25    It is the interview of Special Agent D'Amico on July 24, 2018.

 1    We had another clip from that interview which we submitted as

 2    part of the sentencing memorandum.  It's submitted in response

 3    to the video that was provided by defense counsel where defense

 4    counsel met with the parents -- mother in Morocco.

 5         (Video played.)

 6              **MR. ZANZI:**  That's it, Your Honor.

 7              **THE COURT:**  Okay.  Can you -- I watched the video of

 8    Mr. Durkin interviewing the mother-in-law.  Frankly, I'm having

 9    a little hard time hearing that.

10              **MR. ZANZI:**  Yes.

11              **THE COURT:**  Tell me the significance of what I just

12    heard in conjunction with the video that I'm referencing.

13              **MR. ZANZI:**  Yeah.  So, one, the defendant was asked

14    did they visit any properties when she was -- in January of

15    2015, before she went to Hong Kong, she visited Morocco.  It

16    was herself and her two children.  Moussa couldn't come because

17    of his visa issues.  She went there.  It is our position that

18    they weren't -- she was never intending to buy property.  That

19    wasn't something that they were planning to do.  And the -- and

20    also Abdelhadi's wife was there too.

21         Defendant flew out to Morocco, met with the mom, and said

22    that they went and visited properties, they actually visited

23    properties, to suggest that that was something that she was

24    planning and intending to do.

25         This video she said they never went to visit properties.

 1    Defendant admitted to the FBI agent when she went out there

 2    they never went to visit any properties.

 3        One, it's to show the credibility of that video that

 4    defense provided, but in terms of its significance in this

 5    case, it has minimal significance in this case, Your Honor,

 6    because she went to Hong Kong.  She was charged for going to

 7    Hong Kong and moving money, and in her plea agreement she

 8    said she moved that money.  Yeah.

 9            THE COURT:  Okay.  I don't want to cut you off, but

10    you are kind of straying into argument.  You have answered my

11    question.

12            MR. ZANZI:  Fair enough.  I just wanted you to

13    understand the context of it.  Okay.  Fair enough.

14            THE COURT:  Understand.

15        Do you want to say anything in response to that?

16            MR. DURKIN:  I'd like to say a lot of things, but --

17    this is one of those things that, you know -- mother making it

18    up?  The note that I just got is that we did go to locations.

19    I wasn't allowed to look at actual apartments because Moussa

20    wouldn't allow it, the actual apartments.  So if I asked the

21    wrong question of the mother or whatever, then that's on me.

22    But I certainly -- I didn't go there to interview this witness

23    for a hearing.  I went there to meet with them to get a sense

24    of what was going on, and that's what she volunteered to me.

25        And this idea that somehow they want to take a snippet out

 1   of an interview, one minute out of a whole interview, when she

 2   just gets off a plane, she's just been separated from her

 3   children, she's obviously a mess.  God knows when she had

 4   sleep, and somehow -- see, now she's telling the truth, this

 5   person who doesn't tell the truth.

 6           **THE COURT:**  Okay.  I understand.

 7           **MR. DURKIN:**  Got it.

 8           **THE COURT:**  And I'll hear you guys out entirely --

 9           **MR. DURKIN:**  Thank you.

10           **THE COURT:**  -- at the appropriate time.

11      Is that all that you have by way of a factual proffer?

12           **MR. ZANZI:**  Yes, Your Honor.  Obviously, it depends

13   on what defense has whether or not we have anything in

14   rebuttal, but at this point, we have nothing further.

15           **THE COURT:**  Again, that's why I was asking.  It

16   sounds -- I thought we had agreed that -- I'm just going to

17   hear from them once.

18           **MR. ZANZI:**  Okay.

19           **THE COURT:**  Whether it be by way of -- they are going

20   to proffer information to me as part of their allocution.

21           **MR. ZANZI:**  Okay.

22           **THE COURT:**  Of course you'll have your allocution as

23   well.  But my intention is not to allow you then to call

24   witnesses to sort of re- --

25           **MR. ZANZI:**  We are not planning on recalling any

 1   witnesses.

 2           THE COURT:  You want an opportunity to address those

 3   things.

 4           MR. ZANZI:  Yes.

 5           THE COURT:  We on the same page here?

 6           MR. DURKIN:  I hope so, but let me make myself clear,

 7   if I haven't.

 8       We have put evidence in via our pleading.  I suppose

 9   that's, technically, a proffer because we didn't have a trial

10   and you haven't made evidentiary rulings; but since you can

11   take everything into account, those are the facts we would be

12   proffering.  But I don't want to have to go through the

13   pleading and say, now, Judge, we're proffering to you

14   exhibit -- so there's --

15           THE COURT:  Listen, I have read everything that

16   you --

17           MR. DURKIN:  I can't make --

18           THE COURT:  Let me just say I have read everything

19   that you submitted, and I'm taking it all into consideration.

20           MR. DURKIN:  Good.  Because I have re-read our

21   response, and I don't -- honestly, don't think I can say it any

22   better than we said it in the response.

23           THE COURT:  All right.  So let's be back here at

24   one o'clock.  We'll take an hour for lunch, and we'll pick up

25   at that time with -- I will hear from you first, Mr. Durkin.

```
 1   Then I will hear from Ms. Elhassani, and then I'll hear from

 2   the government.  And then I'll be ready to give you my -- hand

 3   down my sentence.

 4           MR. DURKIN:  That's fine.  Can we just talk with her

 5   for a minute on the white noise?

 6           THE COURT:  Guys, can you let --

 7           THE MARSHAL:  Yes, Your Honor.

 8       (A recess was had at 11:58 a.m.)

 9       (The following proceedings were held in open court

10        beginning at 1:04 p.m., reported as follows:)

11           DEPUTY CLERK:  All rise.

12           THE COURT:  You can be seated.

13       All right.  We're back on the record in United States

14   versus Elhassani, Cause No. 2:18-CR-33.  Continuing the

15   sentencing hearing.

16       Okay.  Mr. Durkin, I'm going to turn it over to you now.

17           MR. DURKIN:  I'm sorry, Judge.  I thought the

18   government goes first.

19           THE COURT:  No, you go first in my court.  It goes

20   you and then it goes Ms. Elhassani and then I hear from the

21   government.

22           MR. DURKIN:  I'm sorry.  I'm just used to the other

23   way around.

24           THE COURT:  Really?  Do they do it differently up

25   there?
```

1        **MR. DURKIN:**  I think, for the most part, it's the

2  government goes first.

3        **THE COURT:**  Well, you're up.

4        **MR. DURKIN:**  When it Rome, you do what the Romans do.

5        **THE COURT:**  I suppose.

6        **MR. DURKIN:**  I can do that.

7     Although, really -- and I'm not usually at a loss for

8  words, as you know -- I'm kind of at a loss for words here.

9     As I said earlier, I really think we said everything that

10 had to be said in our response that was filed on September 4.

11       **THE COURT:**  Tom, can you move the thing closer to you

12 because I'm even having a hard time hearing you here.

13       **MR. DURKIN:**  Sure.

14    I said I'm -- as you may know, or as you do know, I'm not

15 usually one who is at a loss for words, but I'm almost at a

16 loss for words here for the just sheer distance between the

17 parties on this, which I never, ever anticipated; and I'll

18 simply refer to the first paragraph of our pleading.

19    The government seems, to me, to be acting as if there's no

20 mitigation whatsoever, or, at least, as we said, as they seem

21 to put it, "nothing they can confirm."  And I, frankly, just

22 have a hard time with that.  I don't understand it.

23    And let me read this.  And this is on page 9.  "Domestic

24 violence is a pattern of abusive behavior in a relationship

25 that is used by one partner to maintain power and control over

1    another current or former intimate partner.  Domestic violence

2    can be physical, sexual, emotional, economic, or psychological

3    actions or threats of actions that influence another person.

4    This includes any behavior that intimidates, manipulates,

5    humiliates, isolates, frightens, terrorizes, coerces,

6    threatens, hurts, injures, or wounds someone."

7         And that's not Durkin on life.  That's the Department of

8    Justice description of the Office on Violence Against Women.

9    That's the Department of Justice.  This Court, which I'm proud

10   to be a member of, had a seminar, not many weeks ago, on just

11   this issue.  The Court did.  I wasn't there, but I wonder if

12   anyone from the U.S. Attorney's Office was.

13        It's, like, where are these people?  Are they on another

14   planet?  Now, they can argue all they want about terrorism and

15   the war on terror and how this is awful, but how they can claim

16   that this woman is not the victim of violence against women or

17   domestic abuse is beyond me.

18        And I don't really think they do.  I think they believe

19   it.  I just don't think they can say it.  That's what I think,

20   and Mr. Zanzi can say what he wants.  But I can tell you this,

21   I wouldn't have negotiated this case if I thought they were

22   going to recommend 10 years, trust me.  I didn't negotiate to

23   get from 20 to 10 on this case because I would be arguing the

24   same thing if the ceiling were 20.

25        This is a woman who doesn't deserve a lengthy sentence.

```
 1   She deserves a sentence, alright, but it doesn't have to be
 2   lengthy; and, in fact, a lengthy sentence is counterproductive,
 3   mean-spirited, and just wrong.
 4       I look back at my bond motion that we filed in December of
 5   2018 that had the report of Dr. Xenakis, and it was attached to
 6   that.  It is also attached to that addendum.  It is probably --
 7   with the way everything gets printed so often these days, you
 8   get multiple versions of it.
 9       But this was Dr. Xenakis in December of 2018 talking about
10   how her early life and the domestic violence and the torture,
11   cruelty, and harsh treatment as a prisoner and POW are the
12   sources of debilitating symptoms and impairments that have
13   erupted as post-traumatic stress disorder and major depressive
14   disorder.
15       Now, I hear the -- and he confirms that in his more
16   detailed report dated January 17, 2020.  And that's where --
17   part of it I read to the witness today.  Not trying to be cute
18   but trying to almost shame the government because, it's like,
19   do they dispute that?
20       "Ms. Elhassani endured tribulations in her childhood and
21   adolescence that currently aggravate her conditions and
22   problems.  Family members report that she was the victim of
23   childhood abuse and neglect.  The records do not indicate that
24   she received appropriate evaluation or treatment for her
25   symptoms and problems."
```

1      "Ms. Elhassani did not complete high school or vocational

2  training.  Starting with high school, she engaged in sequential

3  relationships, marriages, and living arrangements that were

4  destabilizing and attributable to the consequences of abuse and

5  neglect.  Her marriages and relations as a young adult were

6  unstable and troubled, including the suicide of the man that

7  impregnated her."  That's what I was asking this guy about

8  today.

9      "Her marriage to a man Moussa Elhassani that controlled,

10 abused, and manipulated her is consistent with abuse and

11 neglect during her developmental years."  And, again, he goes

12 on to read -- to describe the two diagnoses from the DSM-5

13 309.81, post-traumatic stress disorder; 292.63, major

14 depressive disorder.  And he talks about how much help she

15 needs, not a penitentiary sentence.

16      And this is a man -- and I'm almost disappointed that we

17 didn't call him because he's an incredibly good witness.  The

18 government attacks him because he's always arguing a defense

19 position.  This is a retired brigadier general from the U.S.

20 Army, and he says in his report what his role is and how

21 concerned he is about national security matters.  And he is

22 impressive, and if you want to talk to him, you can.  He's

23 available right now.

24      But I'm telling you -- this is the same guy in the *Daoud*

25 case, which I think you are familiar with because of the

 1    Seventh Circuit and so forth.  This is the same witness that

 2    Judge Sharon Johnson Coleman found more credible in the *Daoud*

 3    defense -- I mean, in the *Daoud* competency hearing over the

 4    government's doctor from Springfield, Missouri.  Found him more

 5    credible than a government doctor and made her rulings based on

 6    that.

 7        This is a good guy, and he's not a hack.  And they're not

 8    challenging this, apparently, other than the source of it.

 9    Well, let me read some of the things they missed about some of

10    the sources of that information, and you have it in our witness

11    statements from the investigator, Exhibit B of Document 24-1,

12    our initial pleading.

13        This is from Andrew J. Moring.  I mean, I guess maybe they

14    think we made these up too.

15        "AJ stated he started noticing Samantha losing weight."

16    This is all after she gets hooked up -- she's known AJ --

17            **THE COURT:**  Can I interrupt just for a second just so

18    I have some context because I made a note about Mr. Moring.

19    Where does he fit into the story?  Who -- how did he know her,

20    and can you give me a little background on that?

21            **MR. DURKIN:**  He said that he and Samantha -- he

22    states it here.

23        "He and Samantha grew up in Arkansas.  AJ said he knew

24    Samantha from around 1999, which is when he was nine years old,

25    and Samantha was 14 or 15 when they met.  He stated he was

1   working in the rice fields in Arkansas when he got the

2   opportunity to move to Elkhart and work at the VIA address."

3   He worked at the joint that the Elhassani family owned.

4       "AJ, at the time, thought Moussa was a nice guy.  AJ said

5   Moussa and Samantha invited him to stay with them."  That's how

6   he knew them.  But he said "AJ started noticing Samantha losing

7   weight and having circles under her eyes."

8       Now, this isn't Samantha telling him things.  This is his

9   observation of Samantha as he observed her living with Moussa.

10  This is somebody who has known her for a long time.

11      "...losing weight and having circles under her eyes.  This

12  was when AJ learned from Samantha that Moussa was telling

13  Samantha that she was fat and had to lose weight."

14      That's classic controlling men's behavior towards women.

15      "Samantha also informed AJ that Moussa was beating her.

16  AJ said Moussa told Samantha to quit smoking cigarettes and one

17  day Moussa found a packet in her car.  Moussa came into the

18  house and smashed each cigarette one at a time on top of

19  Samantha's head."

20      "AJ has observed Moussa hit and shove Samantha."

21      So that's not her reporting it.  That's the direct

22  observations of a witness who was present to watch that.

23      "AJ said Moussa was a bad person.  AJ said Samantha was a

24  good girl just caught up with lies and couldn't get away from

25  Moussa.  AJ said after work one evening he came home and walked

 1    in the door and Moussa was standing there pointing a pellet

 2    rifle right at his face.  AJ said, 'what are you doing?'

 3    Moussa said, 'ha-ha, just kidding.'"

 4        "AJ said Moussa used to meet with the local drug dealer.

 5    AJ said Moussa started using cocaine a lot.  AJ said they had

 6    to call police on Moussa because he barricaded himself in the

 7    warehouse.  Moussa was high on drugs and he thought people were

 8    out to get him.  AJ said it was Samantha, M█████, and him

 9    knocking at the door trying to get out."

10        And this is related to this whole going to use the kid as

11    a camouflage or whatever they are saying.

12        "AJ said Samantha told him she didn't want to have sex

13    with Moussa but he would not take no for an answer and pretty

14    much would rape her.  AJ told Samantha to quit taking all the

15    abuse and leave Moussa.  Samantha told him it was okay.  AJ

16    said Samantha decided to tell Moussa she was leaving him.

17    Samantha told AJ that Moussa grabbed a pair of scissors, held

18    her down in front of M█████, her five-year-old son, and put

19    the scissors to her throat."

20        That's AJ.

21        How about Angela Benke.  "Consistent with AJ, Angela

22    stated that after a while, that is, after a while living with

23    Moussa, she noticed Samantha was not the same and asked

24    Samantha if she was okay.  Samantha said no."

25        Now, there's another live witness who noticed a change in

1    a woman living with a crazy man.

2        "Samantha said no.  Samantha told Angela that Moussa hits

3    her and she doesn't like the way Moussa treated her son.

4    Samantha said he is abusive to him.  Also, Samantha told Angela

5    that she was scared of Moussa."

6        "Angela stated she told Samantha, 'If you are afraid, why

7    don't you move out?'  She said, 'I'm in love with him,'" which

8    is also a classic, you know, what do they call that, Stockholm

9    syndrome-type issue where even if they're treating you badly

10   you begin to love them.

11       "Angela stated" -- not Samantha -- "she felt Moussa was

12   looking for someone he could control.  Angela stated Samantha

13   came in one day and she was crying.  And Angela asked if it was

14   Moussa and Samantha said yes.  Samantha told Angela that Moussa

15   told her if she was ever to leave he would kill her.  Samantha

16   told Angela, 'I'm scared to death.'"

17       "Angela said she told Samantha there are people that can

18   help her.  And Samantha said, 'He will kill us.'"

19       That's a classic sign as well.  Even when help is

20   available, they can't take it because they're too afraid to get

21   it.

22       "Angela told Samantha" -- "Angela stated Samantha told her

23   Moussa forced her to have sex with him and that it was brutal

24   and not passionate."

25       Now, you know --

1        And this is kind of telling.  "Angela said when Samantha

2    was not with Moussa she was a different person, that she was

3    very outgoing, friendly, and easy to be around.  When Moussa

4    was around Samantha, she would say nothing."

5        And then, finally, in that pleading, there's a third

6    witness, Andrea Lightner, who I believe is in the overflow room

7    or the room that people can't come in.  I don't know what --

8    there's another room here.

9            **THE COURT:**  The jury assembly room.

10           **MR. DURKIN:**  Which I didn't know about.

11       And this is someone that worked there since 2011.  "Andrea

12   said during sometime when Samantha was working with Moussa at

13   one of the other warehouses Moussa got mad at her and took her

14   car keys and made Samantha and M█████, her son, walk home,

15   which was several miles away."

16       This is the part I meant before about which will explain

17   why she took him to Hong Kong.  "It was snowing outside and

18   cold, Andrea said.  Samantha told her that when she and M█████

19   got home Moussa was already home and had changed the locks on

20   the doors."

21       Think maybe you might want to keep your son away from

22   somebody that would do that to a kid, much less his wife?

23       "Andrea said she never saw the abuse."  But kind of like

24   that old saw about maybe you didn't see it snowing that night

25   but when you wake up -- when there was no snow on the sidewalk

1    and when you get up in the morning and there's a foot of snow

2    you can kind of safely presume that it snowed.

3        "She never saw the abuse, but several times Samantha would

4    come in with lots of makeup on to hide bruises."

5        That's a live witness.  That's not Samantha reporting

6    things.

7        "Andrea said you could tell when Moussa came around

8    Samantha.  She would kind of cower."

9        That's another observation by a live witness who is

10   describing things.  This isn't Samantha reporting to try to

11   sneak her way out of some jail time.

12       And then there's the report from her sister that was filed

13   with our response on Document 32, which, again, is another live

14   witness.

15       She talked about a few times when she told Samantha to

16   come and stay with her for a while until things calmed down

17   over what was going on.

18       She said that never happened because either Samantha's car

19   keys were missing, tires were slashed, and/or the car battery

20   was taken out.  That's what he used to do.  When she would

21   begin to act the least bit independent, he slashed the tires

22   once.  Another time he took the car battery out so she couldn't

23   go anywhere.

24       She stated Moussa was always holding onto the young

25   daughter and would tell Samantha she could take M.S. but the

1    baby is staying with him because that was his daughter.  That's

2    classic too.

3        Zahra said Moussa would not even let Samantha go stay with

4    his own sister and basically wanted to keep Samantha at home

5    with him by using the daughter as a hostage.

6        She also says, "Samantha wanted to keep the kids together

7    and may have went to Syria because of that.  Zahra said

8    Samantha was the type of person where she would take care of

9    her issues herself and no matter how tough Moussa was on her

10   she would go along with it."

11       Again, classic victim.  Always thinking that it is going

12   to change; it is going to be okay; it is just going to be okay.

13       And, yet, this is the same government that tells you that

14   she has nobody to blame but herself.  Can you imagine why

15   prosecutors would take that position, how -- with that thing I

16   read from the Department of Justice, how they could take a

17   position that a woman in her circumstances has nobody to blame

18   but herself?  That's just okay?

19       Have we lost our mind in this country because it's a war

20   on terror, because Washington says we got to do something,

21   because we got to get maximum time for all terrorism

22   convictions for fear judges might start acting sane.  That's

23   what's going on.  That's what's going on here.  That's what's

24   wrong with the "one-size-fits-all" terrorism enhancement.

25   That's exactly what's wrong.

1    Nobody to blame but herself.  And they say we didn't --

2  that you only have to rely on her words, as if she's making it

3  up to save her neck in here.  Take a look -- and I'm sure you

4  have.  I hope you have because I know you well enough and I

5  know you would have.

6    Did you listen to those calls with Bauer, which they --

7  again, they want to play both the red and the black square, to

8  use Mr. Herman's analogy here.  When it's okay, when those

9  things help them, you should use it against her.  But when they

10  hurt them, no, you can't take that into account.

11    You know, look at those Bauer calls, which they say,

12  but -- and I love this -- "but" -- in italics -- "whatever

13  happened here" -- in case you didn't get that, so, listen here,

14  Judge Simon -- "but whatever happened here, Elhassani's long

15  history of self-serving lies and manipulation make it

16  impossible to completely trust her account without independent

17  verification."  Well, I submit to you we've supplied plenty of

18  independent verification.

19    But as we said there, this flippant and mean-spirited

20  dismissal is wrong on so many levels, and it's difficult to

21  imagine that a response is necessary since there is ample

22  evidence of the horror she endured in Syria.  And then we go

23  back to just recite a few of those.  That's on page 21 of our

24  pleading.

25    She described what happened to her in the ISIS prison.

1    Are they suggesting that she made this up?  This is what she

2    told Bauer, and this is classic.  This is consistent with every

3    report of everybody that's been in an ISIS prison, and our

4    government knows full well this is consistent with what

5    happened.  They know that because they know what happened in

6    those camps, and for them to say, "but whatever happened to

7    her."

8         And here is what she says happened to her, and you have

9    nothing to show that it wasn't true.  Because nobody would want

10   to be talking about this if it didn't happen.

11        "Her injuries included severe burns and severe vaginal

12   bleeding.  She was covered in bruises and had taser burns on

13   her body.  She described how she was kept for days in a tiny,

14   cramped cell no bigger than a bathroom stall."

15        Totally consistent with all the media reports about what

16   happened there.

17        "The ceiling was a cage from which there hung handcuffs."

18        It's like a scene out of the CIA black sites, I might add.

19        "She had to use the cell for a bathroom and suffered

20   severe dehydration from lack of food and water.  She recalled

21   one particular torture.  An Egyptian would take her handcuffs

22   down her back -- down behind her back and pushed her forward

23   like a rag doll.  The Egyptian would uncuff her and then tie

24   her hands from a pipe so she would be standing on her tip

25   toes."

1        That's right out of the playbook.  You know what I heard

2   in the military commissions in Guantanamo?  Just that same

3   thing, that that's what we did in the black sites.

4        But they know this happened in ISIS.  They know this

5   happened over there.  And they know this is totally consistent,

6   and why would she make that up?  Why would you dare make that

7   up to have to tell people about that?

8        "No matter what she said, the interrogation wouldn't stop.

9   She was told that if she did not confess to be her son -- to

10  being a spy, then her son would be brought in and she would

11  have to watch him tortured."

12       At the time she was eight months pregnant.

13       "When she was shocked, she would ask if her baby moved.

14  She described many instances when she thought she would be

15  executed, including after other women and men in the prison

16  were killed."

17       Yet that's not mitigation?  That's not a 3553(a) factor

18  that you could rely on to say, wow, for as bad as you were,

19  Samantha, nobody deserved this.

20       And certainly our country shouldn't say to her, who is an

21  American citizen, who is not an ISIS member, not even a Muslim

22  for that matter, she's a Christian, that, oh, well, that's your

23  problem.  Too bad.  Too bad.  We don't know whether it

24  happened.  We just can't be sure it happened.  But they can

25  speculate about what she was doing with the kid.

1        I don't mean to get so passionate, but I am incredibly

2   disappointed in the position that the U.S. Attorney's Office

3   has taken, and I have a lot of respect for this U.S. Attorney's

4   Office, so -- and Mr. Kirsch and I are quite good friends, and

5   I get along very well with Abizer.

6        I don't think this is coming from the U.S. Attorney in

7   Hammond.  I think this is coming from Washington.  That's what

8   I think.  Maybe I'm wrong.  Maybe they're not as nice of people

9   as I think they are.

10       But I just -- I cannot imagine that that would be a

11  position that this office, if it was independent, would take.

12  I would hope not.

13       But thank God that's why we still have a judiciary.  Now,

14  I understand you can say, well, you know, these guidelines are

15  the guidelines.  And I won't get into what we discussed today

16  because I'm not going to advocate anything, but you know that

17  you have complete, sound discretion, and I beg you to exercise

18  it here because it's appropriate.

19       A sentence above five years, in my opinion, would be

20  excessive.  It doesn't work any other way.  The way my head

21  works, at least the way it used to work in these courts, it

22  used to work when we weren't in a war on terror, which is we

23  did the right thing.

24       And if you look at the time she has in custody already,

25  and I would submit -- I mean, she's been in custody 27-plus

1    months, okay.  So if you give good time credit on that, which I

2    think she's entitled to, that would be a 32-month sentence,

3    which would walk her out the door today.  I'm not asking you to

4    walk her out the door today, but I am asking you to give her

5    some credit for the time she was in the Kurdish camp.  I'm

6    going to tell you why.

7        When she was first contacted by the FBI, it was November

8    of 2017.  They returned the Indictment in March of 2018.  I

9    assume that there was a warrant issued upon the return of that

10   sealed Indictment.

11       So the FBI had the ability, unless they can convince you

12   to the contrary, to get her that day and take her right out of

13   that camp.  They didn't for whatever reason, and I'm assuming

14   there are state department reasons or whatever logistical

15   reasons there were, or what have you.  But had she been in

16   Indiana, they would have picked her up, and she would have

17   gotten that credit.  So I'm saying from November '17 -- I'm

18   sorry.  From November of 2017 to November 9, that would be the

19   equivalent of 36 months.  So I would ask you to give her that.

20       So that's, roughly, eight months that I would like you or

21   ask you to take into your calculation as to where you get to,

22   which I think is fair.

23       The other real issue, I think -- and it kind of goes back

24   to my bond motion, and it coincides with the issue of

25   supervised release -- she really needs treatment.  She has

1    gotten better at Porter County only with the use of medication,

2    which has had some real hard effects on her.  I was very

3    worried about her --

4         Samantha, when was it?  When did you gain all that weight?

5         -- like January of last year.  I saw her before COVID.  I

6    saw her very regularly because we live -- we have a house in

7    Michiana and I would go back to Chicago and I would

8    frequently -- it wasn't that far out of my way to go down 49,

9    so I saw her, maybe, like, every week or two weeks back in that

10   day.

11        There was a time -- maybe it was Christmas, I guess.  She

12   says it was January.  Maybe I didn't go there much at

13   Christmas, so maybe between Thanksgiving and Christmas I don't

14   know if I saw her much -- I was shocked when I saw her.  It was

15   like somebody had put a pin in her and pushed the air pump.

16   She was huge.

17        And I said, "What happened?"  And it was the medication.

18   And finally we got Xenakis's opinion, and they were kind enough

19   to talk to Xenakis at the jail -- and that jail is very good,

20   by the way, in fairness to them -- and they adjusted the

21   medication.  And then she started working out more and -- but

22   you could kind of tell that she was mentally better but she was

23   physically awful.

24        Now I think she's kind of in between.  And I think it's --

25   I don't see what a lengthy penitentiary sentence would serve

```
 1   under the circumstances because, one, if it's -- the usual saw

 2   is for general deterrence.  Well, I don't know that there's

 3   going to be a lot of women in the world that will be watching

 4   this and, you know, going, oh, my God, you know, this woman got

 5   a slap on the wrist in Indiana by getting four or five years.

 6   That's terrible.  I don't think that's an issue, and I think

 7   you have enough experience to know that can't possibly be an

 8   issue.

 9       I think the most aggravating factor here is the one the

10   government -- the card the government played today, which I

11   get, and that look what happened to her son.  Well, it's true.

12   And she has something to say about that, which you'll hear.

13       But I can tell you how racked with guilt she is over that,

14   but I can also tell you that -- and I'm also happy to see that

15   the boy is doing as well as he's doing.  That was the report we

16   got -- that's Samantha's father in the back there.  He reports

17   that the kids are good as well.  I don't know that he has seen

18   them, but he and this J█ get along very well.

19       The other three kids are getting along very well, and it's

20   the hope of the family, as we told you, that they're going to

21   adopt them.  And I think DCS is on board with that, from

22   everything that I'm aware of.

23       But I can tell you it has been -- if you want to talk

24   about punishment and self-inflicted punishment, being separated

25   from her children has been agonizing for her.  And you can say,
```

```
 1   well, she should have thought more about her children.  Yes and
 2   no, you know.
 3        Forget, you know, whether her description of the white van
 4   and whether she was forced to go along or make a choice in a
 5   quick moment.  The fact is she did go along to try to protect
 6   the children.  I happen to believe her version of the van, but
 7   I don't think that's critical for your purposes.
 8        I think that -- I think there's a lot of room for grayness
 9   over what was really going on and what she knew.  The sense I
10   got was that it was -- the real radical was Abdelhadi and not
11   Moussa, and I think there's a lot of support in the facts for
12   the fact that it was Moussa who was more on the fence.
13        I mean, there's no dispute, at least from what I
14   understand, over whether Moussa was, at least, when she first
15   met him, more western than anything else.  And in that sense,
16   you know, I mean, he was smoking; he was drinking; he was
17   visiting prostitutes; he was a typical big western man, pig, to
18   put it mildly.  And then he turned goofy.  And I know what
19   that's all about because I've represented people that that
20   happens.
21        I've accused them more rhetorically than anything else of
22   using a proxy prosecution here, but I think from a sentencing
23   standpoint, we need to be careful about who the real terrorists
24   were here.
25        You can say, well, she shouldn't have gone and brought
```

1    that money there.  Yep, she shouldn't have melted down the

2    gold.  Yep, she should have got away from him.  Yep, would

3    have, could have, should have is a lot of things.  But the real

4    issue is what can we do in light of everything here and what do

5    we do for someone who has suffered as much as she had?

6        And I would submit to you that a lot of incarceration

7    helps no one.  M███████, according to J███, may or may not ever

8    make up with his mother.  I hope that that changes.  I would

9    hope that everybody in this room would hope that changes, and

10   the way that will happen is if M██████ continues to get

11   better -- I was kind of disappointed to hear that he stopped

12   the therapy.  I am surprised by that because I didn't know

13   that.  I thought he was still in therapy because that's what

14   was helping him so much.  That's what I hear has helped.

15       DCS has been very good in this, by the way, which they get

16   a bad wrap a lot of times.  But they've, at least from

17   everything I've gathered, have really stepped up here and

18   provided help for these kids and got them to the grandparents.

19       But everybody has to get better here, including her.  And

20   if there's any hope for that, then I think there has to be some

21   type of sentence that doesn't warehouse her and gets her the

22   services she needs, which she won't get in the Bureau of

23   Prisons, and you know that.  She's just not going to get the

24   kind of help she can get in the Bureau of Prisons on the

25   outside, and that's what Xenakis's opinion is, and that's what

1  he's reported to you.

2      I think that -- and this is particularly true -- it's my

3  understanding that the government is supposedly coming up with

4  a CVE program in this country, finally.  I would like to see it

5  on the front end rather than on the back end.  But based on the

6  *Daoud* case, it's my understanding, talking to somebody who was

7  on the *Daoud* probation side who is on a national task force,

8  they are putting together a program for this countering violent

9  extremism.  Now, I don't think she needs that, in particular.

10  But my point is, in fashioning supervised release conditions, I

11  think you can alleviate any concerns about danger or -- danger,

12  I guess, more than anything.

13      I think that -- I think that this is a time, and I think

14  the President-Elect kind of said it best.  This is a time we

15  need some healing, and this is not a time where we need to be

16  mean-spirited and harsh.  The war on terror is getting pretty

17  old.  It is in its 19th year.

18      It seems to me that this is a case where you can fashion a

19  sentence -- I'm saying in the four to five range -- that would

20  meet every purpose of 3553(a), would not be more harsh than

21  necessary, and take into account all those factors.  That's

22  what I'm asking for, and I think I'm right.

23      I think that there are just sometimes cases where the

24  politics and the positions get too hard.  Maybe we should have

25  had a trial.  I don't know.  She didn't want to go through the

1    trial.  I did.  I think we would have had a better sentencing

2    hearing had we had a trial, but I think it was the right

3    decision for her; otherwise, I wouldn't have let her do it.

4    I'm asking you for some mercy.

5            THE COURT:  Thank you, Mr. Durkin.

6        All right.  Ms. Elhassani, is there anything that you wish

7    to say on your own behalf before I sentence you, ma'am?

8        Again, would you mind removing your mask while you're

9    talking to me.

10           THE DEFENDANT:  Can you hear me if I stand?

11           THE COURT:  Sure.

12           THE DEFENDANT:  I just can't see you very good.

13           THE COURT:  Okay.  Very well.

14           THE DEFENDANT:  I know you said that I'm not allowed

15   to go off script.

16           MR. DURKIN:  No.

17           THE DEFENDANT:  I just want you to know that I really

18   hate that I have to read this, but it's a really emotional

19   time, and it's probably better.

20       I am standing here before you today because I do want to

21   apologize for what's happened and for what I've done and for

22   the times that I've been able to make it different and didn't.

23       But before that, I want to publicly apologize to my son's

24   father, J.S., the one that testified here today.  I don't know

25   if he can hear me or not, but I really -- it has torn me up

 1   completely that I let another man come between him and his son

 2   and come between us because we were good friends for a long

 3   time, and we did make it work.  He trusted me to take care of

 4   our son, and I failed at that.  And I hope one day that he'll

 5   let me ask my son for forgiveness, even if he doesn't forgive

 6   me.

 7       And then there's my parents.  This is the third generation

 8   that they've raised.  My children are the third generation that

 9   they've raised.  And my dad, he's always wanted a quiet

10   retirement, but he's known since 15 years ago he wouldn't be

11   able to do that when he adopted my sister's daughter, and he's

12   always been there to take care of us.

13       And my mom, too, she's always been there to take care of

14   us and pick up the pieces, and I want for more than anything to

15   be able to go to my mom.  I wish she could be here today, but

16   she's with my kids because they can't -- they can't come to

17   things like this, and they can't be around people because of

18   the coronavirus.

19       I just want to thank them and tell them I'm so sorry for

20   everything that's happened and everything that I've put them

21   through.

22       And since I was a kid, my dad told me, no matter what,

23   even if I was wrong, he would stand here next to me, and that's

24   where he's at today.

25       It's been difficult, but I have learned that I need to ask

1    for help.  Mr. Tom has helped me through that.  Mr. Josh has

2    helped me through that.  When I tell them everything is okay,

3    they tell me, "It's okay if everything is not okay.  You just

4    got to let us know."

5        And I'm thinking of my future now and what I want to pass

6    down to my kids.  And I want to continue my education so even

7    if I can't be with them I can, at least, pass something down to

8    them to the point when I can be with them.  And I want to be

9    the mother and the daughter that I'm supposed to be to both my

10    parents and to my kids.  I want to be there for them the way

11    that they have been there for me.

12        And I realize it's going to take a lot of time and a lot

13    of help on my part.  There's a lot of therapy that I haven't

14    received, and I am definitely going to work very hard on that

15    and to try to change things.  I'm 35 years old, and I can't

16    keep doing things like this.

17        And I want to apologize that we're here today and to our

18    government and to Mr. Marty, who I had the pleasure of meeting

19    many times, and that I didn't trust him enough to tell him what

20    was going on and that I just tried to handle it on my own.  And

21    I wish I could do it all different.  I certainly would.  I'm

22    sure you've heard that so many times, but I promise you, nobody

23    can mean it the way that I do today.

24        And I would like to ask for your forgiveness and mercy the

25    way that Mr. Tom has asked for mercy.

1       **THE COURT:**  Okay.  Thank you, ma'am.

2       Mr. Zanzi, I'll hear from you now and the government's

3  position.

4       **MR. ZANZI:**  Well, Your Honor, it's no secret that the

5  parties see this case very differently, and you have been given

6  a lot of material, including lengthy sentencing memoranda and

7  exhibits.  I know you have reviewed them all.

8       Before you make your decision, I want to remind you what

9  defendant has pled to and what she did that brought her here

10  before you today.

11       About a year ago, November of 2019, defendant admitted to

12  you in this courtroom that she knowingly and willingly helped

13  her husband travel to Syria to join ISIS, and please consider

14  that, Your Honor, and put it into context because a lot has

15  changed in the world since she made those decisions, certainly

16  in this year.

17       Defendant's husband hold her he wanted to join ISIS in

18  November 2014, and by that point in time, you have to be living

19  under a rock not to know what ISIS was and that they were a

20  threat to the United States.

21       If you recall, anybody who had a TV or a smartphone would

22  have seen those very shocking images -- they are seared in most

23  American's memory -- out in the sands of the Middle East of

24  Jihadi John and other ISIS members beheading Westerners and

25  American journalists and just thinking, wow, this is the new

1    existential threat and Islamic terrorism and a threat to

2    America and a threat to the world.

3        And defendant admitted herself that she -- both to the FBI

4    and in her journal, or whatever this document is that she

5    wrote, that she knew about these.  She saw them.  Anybody would

6    have seen them.

7        And her husband told her that he wanted to fight for this

8    group, to fight for them.  And this is a terrorist organization

9    that was creating havoc in war-torn Syria destabilizing the

10   region, imposing a threat to U.S. national security interests.

11   And Moussa said that he wanted to leave his stable, maybe

12   boring job in Elkhart, Indiana, and fight for them.

13       So what did defendant decide to do?  She knowingly and

14   willingly helped him.  That's the *mens rea* in this case,

15   knowingly and willingly she helped him.

16       Moussa and Abdelhadi were two Moroccan citizens who had

17   overstayed their visas in the United States.  They couldn't

18   just hop on a plane to Turkey with suitcases filled with gold

19   and cash.  They couldn't do it.  It was way too risky certainly

20   by 2015.

21       They needed a staging location that would not draw

22   suspicion, and they needed defendant to set it up.  And she

23   admitted in her plea that she agreed to do this knowingly and

24   willingly.  I say that because there's been a lot of talk about

25   whether or not she had true agency here.

1    She transported tens of thousands of dollars in gold to

2  Hong Kong knowing that these funds would be used to help her

3  husband fight for ISIS.  Defendant claims that all she did was

4  move some money around, at least in the sentencing memoranda.

5  And the question is, what real crime occurred here, and that

6  she's otherwise innocent in this scheme.  It was really all

7  about some proxy against Moussa and Abdelhadi.

8    Well, first of all, what defendant did was -- admitted to

9  was pretty serious.  Certainly, you saw that case in the Ninth

10  Circuit where someone opened a social media account.  She did a

11  lot more than that.  You consider what this money was going to

12  be used for and what impact it was going to have to fight

13  people and kill people.

14    Second, moving money around is not all she did.  That's

15  the charge here.  You have to look at the relevant conduct as

16  well.  She made Moussa's dream of becoming a terrorist fighter

17  possible.  She knew that this was a terrorist organization.

18  They were engaged in terrorists activity.  That's part of the

19  plea.  And she joined him in this evil journey.  She lied for

20  him.  She uprooted her family and took her seven-year-old boy

21  and two-year-old girl to a war zone for him.

22    You heard from J.S. and the impact that this had on his

23  child.  We're all relieved that he's making progress, but it is

24  not going to be easy.  The fact that he's not going to therapy

25  anymore, the images that he has in his head, the fact that he

 1    can't even hear fireworks, this kid has got a long way to go.

 2         As you know, defendant has spent a lot of time talking to

 3    media and journalists and, you know, writing this document

 4    which is -- what I believe is to be the story she wants people

 5    to believe.  There are reasons she's writing -- talking to

 6    journalists is because, you know, they're going to do something

 7    or produce something about this.  She wants people to believe

 8    story.

 9         And even in the arguments you heard today and the video

10    you saw with the mother and everything like that, what she

11    wants you to believe is that she didn't know she was going to

12    Syria -- at least that's what I take it as -- she didn't know

13    she was going to Syria.  She thought she was going to Morocco

14    for a knee surgery or to buy a vacation home or that they were

15    coming back soon.  This is the story that she's been selling

16    for a really long time.  And, frankly, Your Honor, that's

17    absurd.

18         She's admitted to smuggling her entire life savings

19    halfway across the world in a direction opposite from Morocco

20    so that her husband could join ISIS.  She did that for that

21    purpose.  And she and her husband spent thousands of dollars on

22    last-minute flights to Hong Kong, one of the most expensive

23    cities in the world.  They melted down gold to look like

24    jewelry.

25         She wants people to believe that she thought she was going

 1    to Morocco to get cheap knee surgery or to buy a cheap vacation
 2    home on the beach.  How was she going to pay for that, in
 3    melted down gold?  It's just not plausible, Your Honor.  It's
 4    not a plausible, logical conclusion.  There's just no evidence
 5    that they were planning to travel to Morocco for knee surgery
 6    or a vacation home or any other reason because they are not the
 7    truth, Your Honor.
 8         It's not -- when we say, Your Honor, about
 9    accountability -- and, you know, this case was a carefully
10    negotiated plea agreement, and she pled to the bear minimum
11    that allowed her to still make these arguments.
12         And that's when we say she's not taking full
13    accountability.  We're not asking for you to not give her
14    acceptance of responsibility credit, but we are asking you to
15    consider that as 3553(a), is she really taking full
16    accountability and responsibility?
17         You know, talking about picking and choosing the videos
18    with Josh Baker, soon after her plea, this is the first thing
19    she did.  The reason why we put that video in is because what
20    she said was contradictory to her plea.  She said at the time
21    she didn't really know -- that she went to Hong Kong, she
22    didn't really know if they were going to Syria.  That's not
23    consistent with her plea.  She didn't really know if it was for
24    ISIS.  She thought her husband was going to Morocco.  If they
25    are going to Morocco, then it is not for ISIS.

1    You know, the only conclusion -- the only logical

2 conclusion -- the reason why they are doing all of these

3 countersurveillance techniques and the way that they handled

4 things and the lies that they told and all the work that was

5 done, because this wasn't easy, was because she knew that when

6 she committed these crimes that she and her children were

7 ultimately going to Syria to a war zone so that Moussa could

8 become a fighter for a terrorist organization.

9    And if you, Your Honor, agree with that and you agree with

10 that conclusion, then the things that defendant did are

11 horrifying.  And she lied to J.S., M.S.'s father in order to

12 get his permission for a passport so she could take him over

13 there to a war zone and subject him to all of those things.

14 She deprived J.S. of an opportunity to stop her and protect his

15 son.

16    She pulled him out of school just one month before they

17 left for good and she took him to a shooting range and bragged

18 about him as a sniper.  He said he had no problem with him

19 shooting or anything like that, and nobody here is saying that

20 that's in and of itself -- by itself there's anything wrong

21 with that.  To each their own.  But knowing they were going to

22 live amongst ISIS where children were being recruited to fight,

23 that makes the whole incident really alarming and the timing

24 and on the context of it.  What was going on in her head at

25 that time?

1          And during their final trip to Hong Kong, she helped

2    Moussa procure tactical gear, rifle scopes and image-stabilized

3    binoculars.  She wants to explain that to suggest that, well,

4    he was just buying this stuff to try to sell to hunters in

5    Morocco.  This is what she's trying to tell -- this is what

6    she's trying to tell the world and explain this to people.

7    That's just -- it's implausible; it's untrue; it's

8    preposterous.

9          When you know your husband wants to go to ISIS, it's --

10   you know, whether you believe that she actually purchased these

11   items or not, it's undisputed she helped obtain this gear; and

12   she did that knowing what her husband was going to do with it.

13         From the beginning of this case, defendant has blamed

14   everything on her husband, and we're not here to defend

15   Moussa Elhassani.  Moussa Elhassani is a terrible person.  We

16   agree with that.  You can take judicial notice of that.

17         But it's also very telling, this diary -- and we included

18   the whole thing for a reason because she -- it is -- she bears

19   out all of the terrible things that happened to her in Syria

20   and all the terrible abuse that she endured, which was

21   corroborated in Syria.  But it's not how she paints the story

22   of why she went there.  She doesn't say that she went to Syria

23   because of him, because he forced her or anything like that.

24   She says he tricked her.  They were planning to go to Morocco.

25   It's the same story she's selling everyone else.

1    He's dead by this point.  By the time that she writes

2  this, he is deceased.  She's no longer living in the Caliphate.

3  She's unencumbered by him, and she's not afraid to talk about

4  the very terrible things that happened to her, which we're not

5  dismissing or disputing the terrible things that happened to

6  her.

7    But here in this document, she doesn't say she went there

8  because of his psychological abuse or because of his -- she

9  doesn't say that he's a great guy, but she didn't say because

10  of his psychological abuse or physical abuse.  It's because --

11  they were going to Morocco, and he tricked her at the end.

12    She described him as a loving father and husband before

13  they went there and then something changed, and that's

14  consistent with what the government knows.  When individuals go

15  into ISIS and they become -- they become indoctrinated and they

16  turn -- I mean, he was a bad guy to begin with, but they turn

17  into monsters.  And certainly what happened here.

18    And defendant may have admitted to some of her criminal

19  actions enough to plead guilty to the charge at hand, but she

20  is not taking full responsibility for her actions.  If you knew

21  your husband was going to Syria to fight for ISIS, or even if

22  you knew there was a remote chance of it, why would you get on

23  that plane for the final departure?  Why would you take a

24  chance?  Why would you take your kids with you?

25    If you knew there was even a remote chance that you and

1   your children could end up in a war zone halfway across the

2   world, why didn't you tell the FBI with whom you had a good,

3   friendly established relationship?  Why not tell anybody?

4        The only logical conclusion from all the facts and

5   circumstances is that defendant went to Syria and brought her

6   kids there knowingly and willingly.

7        Now, you seen the videos of M.S.  And I didn't play them

8   here today because I'm not -- I didn't want to do that for

9   shock value.  They're shocking enough if you have even seen

10  them once, and they are haunting.  What defendant's children

11  went through and suffered because of her decisions is

12  unconscionable and unimaginable and has affected a lot of

13  people who care about these children.

14       And she can point fingers all she wants, and we don't

15  dispute that bad things happened to her.  A lot of defendants,

16  tragically, have tough upbringings, and we don't dispute that

17  or minimize that.  But does it excuse these decisions and the

18  decisions that she made for her children who had no choice in

19  the matter?

20       She had plenty of opportunities, Your Honor.  She had

21  plenty of -- she had choices, choices along the way.  This

22  occurred over a period from November 2014 until they left for

23  good in March.  How many chances did she have to stop this and

24  to protect her children?

25       We are not blind or unsympathetic to the arguments in

```
 1   mitigation.  It is one of the reasons we made the offer that we

 2   did.  But when evaluating defendant's arguments in mitigation,

 3   we want to remind you that some things have been corroborated

 4   and some things have not about her story and about what has

 5   happened.

 6       And, yes, we have trouble believing her account because

 7   she has a long history of telling a story that will serve her

 8   personal interests.  It doesn't mean that we're victim shaming

 9   or that we're all the nasty things that we have been accused

10   of.  She has real credibility issues.

11       We also don't believe that it's untrue that some of these

12   terrible things happened to her, and you should consider that.

13       You know, when it comes to Dr. Xenakis, you know, we're

14   not disputing his conclusions -- let's just put his analysis in

15   perspective.

16       He met with her a couple of times.  He's not a treating

17   physician.  We do disagree with the very broad conclusion that

18   the BOP cannot treat her.  And, you know, yes, there are cases

19   where he has been credited.  There are cases when he's not been

20   credited very highly.  I will give you one example, *U.S. v.*

21   *Abu Ghayth*, 945 F.Supp. 2d 511, Southern District of New York,

22   2013.  This was Sulaiman Abu Ghayth.  He was a reputed

23   son-in-law of Osama Bin Laden.

24          MR. DURKIN:  I'm sorry.  I thought we had an

25   agreement that they were not going to contest Xenakis.  That's
```

1    why we didn't call him.  Now, I have bit my tongue here over a

2    lot of things, but this is unfair.

3              **THE COURT:**  Okay.

4        Proceed.

5        Overruled.  Proceed.

6              **MR. ZANZI:**  Okay.  I just want -- the simple point I

7    want to make is the judge in that case made the following

8    quote, and this is at page 518 of the opinion.

9        "The Court affords minimal weight to Dr. Xenakis's

10   testimony.  Dr. Xenakis never examined or met Abu Ghayth,

11   relying instead on hearsay concerning Abu Ghayth's time in

12   Iran, Abu Ghayth's affidavit, witness testimony, and the FBI

13   agent's transfer log in reaching his conclusions.  He was,

14   obviously, partisan and expressed opinions with little basis

15   relying predominantly on second-hand accounts and theoretical

16   possibilities."

17       All I'm saying, Your Honor, is that, you know, he is

18   willing to make conclusions based upon what defendant provided

19   him, the information a defendant provided him.  And it's up to

20   you to determine whether or not -- how much do you credit that?

21   How much do you believe and rely upon that?

22       We understand that there's some corroboration.  We

23   understand what AJ Moring said.  These are people who care

24   about the defendant and are biased towards her, and we're not

25   saying that they're not true.  But we have a hard time with her

 1   credibility.

 2       Your Honor, this is a serious crime, and a lot of terrible

 3   things have happened to a lot of people because of defendant

 4   and her decision to support her husband and move her family to

 5   Syria.  She made it all possible.  Her role in these plans was

 6   a purposeful, extensive commitment over the course of several

 7   months.  And although ISIS may be a very different threat than

 8   it was in the past, extremism in all forms continues to pose a

 9   threat to American society and its national security.  And

10   whatever her motivation is at the time and whatever her excuse

11   is or rationale is now, her crimes justify a significant

12   sentence not because the guidelines recommend it but because it

13   is just and fair.

14       Thank you, Your Honor.

15           **THE COURT:**  Okay.  Thank you, Mr. Zanzi.

16       All right.

17           **MR. DURKIN:**  I could say things if you -- if that

18   was --

19           **THE COURT:**  I listened to you for 45 minutes --

20           **MR. DURKIN:**  Okay.  That's fine.  I'm just --

21           **THE COURT:**  -- and Mr. Zanzi for maybe another half

22   an hour.  I've heard enough.

23           **MR. DURKIN:**  I'm only smiling because you kind of

24   looked at me.  I thought maybe you wanted to hear from me.

25           **THE COURT:**  Ms. Elhassani, I'm going to talk to you.

 1    I like to talk to the defendant at sentencing because you are

 2    the person who has the most interest here.

 3         So there's a lot of things, just for your edification,

 4    that I have to take into account when I sentence people.  I do

 5    my level best in every sentencing to do that.

 6         And, you know, the first thing that I have to look at is

 7    what do the United States Sentencing Guidelines recommend.

 8    That's one factor.  And I'll talk a little bit about those in a

 9    couple of minutes.

10         But in this case, as you have heard me say, the sentencing

11    guidelines recommend a sentence of 10 years.  And it only gets

12    to 10 years because, as I'm sure Mr. Durkin has explained to

13    you, there's a statutory cap here of 10 years.  The guidelines

14    were actually well in excess of that, so it makes the guideline

15    range 10 years.  So that's certainly something that I have to

16    take into account when I sentence people.

17         There's a whole host of other things as well, though, that

18    are just as important as the sentencing guidelines when I try

19    to arrive at what I hope is a reasonable sentence.  I have to

20    look at the nature and circumstances of the crime.  That's no

21    surprise.  I have to look at what did you do that brings you

22    here today, your actual criminal conduct.

23         But I also have to look at your personal history and

24    characteristics, and that's a very broad concept I'll talk

25    quite a bit about in a minute.

1          But to kind of sum it up, the way I like to look at it is
2     I have to look at both what you did and who you are as a person
3     in trying to arrive at a fair sentence.  And in doing that, I
4     have to take into account a number of things.
5          I have to try to impose a sentence that's going to reflect
6     the very serious nature of the offense.  I have to try to
7     announce sentences that are going to promote respect for the
8     law, provide just punishment for the offense.  I have to be
9     concerned with deterrence of criminal activity, and there's two
10    types of deterrence.  One is specific deterrence, trying to get
11    you to stop committing crimes.
12         You know, you arrive in this court -- set aside this
13    criminal history category VI that these guidelines have, sort
14    of, launched you into, but you arrive here today with not so
15    much as a parking ticket in your background.  So that's
16    certainly something that I have to take into account.  No
17    arrests, no convictions, no juvenile adjudications, no driving
18    offenses, nothing.  You come here, really, as a true first-time
19    offender.  So I have to ask myself, when I announce a sentence,
20    what is the likelihood that you're going to reoffend?  And
21    that's something I have to take into account when I sentence
22    you.
23         Then there's also the concept of general deterrence and
24    that's kind of a "pie in the sky idea" that what we do here
25    matters in a larger sense, that there's people out there who

 1  would be deterred from committing crimes if they heard what was

 2  going on in this courtroom, that would deter them.  You know,

 3  whether that's based in any kind of reality or not, it's

 4  certainly something I have to take into account.  There is some

 5  sense that people want to comport themselves within the

 6  confines of the law and that if they hear that people receive,

 7  you know, extended sentences, perhaps there's a hope that it

 8  would make people think twice about committing crimes.  In any

 9  event, that's another factor I have to take into account.

10      I have to try to avoid unwarranted disparity among

11  similarly situated defendants, so that's another factor.  And,

12  ultimately, the goal is to arrive at a sentence -- what I'm

13  mandated to do is try to arrive at a sentence that is

14  sufficient but not greater than necessary taking all of those

15  varying things into account.

16      And many of these things are in conflict.  If you were me,

17  if you put yourself in my shoes and you heard Mr. Durkin talk

18  and then you heard Mr. Zanzi talk, you would hear two, really,

19  different views of the world, and that's because there are

20  crosscurrents in every case that -- facts that can't add up or

21  people view them in a different light, and I have to try to

22  separate those out.

23      The way I try to do that is by just looking at the case

24  from -- what are the aggravating factors, what are the things

25  about this case that really make people go, wow, it's awful, it

1    really aggravates the offense, and then what are the things

2    about the case that make people think, oh, wow, that's how she

3    was brought up or, wow, this was what her husband was doing to

4    her.  These are things that might mitigate the offense.  So

5    that's what I'm going to try to talk about here today.

6        Let's start with the -- you know, what are the aggravating

7    factors in this case?  There's no question, and you've admitted

8    to it, you've pled guilty to it, that you were really

9    instrumental in getting your husband and his brother, your

10   brother-in-law, into Syria in a very real way.

11       It would have been very, very difficult, probably not

12   possible, for them to have done this without your help because,

13   of course, they had immigration issues and they were in this

14   country, I believe, on a green card or some kind of

15   immigration -- or student visa's that had expired, making their

16   travel overseas very difficult.  And once they left the

17   country, they weren't likely to come back in.  So they needed

18   somebody to assist them in this undertaking, and, of course,

19   that's what you did.

20       So the first trip you make is in February of 2015.  You go

21   to Morocco via Istanbul; and according to the presentence

22   report, you meet with or speak with some people in Turkey to

23   assist you in setting up a bank account or something to that

24   effect.  That's what -- in the presentence report, that's what

25   it reflects.

1          Now, the second trip that you make is on February 15 of

2     2015, and this is the trip to Hong Kong that you bring your

3     son, and it's especially aggravating.  Under anybody's view of

4     the world, it's especially aggravating that you brought his

5     father to Chicago and misrepresented to him where you were

6     taking his son.  I mean, you lied to him.  That is a terribly

7     aggravating factor in my view of the world.  This is his son

8     too.

9          So you take your son to Hong Kong, and this is just one

10    week after you had returned from your earlier trip.  And you

11    are bringing cash and melted down gold, and you get a storage

12    facility and start stockpiling the things that you and Moussa

13    and his brother would need to ultimately get into Syria.

14         So then you return home, and then you make what I can only

15    describe as a jaw-dropping trip to Hong Kong.  I can't even get

16    my mind around it.  I mean, I can't fly to Miami without being

17    tired.  I'm led to believe that you bring your son to Hong

18    Kong, and it's a day trip.  You are there and back on the same

19    day, and that's just amazing to me.

20         And the reason you are doing it, of course, is to further

21    these efforts to get money out of the United States and assets

22    out of the United States into a foreign land so that,

23    ultimately, they can be transported for use to get Moussa and

24    his brother into Syria.

25         There's an effort to sell all of your personal belongings,

```
 1    or many of them, guns and cars, other personal things, I think,
 2    on eBay, if I read correctly.  And you -- it appears you were
 3    misrepresenting to your friends and some coworkers about the
 4    purpose of your upcoming trip to hide -- you kind of lied to
 5    them, frankly, about why you were making this last trip
 6    overseas.  You knew the real purpose you were going there, and
 7    you were trying to hide it from the people who probably loved
 8    you and would have been mystified to find out your real
 9    purpose.
10         And then you had the opportunity, you know, to tell the
11    FBI, because you had been working with the FBI on and off over
12    many months prior to that.  And according to the agents, you
13    told them that you were going to Morocco to have knee surgery
14    by your father-in-law who is an engineer, not a doctor, so it's
15    more lies that you have told.
16         And then in March, just about a week later, March 22,
17    2015, you make the final trip to Hong Kong; and while you're
18    there, there's a dispute, of course, about whether you actually
19    procured through eBay or other online sources or whether Moussa
20    was doing that, but one way or the other, I think everybody is
21    in agreement that you, at least, participated in picking up
22    this, I'll call, tactical gear that they needed for their
23    impending efforts to get into Syria.  And you are -- further
24    involvement in that.
25         You finally arrive in Turkey on April 7 of 2015, and
```

 1    shortly thereafter, you end up in Syria.

 2        Now, what happened to your son in Syria is very troubling

 3    to me, I got to tell you.  I mean, these videos of him holding

 4    some machine gun, or whatever it is, and assembling it and

 5    disassembling the rifle and, sort of, being shown how to use a

 6    suicide belt, I mean, these are horrifying, horrifying facts

 7    that are very, very disturbing.

 8        And so from my perspective, those are all of the things

 9    that aggravate the offense.  I think it's a fair summary of it.

10    And it can't be lost that the efforts here are -- what you're

11    attempting to do is assist two people in joining ISIS who has,

12    you know, avowed terrorist connections and intentions and no

13    question intentions and, in fact, acted on those intentions to

14    engage in violence, so it's a serious case.

15        Now, there's a lot that mitigates the case, too, on the

16    other hand.  As you heard me say, this guideline enhancement --

17    I have found it applies.  Everybody has agreed to it that it

18    applies.  But, at best, it's a shaky application of that

19    guideline, in my opinion, and I have substantial misgivings, as

20    I have said earlier, whether it really applies or not.  I found

21    that it does by virtue of the agreement.

22        But what that guideline range does is create, really, a

23    binary world.  What that guideline does is it creates a world

24    in which you either are a terrorist, which is the worst you

25    could ever imagine, you know, Bin Laden, or you're like a horse

1    thief.  It is either-or.  And I don't think that that's the way

2    the world should operate, that there are gradations of

3    seriousness of even terrorism offenses and that people who

4    engage in serious violence and kill people and do all sorts of

5    horrible things are much worse than people who aid them or

6    finance them, I think, in any very real world view of things.

7         And so I just don't like the way this guideline creates a

8    binary choice between a substantial prison sentence or hardly

9    any prison sentence at all.  I think that's unfair.  I think it

10   is unwise, and I fundamentally disagree with that guideline

11   provision, which I think I'm free to do under Seventh Circuit

12   authority.

13        But what it has done here is by virtue of that guideline

14   applying, it has quadrupled, I suppose, quadrupled the

15   offense -- the suggested sentence from 33 to 41 months to 120

16   months, four times the length of sentence by virtue of this

17   application of the one guideline enhancement.  I think that's

18   unwise, and I disagree with it.

19        I do think that the defendant has expressed genuine

20   remorse here, genuine remorse.  Only she knows whether you

21   really are truly remorseful or you are just telling me that.  I

22   can't read your mind, but from my point of view, I do sense

23   that there's genuine remorse here.

24        And I also think that there's -- mitigates the offense

25   that there's no question that the defendant was manipulated by

 1    her husband.  I mean, you'd have to be living in a different

 2    world to not, I think, understand that or take it into account.

 3    There's no conceivable way that this defendant would be sitting

 4    in this courtroom but for the actions of her husband, Moussa.

 5    She just wouldn't be here.  She wouldn't be involved in

 6    financing terrorism or anything of the sort.  That would be

 7    just far beyond comprehension.  And I do think there is

 8    evidence here that the defendant was being abused by her

 9    husband.

10        It's not just relying on what she has said.  I read very

11    closely what Mr. Moring said and Ms. Benke said as well as

12    Ms. Lightner and even what her former -- the father of M.S.,

13    J.S., who testified here today, that she changed really

14    dramatically once Moussa became part of her life, which I think

15    is some corroboration of abuse.

16        But all of those witnesses have corroborated what she

17    says, that he engaged in bullying and intimidation and physical

18    acts of violence and emotional violence against the defendant,

19    and so I think there is certainly some facts to support that.

20        Now, once she got into Syria and was living in Syria and

21    eventually her husband was killed in an American -- I guess in

22    a drone strike.  I guess I don't know who.  But he was killed

23    and she became imprisoned by ISIS, and she has recounted all of

24    the just horrible things that she had to endure during her

25    imprisonment, being burned, sleep deprivation, subject to

1    rigorous and physically demanding interrogations.  She had

2    severe bleeding.  She was kept in a cramped cell, severe

3    dehydration, and so in many ways her, sort of, imprisonment

4    started well before July of 2018 when she was finally brought

5    to Indiana to face these charges.  And I think that's certainly

6    a mitigating factor that I should take into account.

7        I also think it's terrific that her father is here and

8    remains, sort of, a stalworth in her life.  Good on him and her

9    mother to step into the void here and be raising these three

10   very young children, and you are very lucky to have somebody

11   like that to step into the breach.  But I do think that that

12   portends, hopefully, hopeful things for the defendant's future,

13   that she can have a meaningful life with her family and her

14   children at some point when she gets this whole mess behind

15   her.

16       She also suffers from serious mental health issues.  I

17   mean, I don't think the government disagrees with this.  Maybe

18   the degree of it can be subject to debate, but it is reported

19   by Dr. Xenakis that she suffers from PTSD.  Gee, that's not a

20   shock.  She's been -- spent many years in a war-torn

21   environment and then subject to a prison camp and then a

22   refugee camp and separated from her children and in an abusive

23   relationship, so it's not at all surprising that she would

24   suffer from post-traumatic stress disorder and also a major

25   depressive disorder.  There's nothing about that that I think

1  is even controversial or surprising.  She has had a series of

2  probably charitably, I'll call, unhealthy relationships, so

3  that needs to stop.

4      But the defendant also had an excellent employment history

5  before this whole crazy episode commenced.  She was always

6  working, always maintained employment, which I think portends

7  well for her future as well.  She's, obviously, very smart,

8  well spoken, and a hard worker, all of which will bode well for

9  her future.

10     So those are all the things that I have looked to that I

11 think aggravate the offense and mitigate the offense, and as in

12 any case, they cut both ways.  And so taking all of that into

13 consideration, I've arrived at the following sentence I intend

14 to give.  I will give counsel one final chance to make any

15 final comments or make any other objections.

16     But it is the judgment of the Court pursuant to Title 18,

17 United States Code, Section 3551 and 3553 that the defendant is

18 hereby committed to the custody of the Bureau of Prisons for 78

19 months.

20     The defendant will then be placed on three years of

21 supervised release.  Within 72 hours of the judgment or the

22 defendant's release from the custody of the Bureau of Prisons,

23 she shall report in person to the nearest probation office for

24 this district between the hours of 8 a.m. and 4:30 p.m.  And

25 while on supervision, she'll have to comply with the following

 1    conditions.  There's four mandatory conditions.

 2        She shall not commit another federal, state, or local

 3    crime.  She shall not unlawfully use, possess, or distribute a

 4    controlled substance.  She shall submit to one drug test within

 5    15 days of release from imprisonment and at least two periodic

 6    tests thereafter for use of a controlled substance, and she'll

 7    have to cooperate in the collection of DNA as directed by the

 8    probation office.

 9        There's a number of discretionary conditions of

10    supervision, and all of these were detailed in the presentence

11    report.

12        Mr. Durkin, what my practice is is to simply incorporate

13    the language of the condition and the reasoning behind each of

14    those conditions from the presentence report into my comments

15    here today.  Do you have any objection to that process?

16            **MR. DURKIN:**  No.

17            **THE COURT:**  Okay.  So we're on page 23 of the

18    presentence report, Document Number 18.

19        I would give Discretionary Condition Number 1, Number 2,

20    Number 3, Number 4, Number 5 -- we're on page 24 now -- Number

21    6, Number 7, Number 8, Number 9, Number 10, Number 11,

22    Number 12, Number 13, Number 14, Number 15, and Number 16.

23        The reasoning behind each one of these conditions is fully

24    delineated in the presentence report, and I incorporate my

25    reasoning into my comments here today.

1     I misstated earlier.  The fine range in this case was

2   actually 150,000 to 1.5 million.  In all events, the fine is

3   waived in this case because the defendant has an inability to

4   pay a fine, so the fine is waived.  The defendant is ordered to

5   pay a special assessment of $100, which is due immediately.

6     The sentence that I have just given is below what the

7   sentencing guidelines suggest.  I have given a sentence below

8   what the guidelines suggest for the reasons that I stated at

9   length here on the record.  But to summarize, principally,

10  first, that I think the 3A1.4 guideline enhancement here works

11  a particular unfairness given what I'm calling its binary

12  nature.

13    Second, that the defendant has, in many ways, suffered a

14  substantial history of abuse, and for all of the other reasons,

15  to include her current mental health concerns that I have.

16    Counsel, do either of you know of any reasons why the

17  sentence should not be imposed as stated?

18    Mr. Durkin?

19        **MR. DURKIN:**  Nothing other than what we argued in the

20  past.

21        **THE COURT:**  Mr. Zanzi?

22        **MR. ZANZI:**  No, Your Honor.

23        **THE COURT:**  All right.  Does either side need any

24  further elaboration on the sentence that I have just announced?

25    Mr. Durkin?

1          **MR. DURKIN:**  (No response.)

2          **THE COURT:**  Anything else you want to say?

3          **MR. DURKIN:**  I could stay all day to say things, but,

4    no, I mean, we don't need anymore elaboration.

5          **THE COURT:**  Mr. Zanzi?

6          **MR. ZANZI:**  No, Your Honor.

7          **THE COURT:**  All right.  I do order the sentence

8    imposed as stated.

9        Ms. Elhassani, I have to advise you that you heard the

10   judgment of the Court imposing sentence upon you.  Pursuant to

11   Rule 32(j) of the Federal Rules of Criminal Procedure, I advise

12   you that you can appeal your conviction if you think your

13   guilty plea was somehow unlawful or involuntary or if there was

14   some other defect in the proceeding not waived by your guilty

15   plea.

16       Ordinarily, you would also have a right to appeal your

17   sentence under certain circumstances if you think it was

18   contrary to law.  Now, a defendant can waive their right to

19   appeal as part of a plea agreement.  You entered into a plea

20   agreement where you waived your right to appeal.

21       Those waivers are generally enforceable, but if you think

22   for whatever reason the waiver in this case is not enforceable,

23   you have to present that theory to the Court of Appeals by

24   filing a notice of appeal within 14 days of the judgment being

25   entered in your case.

```
 1        If you want to file an appeal but you are unable to pay

 2   for the costs of an appeal, you may apply for leave to appeal

 3   in forma pauperis, which means you can appeal at no cost to

 4   you.

 5        Counsel, I just remind you of your duties to perfect the

 6   appeal should your client wish you to do so.

 7        Mr. Zanzi, you'll be dismissing the other Indictment, I

 8   take it; is that right?

 9            MR. ZANZI:  Yes.  Do you need us to file something,

10   Your Honor?

11            THE COURT:  Yes, please.

12            MR. ZANZI:  We will.

13            THE COURT:  Okay.  I will take that as on oral motion

14   and grant that and sign the written version when it does come

15   in.

16        Mr. Durkin, do you want me to make any recommendations as

17   it relates to the housing of Ms. Elhassani?

18            MR. DURKIN:  Could we tell -- call your clerk on

19   that, Judge, before you write --

20            THE COURT:  Please do it by the end of the day

21   tomorrow.

22            MR. DURKIN:  Yeah.  Let me look at someplace near

23   Oklahoma.

24            THE COURT:  Okay.  Then I'll include that in the

25   judgment and commitment order.  I think I have to technically
```

1  state it on the record here.

2      But, Mr. Zanzi, do you have any objection to him

3  communicating that to me sometime later and me including that?

4          **MR. ZANZI:**  Of course not, Your Honor.

5          **THE COURT:**  Okay.  All right.

6      You know, Ms. Elhassani, it's a tough case for sure.

7  You'll get this behind you, and eventually you'll get out and

8  you're going to -- you'll be on your own, and I have a lot of

9  hopes for you.  I hope you get things on track and you repair

10  your relationships, especially with your oldest son, and, you

11  know, move on in a more productive way.  I wish you well.  Good

12  luck to you.

13          **THE DEFENDANT:**  Thank you.

14          **THE COURT:**  All right.  Thank you.

15      (A recess was had at 2:40 p.m.)

16  * * *

17      (End of requested transcript.)

18                  CERTIFICATE

19      I, Stacy L. Drohosky, certify that the foregoing is a true

20  and correct transcript from the record of proceedings in the

21  above-entitled matter.

22  Date:  January 21, 2021

23                          S/Stacy L. Drohosky
                            S/STACY L. DROHOSKY
24                          Court Reporter
                            U.S. District Court

25